**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**Civil Action No. 2:23-cv-00691**

**In re: U LOCK INC., Debtor**

George Snyder,
Appellant,

v.

CHRISTINE BIROS,
Appellee

**BRIEF OF CHRISTINE BIROS, APPELLEE**

On Appeal from the United States Bankruptcy Court for the Western District of
Pennsylvania, Hon. Gregory L. Taddonio, Chief United States Bankruptcy Judge,
from the Order Sustaining Christine Biros' Objection to George Snyder's Claim
Entered April 14, 2023, at Case22-20823-GLT

Counsel of Record for this Party:

Robert S. Bernstein, Esq.
Pa. I.D. No. 34308
Sarah E. Wenrich, Esq.
Pa. I.D. No. 325834

BERNSTEIN-BURKLEY, P.C.
601 Grant Street
9th Floor
Pittsburgh, PA 15219
(412) 456-8100  Telephone
(412) 456-8135  Facsimile
rbernstein@bernsteinlaw.com
swenrich@bernsteinlaw.com

## <u>INDEX</u>

EXHIBIT A…………..…………………………..……………..……..………………………....1

EXHIBIT B……………………………………………………………...............................189

EXHIBIT C…………………………………………………………………………………191

EXHIBIT D…………………………………………………………………………………195

EXHIBIT E……………………………………………………………………………………196

EXHIBIT F……………………………………………………………………………………211

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE:<br><br>U LOCK INC,<br><br>           Debtor. | Bankruptcy No. 22-20823<br><br>Chapter 7 |
| CHRISTINE BIROS,<br><br>          Movant,<br><br>          v.<br><br>GEORGE SNYDER,<br><br>          Respondent. | Related Doc. No.: |

**OBJECTION TO CLAIM NUMBER 5 FILED BY GEORGE SNYDER**

Christine Biros, as creditor and party in interest in the above captioned chapter 7 bankruptcy case ("Biros"), by and through the undersigned counsel, files this *Objection to Claim Number 5 Filed by George Snyder* (the "Objection"), and in support thereof states as follows:

**JURISDICTION AND VENUE**

1.      The Court has jurisdiction over this Objection pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are section 502 of the Bankruptcy Code and Rules 3002 and 3007 of the Federal Rules of Bankruptcy Procedure ("FRBP").

3.      Biros is a creditor and party-in-interest in this case and thus has standing to object to the claim pursuant to 11 U.S.C. § 502.

## BACKGROUND

4.      U Lock Inc. ("Debtor" or "U Lock")'s case was commenced by the filing of an involuntary petition for relief under Chapter 7 of Title 11 of the United States Code on April 27, 2022 (the "Petition Date").

5.      The Debtor did not file a response to the involuntary petition.

6.      On June 17, 2022, the Court entered an Order for Relief.

7.      George Snyder ("Snyder") and his brother Kash Snyder ("Kash") are the principals of the Debtor.

8.      Robert H. Slone (the "Trustee") is the duly appointed Chapter 7 Trustee for the Debtor and is so acting.

9.      On August 26, 2022, Snyder filed a proof of claim, claim number 5 on the claims docket, in the amount of $99,000.00 for "wage, fair labor standards" with no supporting documentation or other description (the "Wage Claim" or "Claim Number 5").

## CLAIM OBJECTION

10.      11 U.S.C. § 502 provides that a properly filed proof of claim is deemed allowed unless a party in interest objects.  Various subsections of section 502 set forth the grounds for disallowing a claim, including section 502(b)(1), which authorizes disallowance because the claim is unenforceable under any agreement or applicable law.

11.      Pursuant to 11 U.S.C. § 502(b)(1), in relevant part, if an objection to a claim is made, the court shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured.

**BIROS_APPENDIX_0002**
**EXHIBIT A**

12.    The burden of proof for claims filed pursuant to 11 U.S.C.S. § 502(a) is a shifting one and rests on different parties at different times. Under applicable law, the claimant must initially allege sufficient facts to support its claim and, upon meeting this standard of sufficiency, the claim is prima facie valid. Upon objection to the claim, the burden then shifts to the objecting party to produce evidence sufficient to negate the prima facie valid claim. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden then reverts back to the claimant. The claimant must then prove the validity of the claim by a preponderance of the evidence. *Benninger v. First Colony Life Ins. Co. (In re Benninger),* 357 B.R. 337, 340 (Bankr. W.D. Pa. 2006).

13.    Snyder's Wage Claim is based on alleged wages due from the Debtor assumingly pursuant to the Fair Labor Standards Act, 28 U.S.C. §§201 to 209 (the "Fair Labor Act").  The Claim should be disallowed as not enforceable under applicable law against the Debtor for the reasons set forth herein.

14.    Snyder signed Official Form 202 Declaration Under Penalty of Perjury for Non-Individual Debtors indicating that as Director of the Debtor he has examined the information in the schedules and statement of financial affairs filed and believes it to be true and correct (the "Schedules"). *See*, Declaration, Doc. No. 66.

15.    Schedule D and E/F do not list Snyder as a creditor or having any claim, cause of action or otherwise against the Debtor.

16.    Additionally, Schedule G does not list any employment or other executory contract with Snyder.

17.    Nowhere in the Schedules is there any evidence of a debt owed to Snyder.  If Snyder had any such claim for wages from Debtor at the time he signed the Schedules under penalty of

BIROS_APPENDIX_0003
EXHIBIT A

perjury, he should and would have made it known.  The fact that he did not disclose it confirms

that he did not believe that he had any right to payment from the Debtor.

18.    Moreover, Snyder is judicially estopped from making any such claim now by

failure to disclose it in the Schedules and during the course of this case, including at the two 341

meeting of creditors.

19.    Judicial estoppel is a discretionary doctrine recognized by the Third Circuit that

prevents injury to the courts and the justice system by dismissing claims — regardless of their

merit — when such dismissal is necessary to prevent a litigant from playing fast and loose with

the courts. The doctrine is applied only to avoid a miscarriage of justice and only when the party

to be estopped (1) took a position during litigation that is irreconcilably inconsistent with his or

her present position, (2) the party changed his or her position in bad faith, and (3) no lesser sanction

would adequately remedy the damage done by the litigant's misconduct. The Third Circuit and

district courts have invoked the doctrine to dismiss claims where plaintiffs who are in bankruptcy

(or were in bankruptcy) failed to disclose to creditors pending or potential causes of action as

contingent assets in bankruptcy filings. Judicial estoppel remains a fact-specific, equitable

doctrine, applied at the courts' discretion. *Coles v. Carlini*, 2013 U.S. Dist. LEXIS 101873, *1

20.    Snyder, as principal of the Debtor, has testified extensively that the Debtor has no

employees.

21.    In fact, both Snyder and Kash, the principals of the Debtor testified that the Debtor

had no employees when the bankruptcy was filed and never had any. *See*, September 9, 2022 341

Transcript ("September 341 Transcript"), Page 15:3-13); Page 16:1-2; Page 29:5.  A true and

correct copy of the September 341 Transcript is attached hereto and incorporated herein as Exhibit

"A'.

**BIROS_APPENDIX_0004**
**EXHIBIT A**

22.     *See also*, 341 Transcript January 6, 2023 ("<u>January 341 Transcript</u>"), Page 8-9.  A True and correct copy of the January 341 Transcript is attached hereto and included herein as Exhibit "B".

23.     Additionally, on October 1, 2018, U Lock responded to Biros' initial discovery requests in an action filed in Westmoreland County against U Lock (the "<u>Discovery Responses</u>") when asked to identify all current and former employees of Debtor, that "it does not maintain employees and did not maintain employees in the past.  U Lock operates through officers, volunteers, and contractors."  A true and correct copy of the relevant redacted portion of the Discovery Responses are attached hereto and incorporated herein as Exhibit "B".

24.     Additionally, Snyder testified at the September 341 when asked about why his Wage Claim wasn't listed on the Debtor's Schedules as follows: "The $99,000 was what Christine would owe me. We were -- Christine was in charge.  She was the -- she was the silent partner, and things changed along the way and now this lawsuit came and as, as a result, any work I've done there over the past seven years I didn't get paid. So I never got any officer compensation or anything from her, so that those -- those stem from my wages, not -- not others." Exhibit A, Page 22:24-23:11.

25.     This testimony reflects that Snyder did not believe the Debtor owed him any money for employment but rather believed he was owed money (or property) from Biros relating to their ongoing dispute over the real property from which the Debtor operated.  Biros was not an officer or director of the Debtor and had no control over compensation or wages- officer or employee.

26.     Snyder later testified during continued questioning on his Wage Claim at the September 341 that "well either her or U Lock owes me, you know, at least minimum wage, but she controlled the company." Exhibit A, Page 24:9-11.

27.     Snyder's testimony to defend his Wage Claim is that he, Kash Snyder and Shanni Snyder all worked for the Debtor but did not receive any pay.  Yet, Kash Snyder has not filed a claim nor was any claim listed for Kash Snyder on the Schedules.  In fact, there are no employee claims listed on the Schedules (excluding Shanni Snyder's claim based on her fraudulent Default Judgment arising from alleged unpaid wages).

28.     Likewise, Snyder signed the attached Declaration to the Trustee under penalty of perjury (the "Declaration") regarding employees and the nonissuance of any W2s or 1099s that there were no salaried employees and no 1099s were filed because any persons who did work did not receive cash compensation in excess of $550.00.  A true and correct copy of the Declaration is attached hereto and incorporated herein as Exhibit "C".

29.     In the Declaration, Snyder testifies as follows: "Our executive employees such as John Biros, Kash Snyder and myself, we did not take money for salary, all hoping to advance the company until Robert Biros interfered and made Christine Biros file suit.  I understand we were due minimum wage for our work because even executives are entitled to that, but we did not pay it because the company had very little revenue." *See*, Exhibit C, ¶7.

30.     However, Snyder is not entitled to minimum wage under the Fair Labor Act, even if Snyder could make a claim to be an employee as it is inapplicable here.

31.     First, as set forth above, Snyder is not an employee of the Debtor as the Debtor had no employees and thus the Fair Labor Act would not apply.

32.     Second, even assuming arguendo, Snyder was somehow able to establish he was an "employee," the Fair Labor Act provides in relevant part in Section 203(2) that any establishment that has as its **only regular employees the owner thereof** or the parent, spouse, child or other members of the immediate family of such owner **shall not be considered to be an**

BIROS_APPENDIX_0006
EXHIBIT A

**enterprise engaged in commerce or in the production of goods for commerce as part of such enterprise**.

33.    To receive minimum wage under the Fair Labor Act, Section 206 requires minimum wage for every employer to pay to his employees who in any workweek is engaged in commerce or in the production of goods for commerce. 29 U.S.C. Section 206.

34.    Accordingly, pursuant to the Fair Labor Act, Snyder would not be eligible to receive minimum wage under the Fair Labor Standards Act as he is the owner of the Debtor and thus the Debtor would not be considered to be an enterprise engaged in commerce or in the production of goods for commerce as part of such enterprise.

35.    Snyder might try to claim that he was a contractor or contract worker for U Lock during the multiple years covered by his Wage Claim.

36.    There is no assertion or evidence in any of the numerous pleadings and other filings under oath by Snyder or U Lock that would support any claim that there was a contract relationship between Snyder and U Lock for the providing of the services that Snyder claims to have provided.

37.    There is no contract under applicable non-bankruptcy law.  There is no bankruptcy law basis for a prepetition claim by Snyder as asserted in Claim Number 5.

38.    Even if Snyder could maintain a claim against U Lock under the Fair Labor Act, the Claim is deficient on its face as there is no applicable time period or calculation provided to provide support for the Wage Claim.  Accordingly, it is likely that the Wage Claim could not cover the time period requested, as the statute of limitations under the Fair Labor Act is two years and arguably this Wage Claim seeks more than seven (7) years of alleged wages in Claim Number 5. 28 U.S.C.S. §255(a).

39.    "Under the Fair Labor Standards Act (FLSA), the applicable statute of limitations

is three years for a willful violation, two years otherwise. 29 U.S.C.S. 255(a). *Copley v. Evolution Well Servs. Operating, LLC,* No. 2:20-CV-1442-CCW, 2022 U.S. Dist. LEXIS 17266, at *1 (W.D. Pa. Jan. 31, 2022)

40.     When an employer's actions are willful, the statute of limitations is extended to three years: "a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued. " 29 U.S.C. § 255(a). K*elly v. Eckerd Corp*., No. 03-4087, 2004 U.S. Dist. LEXIS 4381, at *4-5 (E.D. Pa. Mar. 10, 2004)

41.     Even if Snyder were to allege the doctrine of equitable tolling, for the doctrine of equitable tolling to apply to the Fair Labor Act, a defendant's misleading conduct must induce a plaintiff to delay filing notice of her intent to sue.  The doctrine is not applied, however, every time a defendant makes an incorrect or even misleading statement to the Plaintiff.  Likewise, the Plaintiff has the burden of proving facts necessary to invoke the equitable tolling doctrine. *See, Kelly v. Eckerd Corp*. 2004 U.S. Dist. LEXIS 4381, at *4-5.

42.     Additionally, as referenced in the Declaration, the Debtor had no money to pay any officer or owner claims.  Snyder is a shareholder, director and officer of the Debtor and under Pennsylvania law, corporate directors owe fiduciary duties to the corporation and its shareholders. When the corporation is insolvent, the directors also owe fiduciary duties to the corporation's creditors. *Bruno v. Beacon Sales Acquisition, Inc. (In re Bruno),* 553 B.R. 280, 286 (Bankr. W.D. Pa. 2016).

43.     Snyder's Wage Claim then would be a breach of his fiduciary duties to the Debtor as he incurred his personal employment claim during a time that the Debtor was insolvent.  Snyder, as a director and officer of the Debtor, would have known that the Debtor was insolvent yet allowed

BIROS_APPENDIX_0008
EXHIBIT A

the Debtor to continue to operate and incur his alleged wages, as well as a default judgment against

the company (of which he was aware and did not defend) by his sister, Shanni Snyder.

44.     Moreover, Claim Number 5 should be disallowed by this Honorable Court pursuant

to 11 U.S.C. § 105.

45.     The United States Supreme Court has recognized that by filing a claim against the

bankruptcy estate, a creditor triggers the process of "allowance and disallowance of claims,"

thereby subjecting the creditor to the bankruptcy court's equitable power. *See*, *Langenkamp v.

Culp,* 498 US 41, 44-45 (1990).

46.     The bankruptcy court has the power to look behind and reduce claims based on

judgments issued by other courts, both state and federal. *In Margolis v. Nazareth Fair Grounds*,

249 F.2d 221 (2nd Cir. 1957), the Second Circuit held that a bankruptcy court may inquire into the

validity of any claim asserted against the bankrupt and may disallow it if it is found to be without

lawful existence and the mere fact that a claim has been reduced to a judgment does not prevent

such an inquiry. As the merger of a claim into a judgment does not change its nature so far as

provability is concerned so the court may look behind the judgment to determine the essential

nature of the liability for purposes of proof and allowance. *Margolis v. Nazareth Fair Grounds,*

294 F.2d at *223-224 (internal citations omitted).

47.     A claim should be rejected and disallowed when it has no basis in fact or law, is

non-existent or illegal." *Diasonics, Inc. v. Ingalls*, 121 B.R. 626, 630 (Bankr. N.D. Fla. 1990)

(citation omitted).

48.     In *Benninger v. First Colony Life Ins. Co. (In re Benninger)*, 357 B.R. 337, 350-

51 (Bankr. W.D. Pa. 2006), Judge Deller applied Supreme Court precedent to disallow claims in

that case as the judgments confessed against the Debtor were unlawful, referencing *Pepper v.

BIROS_APPENDIX_0009
EXHIBIT A

*Litton*, 308 U.S. 295, 301-303, 60 S. Ct. 238, 84 L. Ed. 281 (1939), where the United States Supreme Court allowed a debtor to challenge a state court judgment in bankruptcy court on the ground that a confessed judgment obtained by fraud was void *ab initio* for procedural reasons.

49.     In *Benninger*, the objection to proofs of claim filed by the creditor were sustained and the claims disallowed for grounds including but not limited to the unclean hands of the creditor.  Judge Deller acknowledged, "It is one of the fundamental principles upon which equity jurisprudence is founded, that before a complainant can have standing in court he must first show that not only has he a good and meritorious cause of action, but he must come into court with clean hands." *Benninger* at 350.

50.     Additionally, the Court held that it also found "equally troubling" the fact that the underlying basis of the creditor's claims were "dubious at best."  Thus, Judge Deller ruled that even if the claims had some basis, he would nonetheless disallow them under the clean hands doctrine and for public policy reasons. *Benninger* at 360.

51.     It is clear from the face of Claim Number 5, the complete lack of support for the Wage Claim, including even a simple calculation of wages incurred, and the sworn testimony of the officers of the Debtor that they had no employees, the failure to schedule the Wage Claim or otherwise disclose it, despite being the Officer who prepared and signed the Schedules under penalty of perjury, the Wage Claim should also be denied for public policy reasons.

52.     Finally, 11 U.S.C. §502(d) provides in relevant part that a court shall disallow any claim of any entity that is a transferee of a transfer avoidable under 11 U.S.C. §§547 or 548 unless such entity or transferee has paid the amount or turned over any such property.

53.     At the September and January 341 hearings, Snyder testified that he received the proceeds from the sale of a 2021 Kubota. See Exhibit A Page 12:18-13:3; Exhibit B, Page 37:1-

13; Page 67:18.69:17.  Snyder testified that the Kubota was sold in November 2021 and he paid himself back for an outstanding loan from the sale.

54.     Biros believes and therefore avers, the Trustee will be filing a Complaint to Avoid and Recover the proceeds Snyder received from the Kubota pursuant to 11 U.S.C. § 547 and accordingly, the claim should also be disallowed pursuant to 11 U.S.C. § 502(d).

WHEREFORE, Christine Biros respectfully requests that this Honorable Court enter an order substantially in the form attached hereto granting this Objection and disallowing the Snyder Claim.

Dated: February 24, 2023                          BERNSTEIN-BURKLEY, P.C.

By:  */s/ Robert S. Bernstein*_____
     Robert S. Bernstein (PA ID No. 34308)
     Lara S. Martin (PA ID No. 307272)
     601 Grant Street, Floor 9
     Pittsburgh, PA 15219
     Telephone: (412) 456-8100
     Facsimile: (412) 456-8135
     rbernstein@bernsteinlaw.com
     lmartin@bernsteinlaw.com

     *Counsel for Christine Biros*

Transcript of the Testimony of

# 341 (a) MEETING OF CREDITORS

September 9, 2022

## IN RE: U LOCK, INC.



**412-261-2323**
**depo@akf.com**
**www.akf.com**

**BIROS_APPENDIX_0012**
**EXHIBIT A**

1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

Bankruptcy No. 22-20823-GLT

Chapter 7


In re:                              )
                                    )
U LOCK INC.,                        )
                                    )
          Debtor.                   )
_____/


TRANSCRIPT OF RECORDED PROCEEDINGS:

341(a) MEETING OF CREDITORS

September 9, 2022

BIROS_APPENDIX_0013
EXHIBIT A

2

1                    PRESENT:

2

3

Robert H. Slone, Esquire, United States Trustee

4

George Snyder

5

Sarah Wenrich, Esquire

6

William Otto, Esquire

7

Christine Biros

8

Ms. Shanni Snyder

9

J. Allen Roth, Esquire

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BIROS_APPENDIX_0014
EXHIBIT A

```
                                                           3

1                         INDEX

2

3

4

5   WITNESS:  GEORGE SNYDER

6   EXAMINATION BY MR. SLONE - PAGE 5

7   EXAMINATION BY MS. WENRICH - PAGE 22

8   EXAMINATION BY MR. OTTO - PAGE 29

9   EXAMINATION BY MS. SHANNI SNYDER - PAGE 95

10

11

12  EXHIBITS INTRODUCED:  (NONE)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

BIROS_APPENDIX_0015
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

4

```
 1              MR. SLONE:  Call the Section

 2      341(a) Meeting in the case of U Lock Inc.,

 3      Case 22-20823-GLT.  This is the time and

 4      place for the meeting.  I'm Robert Slone,

 5      the interim Trustee.  Allen Roth is present

 6      as attorney for U Lock.

 7          Mr. Roth, who's present to testify for

 8      U Lock today?

 9              MR. ROTH:  I have George, excuse

10      me, George Snyder here.

11              MR. SLONE:  Okay.  And what

12      officer is Mr. Snyder?

13              MR. ROTH:  Vice president.

14              MR. SLONE:  Vice president?

15      Okay.

16              MR. ROTH:  Yes.

17              MR. SLONE:  Okay.  Before, let me

18      swear him in.  Mr. Snyder, please raise your

19      right hand.  And do you swear that the

20      testimony you're about to give in this

21      matter to be the truth?

22              MR. GEORGE SNYDER:  Yes, I do.

23              MR. SLONE:  Okay.  Now, we have

24      some creditors present.  I'm going to ask

25      you to state your name for the record.
```

BIROS_APPENDIX_0016
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

```
                                                                5
 1        Start with Sarah Wenrich.

 2                  MS. WENRICH:  Hi, Mr. Slone.

 3        Sarah Wenrich here on behalf of Christine

 4        Biros, and William Otto is here as well on

 5        behalf of Ms. Biros.

 6                  MR. SLONE:  Okay.

 7                  MS. WENRICH:  My apologies, Ms.

 8        Biros is also on the line.

 9                  MR. SLONE:  Okay, great.  And

10        Shanni Snyder, are you still present?

11                  MS. SHANNI SNYDER:  Yes, I am.

12                  MR. SLONE:  Okay, and you're here

13        for yourself; right?

14                  MS. SHANNI SNYDER:  Yes.

15                  MR. SLONE:  Okay.

16   EXAMINATION OF GEORGE SNYDER:

17   BY MR. SLONE

18        Q.  Okay, Mr. -- Mr. Snyder, you're

19        testifying as vice president of U Lock.  Did

20        you sign -- well, I'll get to that.  Did you

21        receive a copy of the informational sheet

22        prepared by the Office of the U.S. Trustee?

23        A.  Yes.

24        Q.  And did you read that sheet?

25        A.  Yes.
```

BIROS_APPENDIX_0017
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

                                                            6

1           Q.  Are you personally familiar with the

2      information contained in the petitions,

3      schedules, statements, and related

4      documents, and do they accurately reflect

5      all assets and all liabilities of the

6      company?

7           A.  Yes.

8           Q.  And did you sign the petition and

9      related documents?

10          A.  Yes.

11          Q.  Are there any errors or omissions

12     you wish to bring to my attention at this

13     time?

14          A.  No.

15          Q.  Okay.  Other than in the ordinary

16     course of business, did the company sell,

17     transfer, or give away any assets within the

18     four years prior to filing this case?

19          A.  Nothing outside the ordinary

20     operation of the business.

21          Q.  Yes, no, or will you send me a

22     statement?

23          A.  Oh, I'm sorry.  I said no, nothing

24     outside --

25          Q.  Oh, okay, I'm sorry.

BIROS_APPENDIX_0018
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

7

1          A.  -- business.

2          Q.  Does the company expect to receive

3     anything of value in the next six months?

4          A.  Let me -- let me back up for a

5     minute.  I had mentioned to you, we talked

6     about that Kubota tractor I brought in the

7     -- I brought in the serial number for you.

8     That was sold last year.

9          Q.  Okay.

10         A.  And then the Christine Biros

11    property.

12         Q.  Does the company expect to receive

13    anything of value in the next six months?

14         A.  Just whatever other rents would be

15    collected.

16         Q.  Do you have a claim or cause of

17    action against anyone for any reason or does

18    anyone owe you money?

19         A.  Yeah, everything what's in the

20    schedule there.

21         Q.  Okay.  It says see --

22         A.  And it --

23         Q.  See schedules.  Does the company own

24    any real estate or real estate that has not

25    been listed?

BIROS_APPENDIX_0019
EXHIBIT A

8

1        A.  Yes.

2        Q.  You're saying yes.  Is that the

3    property, the 21 acres?

4        A.  Yes.

5        Q.  And that's subject to the Biros

6    claim; right?

7        A.  Correct.

8        Q.  What was -- this was an involuntary;

9    right?

10        A.  Correct.

11        Q.  But you didn't contest it?

12        A.  That's correct.

13        Q.  So what's the reason for filing this

14    case?

15        A.  The reason that the other person

16    filed the -- filed the lawsuit, you mean, or

17    filed the involuntary bankruptcy?

18        Q.  Yeah, but why didn't you contest it?

19        A.  (Inaudible).

20        Q.  I mean, there's a reason that you're

21    in bankruptcy, or you would have contested

22    it?

23        A.  Well, I was served -- I was served

24    an involuntary bankruptcy and I kind of

25    actually thought (Inaudible).

BIROS_APPENDIX_0020
EXHIBIT A

341 (a) MEETING OF CREDITORS - 9/9/2022

9

1              MR. SLONE:  Whoever that is,

2       please mute yourself.

3              MS. SHANNI SNYDER:  (Inaudible)

4       playing.

5          A.  We really had, you know, no assets

6       --

7          Q.  Hang on, Mr. Snyder.

8          A.  We have -- okay.

9              MR. SLONE:  Somebody's phone is

10      ringing or something.  Check your phones,

11      everybody.  Thank you.

12         Q.  Okay, Mr. Snyder you can continue.

13         A.  Okay, I said we didn't really have

14      any assets. We owed money, and we didn't

15      really have any defenses for the claims.  So

16      the bankruptcy may have other defenses.

17         Q.  When was U Lock incorporated?

18      Approximately when was it incorporated?

19          Hello?  Anybody there?

20              MS. WENRICH:  I'm here.  I'm

21      still here.

22              MR. OTTO:  I'm here.

23         Q.  Okay.

24              MR. OTTO:  I'm here.

25         Q.  When was the company incorporated?

BIROS_APPENDIX_0021
EXHIBIT A

10

1       Mr. Roth, do you know?

2       George Snyder and Allen Roth, are you guys

3       on the line?  Hello?

4                 MR. SLONE:  Okay, everybody else

5       is on the line; right?  Mr. --

6                 MS. WENRICH:  Yes.

7                 MR. SLONE:  Sarah and Bill?

8                 MR. OTTO:  Yes.

9                 MS. SHANNI SNYDER:  This is

10      Shanni. I'm still on the line.

11                MR. OTTO:  This is Bill Otto.

12      I'm still on the line.

13                MR. SLONE:  Okay.  What happened

14      to Snyder and Roth?

15                MS. SHANNI SNYDER:  Seems like it

16      was disconnected.

17                MR. SLONE:  Were they at the same

18      place?  Oh, Jesus.

19                MS. SHANNI SNYDER:  Oh, me?  I

20      have no idea.

21                MR. SLONE:  Okay.  I don't know

22      what to say.

23                MS. SHANNI SNYDER:  I think that

24      was just, the music that was playing was

25      from the office.

BIROS_APPENDIX_0022
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

11

1              MR. SLONE:  Could somebody call

2       Roth?  Maybe I can call him on my cell

3       phone. Okay, we'll call. (Phone dialing.)

4              MR. SLONE:  Hi, Bob Slone

5       calling. We are in a meeting of creditors

6       for U Lock and Allen Roth and George Snyder

7       disappeared.  Are they there?

8              MR. ROTH:  Hi, this is Allen.

9              MR. SLONE:  Allen, you guys

10      disappeared from the --

11             MR. ROTH:  Yeah, I was trying to

12      call back in 'cause I have no idea what

13      happened.  (Inaudible) went blank.

14             MR. SLONE:  Okay, call back in.

15      If not, we'll put you on the -- on, on the

16      cell phone.  But call back in right now.

17             MR. ROTH:  Okay.

18             MR. SLONE:  Thank you.

19             MR. ROTH:  We'll do it right now.

20             MR. SLONE:  Okay, they're calling

21      back in.

22         Okay, Allen Roth?  Hello? (Phone

23      dialing.)

24             UNIDENTIFIED SPEAKER ON PHONE:

25      Allen Roth's office.

BIROS_APPENDIX_0023
EXHIBIT A

341 (a) MEETING OF CREDITORS - 9/9/2022

                                                                    12

1              MR. SLONE:  Yes, Allen said he's

2         trying to call back in.  We --

3              UNIDENTIFIED SPEAKER ON PHONE:

4         Okay, hold on a second.

5              MR. SLONE:  If not, we'll just

6         put -- we'll just do it on the cell phone.

7              MR. ROTH:  All right, this is

8         Allen. We're back.

9              MR. SLONE:  Okay, great.  So you

10        have your backup music on, Allen.  Okay,

11        I'll turn -- that's on the other line.  I'll

12        turn that off.  Okay, we're back.

13   CONTINUATION OF EXAMINATION OF GEORGE SNYDER:

14   BY MR. SLONE

15        Q.  Okay, Mr. Snyder, the last question,

16        when was this company incorporated?

17        A.  In 2015.

18        Q.  Who are the officers?

19        A.  It was -- okay, I was going to

20        elaborate on the -- on the corporation part

21        'cause that was kind of what brought us

22        here.  Or is that enough for you?

23        Q.  That's enough for right now.  Just

24        who are the officers now, or at the time of

25        the filing?

         BIROS_APPENDIX_0024
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

13

1          A.  My brother, Kash Snyder.

2          Q.  Kash, what was he?

3          A.  President.

4          Q.  And you're vice president, George

5     Snyder?

6          A.  Yes.

7          Q.  Any other officers?

8          A.  No.

9          Q.  Who are the shareholders?

10          A.  There's a company called Accredited

11     Business Consolidators Corp and --

12          Q.  Could you speak up, please?

13          A.  Yes.  There's a company called

14     Accredited Business Consolidators Corp, and

15     there's over a thousand shareholders, so we

16     issued, issued shares.  But I'm the majority

17     shareholder.

18          Q.  How much do you own, what

19     percentage?

20          A.  I think it's 51 percent.

21          Q.  I didn't see that Accredited

22     creditors listed in your schedules.  Is --

23          A.  You know what, when we -- I'm going

24     back to with Biros, I was 51 percent.  With

25     currently I'm 90 percent.

AKF Technologies
412-261-2323          BIROS_APPENDIX_0025
                              EXHIBIT A

341 (a) MEETING OF CREDITORS - 9/9/2022

14

1      Q.  You're 90 percent?

2      A.  We can send you a shareholder list.

3      Q.  Yeah, you should do that.  Do they

4   know that this company is in bankruptcy?

5      A.  We provided Otto with a list.

6      Q.  Well, he's -- so what?  Who's John

7   Biros?

8      A.  They -- and they probably don't know

9   the bankruptcy.

10     Q.  It says he owns 25 percent of this

11  company.

12     A.  Who is that?

13     Q.  John, on your statement, Question

14  No. 28, list all the debtors, officers,

15  directors, managing members, general

16  partners, members in control, controlling

17  shareholders, or other people in control of

18  the debtor.  You have one person listed,

19  John Biros, 25 percent.  It says a silent

20  partner from inception.  Your name's not

21  listed.  Kash isn't listed.  No other names

22  are listed here.  So why don't you file an

23  amended schedules so we know --

24     A.  Okay.

25     Q.  -- where we're coming from.

BIROS_APPENDIX_0026
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

15

1        A.  Silent partner.  Okay, we'll file an

2     amended.

3        Q.  How many employees did the company

4     have when the bankruptcy was filed?

5        A.  None.

6        Q.  None.  When's the last time the

7     company had employees?

8        A.  Up till recently, we had -- there

9     was always someone helping there.  There was

10    always about a half a dozen people helping

11    at different times, you know, throughout the

12    years.  But just the -- just limited, you

13    know, just a few hours a year.

14       Q.  Can you get me the records of that?

15    Were the withholding taxes paid for the

16    taxes for those employees?  Were they issued

17    W-2's?

18       A.  Okay, I'll get you the records for

19    the people that worked.

20       Q.  Give me copies of the W-2's for the

21    last four years.

22       A.  Okay.  But there wouldn't be any

23    records 'cause they were -- they were

24    contractors, not -- not -- you know, we

25    didn't have W-2's.

16

1          Q.  So they weren't employees?

2          A.  No.

3          Q.  Well, get me records of what, what

4     they were paid.

5          A.  Okay.  Past four years?

6          Q.  Yes.

7          A.  Will do.

8          Q.  Okay, your bankruptcy schedules said

9     your gross revenues for 2021 were about

10    $13,000; for 2020 was about $12,000.  Do you

11    --

12         A.  Yes.

13         Q.  Thirteen two for '21.  Do you know

14    what it would have been for 2019?

15         A.  Not right offhand.  My brother would

16    probably know that.

17         Q.  Well, was it in that same range?

18         A.  Probably pretty much about the same.

19    (Inaudible) kind of estimate, so I would

20    guess that 2019 would be about the same.

21         Q.  Okay.  How about years prior to

22    that, has it always been about that much?

23         A.  Yeah.  Yeah, it's always been

24    (Inaudible).

25         Q.  Okay.  Does the company have an

341 (a) MEETING OF CREDITORS  -  9/9/2022

17

1       accountant?

2              A.  No.

3              Q.  When -- did the company file tax

4       returns 2020 or 2021?

5              A.  No, we did not.

6              Q.  Did the company ever file tax

7       returns?

8              A.  No.

9              Q.  Why?

10             A.  That was, in 2015 when we got it,

11      Christine Biros and John Biros were silent

12      partners, and everything was pretty much at

13      their direction this whole time.  And they,

14      you know, they ordered us not to file the

15      tax returns because they were indicted by

16      the Attorney General. They wanted to wait

17      until that was over, so we were just in kind

18      of a holding pattern since the inception.

19      And then at some point this lawsuit came

20      about.

21             Q.  Since the bank -- yeah, since the

22      bankruptcy was filed, have there been any

23      effort to prepare tax returns?

24             A.  Yes, I think we were looking for an

25      accountant and we're just gathering our bank

341 (a) MEETING OF CREDITORS  -  9/9/2022

18

```
1    statements and receipts, everything we're
2    going to need for, to file tax returns,
3    'cause we anticipate the Judge had mentioned
4    he was concerned and wanted tax returns, so
5    we're preparing for that.
6         Q.  Has there been any payment to any
7    officers or shareholders in the last two
8    years?
9         A.  The -- no.
10        Q.  No?  If I go back to years three and
11   four, has there been any payments to
12   officers or shareholders?
13        A.  No for three and four.  But let me
14   back up. The last question you asked, was
15   that, you asked for the -- what year were
16   you asking as far as the payments to --
17        Q.  Last two years.  Well, let's say
18   '22, '21, or '20.
19        A.  Yes, in 2021 the -- there was that
20   tractor we had mentioned, the Kubota that
21   was sold.  There was money there and that
22   was -- that was used to reimburse me for
23   loans I provided to U Lock over the past
24   six, seven years.
25        Q.  And how much was that?
```

341 (a) MEETING OF CREDITORS - 9/9/2022

19

1        A.  The sale of the tractor was $45,000.

2        Q.  And you got the $45,000?

3        A.  Most of it.

4        Q.  And that was --

5        A.  From two thousand --

6        Q.  -- to reimburse you?

7        A.  Yes.

8        Q.  For loans?

9        A.  Yes.

10       Q.  Can you get me the information

11   regarding this sale and when you got that

12   money for the Kubota?

13       A.  Okay.  Allen, could you -- piece of

14   paper?

15       Q.  Anything else?

16       A.  No, I think that's it.  Well, yeah,

17   as far as what I paid back to my sister

18   also, Tammy, I had to pay her back

19   approximately $7,000 for, she had loaned the

20   company money for property taxes one year.

21       Q.  When was that done?

22       A.  (Inaudible) we anticipate getting

23   our taxes done here in the next 90 days.

24       Q.  When was Tammy paid?  Is that Tammy

25   Snyder?

BIROS_APPENDIX_0031
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

20

1          A.  Yes.  Or Tammy, Tammy McCarl, M-C-

2     C-A-R-L.

3          Q.  So she was paid $7,000 to reimburse

4     her for taxes?

5          A.  Yes.

6          Q.  And when, when was that done?

7          A.  Right after the sale of the Kubota.

8          Q.  Okay.

9          A.  That would have been probably

10    December of 2021 or November maybe of 2021.

11         Q.  Okay, get me the information on

12    both, on that sale and how the money was

13    disbursed at that time then.

14         A.  Okay, great.  Yeah, I'll get that to

15    you.

16         Q.  Your attorney, Mr. Roth, was there

17    any money paid to him for this bankruptcy

18    yet at this time?

19         A.  Not yet.

20         Q.  Okay, there was a lawsuit in Federal

21    Court that Shanni Snyder filed against the

22    company last year, I believe, and a default

23    judgment was taken.  Why didn't the company

24    defend that case?

25         A.  Well, like I said before, we didn't

341 (a) MEETING OF CREDITORS  -  9/9/2022

21

```
 1        -- we didn't really have any defenses for

 2        it.  She had -- she had did the work.  At

 3        the time we didn't really consider her an

 4        employee.  She was just, you know, she was

 5        doing the work and we had the agreement was,

 6        you know, once we got everything together,

 7        she would get something. And, you know, we

 8        kind of thought she'd go away.  We didn't

 9        think she was going to follow through with

10        it.

11            Q.  Well, if you didn't consider her an

12        employee, why didn't you defend this?

13            A.  Pardon me?

14            Q.  You said you didn't -- you didn't

15        consider her --

16            A.  (Inaudible).

17            Q.  -- as an employee.  Was there any

18        agreement made with her?

19            A.  Just that she would get something

20        when, when we got our, you know, got

21        everything off the ground.  We didn't have

22        money to defend it.  We would have needed

23        $10,000 for an attorney at that point,

24        because it's a corporation.

25            Q.  So you were aware of the lawsuit
```

22

```
 1        then; right?
 2              A.  Yes, I was served.
 3                    MR. SLONE:  Okay, I'm going to
 4        open up questions to other creditors.  We'll
 5        start with Sarah Wenrich.  If you have any
 6        questions, this would be a time.  We're
 7        going to limit, if we're going to drag this
 8        on, we'll -- we'll take a pause and I'll get
 9        my other cases and then we'll come back to
10        this.  But I'll give you a few minutes now.
11        Sarah, do you have any questions?
12                    MS. WENRICH:  Okay.  Yes, I do.
13        Thanks, Mr. Slone.
14  EXAMINATION OF GEORGE SNYDER:
15  BY MS. WENRICH
16              Q.  Mr. Snyder, first off, with regard
17        to your statement earlier that you, that U
18        Lock had no employees and just had
19        contractors, and I just want to make sure I
20        heard you right.  You say it was just about
21        a half a dozen people helping throughout the
22        year a couple hours a year; is that right?
23              A.  Yes.
24              Q.  Okay, so where does your $99,000
25        claim against the company come from then,
```

BIROS_APPENDIX_0034
EXHIBIT A

23

1       and why wasn't it listed in the schedules?

2           A.  The $99,000 was what Christine would

3       owe me. We were -- Christine was in charge.

4       She was the -- she was the silent partner,

5       and things changed along the way and now

6       this lawsuit came and as, as a result, any

7       work I've done there over the past seven

8       years I didn't get paid. So I never got any

9       officer compensation or anything from her,

10      so that those -- those stem from my wages,

11      not -- not others.

12          Q.  And we don't -- we don't agree that

13      she was a silent partner, but even if she

14      was, a silent partner wouldn't have any

15      control over the company; isn't that how a

16      silent partner works? So I'm not sure, can

17      you explain --

18          A.  Well, now she's claiming --

19          Q.  -- how a silent partner would have

20      control?

21          A.  Well, now she's not claiming to be a

22      silent partner; she's claiming to be the

23      owner, that over the past seven years that

24      she was the owner, that that -- that doesn't

25      leave me any compensation for officer salary

341 (a) MEETING OF CREDITORS  -  9/9/2022

24

1          or wages, not even minimum wage for the past

2          seven years.

3                    MR. SLONE:  Well, is she --

4          Q.  I want to clarify, she's not the

5          owner of the company.  She's the owner of

6          the property.  So those are two different,

7          two different issues, no ownership in the

8          company; right?  I mean --

9          A.  Well, either her or U Lock owes me,

10         you know, at least minimum wage, but she

11         controlled the company.

12         Q.  But, Mr. Snyder, you just said that

13         you are not -- there are not employees.

14         And, you know, does it appear on your

15         personal tax returns, the compensation that

16         you're owed or that --

17         A.  Are you saying I'm not an employee?

18         Q.  You said that U Lock has no

19         employees, so I'm not sure how you would be

20         owed that money.  I'm just, I'm trying to

21         close the loop there, and it's not --

22         A.  Well, I could --

23         Q.  Maybe I'm missing something, but

24         it's not making sense.

25         A.  Okay, well, we can file a brief and

BIROS_APPENDIX_0036
EXHIBIT A

25

1          describe the work that I've done and --

2                    MR. SLONE:  Why wasn't it listed

3          in your schedules?  I think if I was owed

4          $99,000, I'd mention it somewhere.

5          A.  I could -- I could amend the

6          schedules, but like I said, things changed

7          from us being partners and them controlling

8          the property. Now they're saying they own

9          the property; it's constructive trust and

10         it's under their direction.  I did all this

11         work for the past seven years.  So they're

12         kind of like, you know, for everything I

13         did, I cleaned out lockers; I met with

14         customers.  I, you know, I developed the

15         land.  I cleaned the weeds, cut the grass,

16         plowed the snow, did building maintenance,

17         fixed the electrical service.

18          All this stuff was done, and it's just,

19         there was no compensation whatsoever.  And

20         they just switched the game (Inaudible),

21         switched it up in the middle here and went

22         from being partners to owners, and then that

23         puts me, you know, with, you know, no

24         compensation for (Inaudible).

25          Q.  Mr. Snyder, I'm not -- I'm not

26

```
 1          disagreeing that you're a partner or an

 2          owner of U Lock, but again, I think that is

 3          a different question. And again, you are

 4          testifying today on behalf of U Lock, who

 5          you say has no employees, and yet you file a

 6          claim as an alleged employee, and they just,

 7          they don't --

 8              A.  Well, then maybe --

 9              Q.  -- match up.

10              A.  Maybe I'm, okay, maybe I'm using the

11          wrong terminology.  Maybe, like I said

12          before, officer compensation.  When I meant

13          no employees, I meant other, there were no

14          employees on the books.  We didn't have a

15          regular staff.  Nobody was paid in that way.

16              Q.  So you said you had contractors, not

17          employees, so do you have 1099's then, if

18          you didn't have W-2's?

19              A.  No, we don't have, no W-2's.

20              Q.  Do you have -- do you have 1099's?

21              A.  Yeah.  There are -- or there's not

22          any 1099's because they -- they weren't

23          enough to -- I think they all made less than

24          five or six hundred dollars like per year.

25          So like I said, they were just help.  They
```

27

1          came in sometimes when they were needed if

2          there was -- there was no -- nobody was on a

3          40-hour work week.  But just me, like I said

4          --

5              Q.  Okay, so --

6              A.  -- I was entitled to at least

7          minimum wage for the time I worked there or

8          officer compensation.

9              Q.  So you, okay, so Ms. Snyder then,

10         Shanni Snyder, your sister, if everyone made

11         less than five or six hundred dollars a

12         year, if she worked for four years, that

13         would be around $2,000; right?

14             A.  I wasn't talking about her 'cause we

15         never -- she didn't make anything.  We

16         didn't pay her anything.  And like I said,

17         we didn't really even consider her an

18         employee.  She was my sister; she was

19         helping out, and the arrangement was, once

20         we got things together, she would make some

21         money.  So she kept track of her

22         (Inaudible).

23             Q.  So is it your opinion that the

24         default judgment that was obtained in

25         District Court was not truthful and

28

1     fraudulent for $260,000?

2        A.  Well, that's not what I said at all.

3        Q.  No, no, I'm -- I understand that

4     you're saying you didn't consider her an

5     employee, so I'm trying to get what the

6     company's position on, because you had said

7     you didn't fight it because you didn't have

8     the legal, the money to pay the legal fees;

9     but what is your position on that then if

10    you don't consider her a real employee?  And

11    it sounds like people just helped out; their

12    compensation would have been a couple

13    hundred dollars a year.  Why is that

14    different there?

15       A.  I don't really have a position on

16    that.

17       Q.  Okay.  I guess I'll move on to the

18    Kubota tractor.  So who did it sell to?  Who

19    did you last sell the Kubota tractor to?

20       A.  Give me back the things I -- it was

21    a private individual.  I have, give me one

22    second, I have some papers in front of me.

23    Let me see if I can find his name.

24       Q.  Okay.

25       A.  Do you have that?  You know, I

341 (a) MEETING OF CREDITORS  -  9/9/2022

29

```
 1        apologize.  I can get that to you, though.

 2        I can give to you the (Inaudible).  Actually

 3        he did have a company.  I can't remember the

 4        name of his company or his name.  But I --

 5        but I have all that information that I can

 6        get to you.

 7             Q.  Okay.  Yeah, that would be helpful I

 8        think and, you know, copy the Trustee on it

 9        as well.  And would, so 45,000 --

10             A.  (Inaudible).

11             Q.  -- was what the tractor was sold

12        for.  How much did the company originally

13        purchase it for and when?

14             A.  I don't know the exact amount, but I

15        think it was around $65,000.  That was

16        purchased in 2016.  And Mr. Slone wants me

17        to get everything around that sale to him,

18        so I'll get all that information, the

19        purchase date, the sale date, the person's

20        name.  I'll get all that to him.

21                  MS. WENRICH:  Okay, all right.

22        Mr. Otto, do you have any, any questions?

23                  MR. OTTO:  Yes, I do.

24   EXAMINATION OF GEORGE SNYDER:

25   BY MR. OTTO
```

BIROS_APPENDIX_0041
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

                                                                      30

1           Q.  Mr. Snyder, who, who are the

2     secretary and treasurer of U Lock?  You're

3     required under Pennsylvania law to have.

4     Can you tell me who they are?

5           A.  Who the secretary and treasurer are?

6           Q.  That's correct.

7           A.  We just have two officers, me and

8     Kash.  I guess the treasurer and the

9     secretary had to be (Inaudible) vice

10    president and treasurer.  So just between

11    us, we fulfill all the roles of office.

12          Q.  Just one moment.

13           That one.  It's right up there.

14           Sorry for the interruption.

15          A.  Okay.

16          Q.  Mr. Snyder, do you have any proof

17    that either John or Christine Biros had

18    anything to do with U Lock or the control of

19    U Lock?  Do you have any written evidence?

20          A.  As far as like a -- as far as a

21    partnership agreement, you mean, or

22    something like that?

23          Q.  Anything.  You never issued shares,

24    so, or share certificates?

25          A.  Yeah, there -- we had weekly

31

1      meetings.  Every single Wednesday we went

2      to, they owned a bar named Caesar's, and me

3      and my brother went down there every single

4      Wednesday to meet Christine for our

5      meetings.  And then also, John we met almost

6      every single day.  And so I'm sure there's

7      some type of evidence, but there's -- we

8      don't have a written agreement as far as the

9      -- them directing the company.

10          Q.  Well, if you -- if you met at a bar,

11     is there -- is there any -- I mean, did you

12     ever keep written minutes?

13          A.  We have some documentation and we

14     also have, you know, some photographs at

15     times we met.  So there is some types of

16     evidence if we had to provide some type of

17     evidence.  I do think they claimed in the

18     beginning of the lawsuit that they didn't

19     even know who we were.  In fact, they had

20     served the lawsuit by advertising in the Law

21     Journal, so I think John and -- John and

22     Christine both denied our existence in the

23     beginning.

24     So we do have some proof that we were --

25     they knew very well who we were, and they

341 (a) MEETING OF CREDITORS  -  9/9/2022

32

```
 1        were trying to be silent partners or secret

 2        partners, I guess, they always told me

 3        because of the -- because of their

 4        indictment for whatever that was

 5        (Inaudible).  We could get evidence and we

 6        could also do a deposition of John and also

 7        do a deposition of Christine. And their

 8        father was there as well, Bob Biros.

 9            Q.  Well, I'm not going to get into the

10        -- to the details, but as you already know,

11        because we've been through this issue in

12        State Court, my client denies everything

13        that you've said.  And you certainly have

14        the right as an individual to walk into any

15        bar, and if Christine or John happened to be

16        there, then you can call that a meeting, but

17        that doesn't mean that's what it was.  Let

18        me move on.

19            A.  (Inaudible).

20            Q.  Excuse me, excuse me, Mr. Snyder,

21        let -- let me move on.

22            A.  (Inaudible).

23            Q.  You claim you made a property tax

24        payment. When did you make that and how much

25        was it and what years did it cover?
```

341 (a) MEETING OF CREDITORS  -  9/9/2022

33

1           A.  I think that was, it was -- I think

2      it was close to 7,000.  I don't have the

3      exact number in front of me.  And that was,

4      I actually can't even remember the -- what

5      year it covered.  But that would just be for

6      one year.  The property taxes are roughly

7      7,000 a year.

8           Q.  Do you know when you made that

9      payment?

10          A.  No, it was -- my sister made it,

11     Tammy.  She made it by check.  So we would

12     have a record of that check we could

13     provide.

14          Q.  Okay.  In the -- in the corporate

15     action you filed to petition for a

16     reorganization, you stated that you had held

17     a shareholders agreement, or I'm sorry, a

18     shareholders meeting.  Did you inform any of

19     your 800-plus shareholders of that meeting?

20          A.  No, it was a -- it was a -- let me

21     take a drink here for a second.  It was just

22     me.  It was just the majority shareholders

23     present. (Inaudible) majority shareholders.

24          Q.  Now, I don't -- I don't remember

25     what the percentages were, but you listed

BIROS_APPENDIX_0045
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

34

```
1        Kash Snyder as a shareholder of a
2        substantial number of shares, much greater
3        than, than the 10 percent that you're
4        asserting that he might own if you own 90
5        percent of the company.  When did you --
6        when did Mr. Snyder -- when did Kash Snyder
7        transfer his shares to you?  Or is -- or is
8        your 90 percent assertion incorrect?
9            A.  Well, there's -- there's -- there's
10       over 400 million shares, and I think Kash
11       has about 4 million.
12           Q.  That's not the number you listed in
13       your -- in your minutes, in your minutes of
14       the shareholders meeting.
15           A.  I gave you a list of the
16       shareholders, didn't I?
17           Q.  You know what, that's -- whether you
18       did or not is irrelevant in this, in this
19       bankruptcy.
20           A.  Okay.
21           Q.  But the point is, and I'm only
22       talking about Kash Snyder at this point, so
23       my question is, when did --
24           A.  He testified (Inaudible).
25           Q.  -- when did he transfer his shares
```

BIROS_APPENDIX_0046
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

35

```
 1       to you?  Or is the 90 percent that you claim
 2       you own incorrect?
 3            A.  No, Kash (Inaudible).
 4                 UNIDENTIFIED SPEAKER:  And the
 5       (Inaudible).
 6            A.  I could read you the -- I could read
 7       you -- yeah, I can --
 8                 MR. SLONE:  Who else is speaking
 9       here?
10            Q.  Who is speaking in the background?
11            A.  Nobody here.  I think there's
12       someone -- someone else's end is on the
13       phone here.  Just me and Allen sitting here.
14                 UNIDENTIFIED SPEAKER:  I think
15       they should, you know.
16                 MS. SHANNI SNYDER:  Not me.
17                 UNIDENTIFIED SPEAKER:  I think
18       they should.
19                 MS. SHANNI SNYDER:  It's not me,
20       Shanni.  Mine's on mute.
21                 MR. SLONE:  If this is going to
22       go on, I'm going to ask that we resume later
23       this afternoon and go through the rest of
24       the questioning.  I have 14 other cases to
25       be heard this morning, so --
```

**BIROS_APPENDIX_0047**
                                                      **EXHIBIT A**

                                                          36

1              MR. OTTO:  What time would you

2       like to do that?

3              MR. SLONE:  How about 2:30?  Call

4       back in at 2:30.

5              MS. WENRICH:  That's, yeah,

6       that's fine.

7              MR. OTTO:  That works for me.

8              MR. SLONE:  Okay?  I'll keep

9       everything here.  Call back at 2:30 and be

10      -- get on at 2:30 p.m. today, okay?

11             MS. WENRICH:  Thank you.

12             MR. OTTO:  All right, very good.

13             MR. SLONE:  Thank you.

14             * * * * * * * (The proceedings

15      were recessed.)

16             * * * * * * *

17             MR. SLONE:  Okay, we're back on

18      the record in the U Lock case, 22-20823-

19      GLT.  This is the continuation of the 341(a)

20      meeting which was started this morning.

21      It's now 2:30 p.m. on September 9.

22          When we left, Mr. Otto was asking

23      questions.  Mr. Otto, you can resume.

24 CONTINUATION OF EXAMINATION OF GEORGE SNYDER:

25 BY MR. OTTO

BIROS_APPENDIX_0048
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

37

```
 1          Q.   Okay.  First, Mr. Snyder, can you
 2      confirm the sale date of the Kubota
 3      equipment?  I think you said it was December
 4      of 2021; is that correct?
 5          A.   I actually think it was, I'm pretty
 6      sure it was November 15 of 2021.
 7          Q.   November 15?
 8          A.   Yes.
 9          Q.   Okay.
10          A.   Correct.
11          Q.   Okay, okay.  And you said you
12      received $45,000 for that?
13          A.   That's correct.
14          Q.   Okay.  In your statement of assets
15      and liabilities, among other things, you
16      said that you had not been involved in any
17      environmental, or that U Lock had not been
18      involved in any judicial or administrative
19      proceedings, and you had not been notified
20      by any governmental unit otherwise that you
21      may have -- that the debtor might be liable,
22      and you had never notified any governmental
23      unit of any release of hazardous material.
24      That's in Document 65, Pages 9 and 10 of
25      19.  And there's a couple of questions about
```

341 (a) MEETING OF CREDITORS - 9/9/2022

38

1      that.  First of all, U Lock was cited at
2      least twice by North Huntingdon Township for
3      sanitation and accumulation of rubbish and
4      garbage, but you did not report that.  Why
5      didn't you report it?
6           A.  Well, it was my understanding
7      Christine Biros went to the code enforcement
8      officer of North Huntingdon and said, write,
9      write my property up for as many violations
10     as you can.  So I think she was trying to
11     get, you know, some, some strategy there she
12     had.  I went to the Township and he said he
13     was not going to write me up; that he was
14     just going to give me a verbal because --
15          Q.  Mr. Snyder, excuse me one minute.
16     Mr. Snyder, you were cited on or U Lock was
17     cited on September 5, 2019, and June 21,
18     2021, and that was well before a final
19     determination had been made in the Biros v.
20     U Lock case.
21          A.  Okay, I was talking about --
22          Q.  And whether -- and whether, whether
23     Christine Biros initiated that or not, you
24     were cited; U Lock was cited by North
25     Huntingdon Township. And when this comment

341 (a) MEETING OF CREDITORS  -  9/9/2022

39

1         or the statement to the Bankruptcy Court was

2         filed, you did not report this.  So my

3         question is, why didn't you report it?

4         Regardless of who instigated it, the

5         Township issued this.

6             A.   Okay, yeah, my previous answer was

7         talking about the most recent.  You were

8         talking about September 5 and what other

9         date?

10            Q.   September 5, 2019, and June 21,

11        2021.

12            A.   Okay.  So on those, my -- to the

13        best of my recollection, I believe they --

14        that was just some garbage needed cleaned

15        up.  We cleaned it up.  There was no

16        environmental issue there. There was no

17        hazardous material or anything like that.

18        It was just a little bit of garbage, and

19        that was resolved.  And I think it was just

20        a warning, not a citation.  There was no

21        fine that I was aware of.

22            Q.   But the -- but the question in the

23        bankruptcy statement is not are you

24        currently under citation; it's have you

25        ever.  So I go back to my question, which

### 341 (a) MEETING OF CREDITORS  -  9/9/2022

40

```
 1        you haven't answered yet, why didn't you
 2        disclose this?
 3            A.  Well, what I -- what I said was, I
 4        think I didn't consider it a citation.  It
 5        was just a warning to clean up some garbage.
 6         And we did that and they were -- the
 7        Township was satisfied.  So I didn't think
 8        it was a citation.  There was no fine or
 9        anything like that.
10            Q.  Did you discuss this with your
11        attorney, Mr. Roth?
12            A.  I discussed pretty much everything
13        with him over the years, so --
14            Q.  And he told you that you didn't have
15        to file this, report this?
16            A.  If there's a mistake on that, we can
17        -- we can certainly (Inaudible) clarify that
18        on there or whatever Mr. Slone would like me
19        to do.  But that's my (Inaudible).
20            Q.  Well, let me take this one step
21        further.  The next question on that section,
22        has the debtor notified any governmental
23        unit of any release of hazardous materials?
24        Now, this was filed in July of 2022, this
25        year, about a month, maybe six weeks after
```

41

1          the disclosure of PCB's on the site; and yet

2          you say that you never notified any

3          governmental unit of any release, but you

4          testified in court that you had in fact

5          notified the fire department.  So what's the

6          truth here?

7              A.  I think, I don't -- I don't know

8          what you mean by the truth, but I just think

9          you misunderstood something.  I never

10         contacted the fire department.  In fact, I

11         think you guys testified that someone else

12         was the initial person to see that fire.  I

13         was driving past on the highway and I saw

14         the fire in the parking lot and I pulled in.

15         The fire department was already there.

16         The police department was there.  There was

17         at least a dozen personnel from the two

18         outfits. So maybe you misunderstood

19         something, or unless I misspoke in trial,

20         but I don't recall saying that 'cause I

21         never -- I didn't call the fire department.

22         They were there.

23              Q.  So, so let me just make sure I

24         understand, Mr. Snyder.  At no time

25         whatsoever did you go to North Huntingdon

341 (a) MEETING OF CREDITORS  -  9/9/2022

42

1      Township to talk to either the police or the

2      fire department about this event?

3          A.  When I was -- I think the next day,

4      I believe, I went to the property and

5      Christine Biros was there with the

6      Commissioner of the Township, and they were

7      talking about the event and they were

8      standing over the -- over the -- over the --

9      the (Inaudible).

10         Q.  Did you -- did you ever -- did you

11     ever go to the North Huntingdon Township

12     Building to report anything to the police or

13     to the fire department about this event

14     within the couple of days after it occurred?

15         A.  Well, I didn't finish answering what

16     you asked me before.  I did speak with the

17     Commissioner. She was there with, you know,

18     with (Inaudible).

19         Q.  No, I'm not asking you about what

20     happened -- I'm not asking about what

21     happened at the site.

22         A.  (Inaudible) the Township Building.

23         Q.  I'm asking if you -- if you ever

24     went to the Township Building to report to

25     the police and the fire department about

43

1       this event?

2           A.  I don't -- no, I did not go there to

3       report anything because it was already

4       reported; they already got there.  I may

5       have went there to ask for a police report

6       or something of that nature or, but that was

7       -- that was already reported.  There was no

8       need for me to report anything.  And --

9           Q.  But at the end of the day, the

10      answer to the 20, to this question, have you

11      ever notified any governmental unit of any

12      release of hazardous material, your answer

13      to that was no, and that's incorrect, is it

14      not?

15          A.  I'm not recalling what that -- no,

16      that's not.

17          Q.  Well, let me move on.  Have you ever

18      paid anything to Mr. Roth for his

19      representation of you in the State Court

20      action Biros versus U Lock?

21              MR. ROTH:  Objection.

22          A.  Hold on.

23              MR. ROTH:  I object to that

24      question.  That's irrelevant and it's none

25      of his business anyway.

BIROS_APPENDIX_0055
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

44

1        Q.  Well, in -- in a way it is relevant

2        because you have -- Mr. Roth has not filed a

3        claim in this case and he hasn't filed any

4        request for payment of fees.  It's been

5        stated both in the State Court action and

6        this action that you had not paid him

7        because you were going to pay him something

8        of value when, when U Lock got turned

9        around.  So my question is, do you owe, does

10       U Lock owe anything to Mr. Roth for legal

11       services?

12       A.  He's never billed me to this point

13       as far as this bankruptcy goes.

14       Q.  Do you think you are going to owe

15       him anything?

16       A.  I don't really want to answer that

17       because I --

18             MR. SLONE:  I think the question

19       is, maybe I'm wrong, but -- this is Bob

20       Slone -- I think the question is, does U

21       Lock owe Mr. Roth anything, any money for

22       legal services rendered at any time?

23       A.  No, not right now.

24             MR. SLONE:  So the answer is no?

25       A.  No, just for the post bankruptcy.

BIROS_APPENDIX_0056
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

45

```
 1         Q.  Okay.

 2         A.  But till then, no.

 3         Q.  Okay, now, so, so let me -- let me

 4      go a little bit further on this in this way.

 5       You said earlier today that when Shanni

 6      Snyder's case against U Lock was filed, you

 7      did not defend it because you would have had

 8      to pay an attorney $10,000 to represent U

 9      Lock.  And yet, at that point in time, U

10      Lock was represented by Mr. Roth, and all

11      you would have had to do was ask him to go

12      into court to represent you.  If you could

13      -- Mr. Roth represented you from 2017 to

14      2021, and if you never paid him anything for

15      that matter, why would you worry about

16      having to pay him for, for going into court

17      for your sister?

18         A.  We -- that's our -- I think that's

19      work product also.

20             MR. SLONE:  Well, no, it's a

21      question, is, 'cause we're trying to find

22      out if there's a creditor, if U Lock has

23      another creditor.  But you're saying U Lock

24      doesn't owe him any money?

25         A.  Well, to clarify it, I said post
```

BIROS_APPENDIX_0057
EXHIBIT A

341 (a) MEETING OF CREDITORS - 9/9/2022

46

```
1        bankruptcy. So I --
2                  MR. SLONE:  No, I'm asking --
3                  MR. ROTH:  He asked --
4                  MR. SLONE:  -- for prior
5        services. In other words, you know, does U
6        Lock owe Mr. Roth any money; does he have a
7        claim here?
8            A.  No, I don't think.  But to answer
9        his, I think the way, what he's kind of
10       asking is, if Allen's representing me
11       without charging at one point, then that
12       means he'll always just represent me for
13       free across the board on anything, is what
14       I'm getting from --
15                 MR. SLONE:  Well, you can answer
16       that yes or no.
17           A.  -- his office.
18                 MR. SLONE:  If you know.
19           A.  Pardon me?
20                 MR. SLONE:  You can answer that
21       if you know.
22           A.  Okay, yeah, I didn't think -- I
23       didn't think that I could just walk in to
24       him and have, say, come represent me in this
25       for free.  Plus, I didn't think the -- the
```

341 (a) MEETING OF CREDITORS  -  9/9/2022

47

```
 1          other part of that question, I said we
 2          didn't really think that lawsuit
 3          (Inaudible), and I had no idea that we'd
 4          bankruptcy at this point.
 5              Q.  (BY MR. OTTO)  Well, let me -- let
 6          me continue with your sister's case for a
 7          moment.  You said earlier that the reason
 8          that you didn't, among other things, the
 9          reason that you did not bother to go in and
10          defend against this, this judgment was
11          because you had no defenses. Well, the easy
12          defense would have been for you to testify
13          that she was not an employee, but you didn't
14          bother to do that.
15          But you and your brother have both given,
16          submitted sworn evidence, number one, that
17          U Lock had no employees throughout that
18          period of time that Shanni Snyder claims she
19          worked for you, and second, that you did not
20          owe anybody any money for employment.  So
21          why wouldn't you go in and at least simply
22          state that?  Even if you lost, you would at
23          least have put up a bona fide defense
24          against her case?
25              A.  I didn't consider -- we didn't
```

AKF Technologies
412-261-2323            BIROS_APPENDIX_0059
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

48

1        consider her a current employee at the time,

2        and I still --

3             Q.  I understand that, but if --

4             A.  (Inaudible).

5             Q.  But if you don't consider her an

6        employee, you have to assert that defense.

7        You can understand why, under the

8        circumstances, this does not sound like a

9        case of two arm's length parties arguing

10       about an employment situation. This sounds

11       more like a brother and sister deciding that

12       they need to get a judgment in order to file

13       a lien against real estate in another

14       county.

15            A.  Yeah, that, that's absolutely not

16       the case.  I mean, this whole thing is not

17       an arm's length. Biros, Christine and John

18       --

19            Q.  But you allowed your sister --

20            A.  (Inaudible).

21            Q.  You allowed your sister to get a

22       default judgment against your company.  And

23       it wasn't, you know, a default judgment of

24       $100.  It was 130,000.  Why wouldn't you

25       even go into court to at least put up a --

341 (a) MEETING OF CREDITORS  -  9/9/2022

49

```
 1          A.  Like I said, we figured she'd go
 2     away.
 3          Q.  Why would she go away?  She got a
 4     default judgment.  That's your sister.
 5          A.  (Inaudible).
 6          Q.  Do you talk to your sister?
 7          A.  (Inaudible).  Pardon me?
 8          Q.  Never mind, that's a (Inaudible)
 9     question.
10          A.  Biros and I have known each other
11     since I was a child.  We've known each other
12     for 45 years. So, and my sister, we've known
13     each other since we were a child, child.
14     I'm not here today to say nothing was --
15     everything was arm's length. That's not the
16     truth.  I was close with my sister.  I was
17     close with Biros.  I was close with the
18     mother, Liz Biros, Bob Biros.
19          Q.  Let -- let me -- let me move on
20     because I don't want you to perjure yourself
21     about the relationship you may have had with
22     the Biros.
23          A.  (Inaudible).
24          Q.  The -- there -- when the -- when
25     title was transferred to you or to U Lock by
```

BIROS_APPENDIX_0061
EXHIBIT A

50

```
 1        the deeds from the Schur estates, there were
 2        a number of trailers and containers on the
 3        site.  You have in the last couple months,
 4        or maybe more than a couple months,
 5        transferred a number of those containers and
 6        trailers off the site.  Why did you transfer
 7        them or move them and where are they?
 8            A.  I believe Mr. Slone said to start
 9        moving some of my things out of there, so
10        that would explain the containers.  What
11        about the -- what trailers are you referring
12        to?  'Cause I don't recall moving trailers
13        out of there.
14            Q.  Well, there were a number -- let me
15        put it this way.  Are you saying that, that
16        you own all of those containers that used to
17        be on the U Lock site?
18            A.  Are you referring to the ten
19        shipping containers?
20            Q.  Yes.  Are you -- are you saying that
21        you personally, George Snyder, owns those?
22            A.  Yes.
23            Q.  When was title transferred to them?
24            A.  There is no title.  Those are
25        shipping containers.  They're just a metal
```

BIROS_APPENDIX_0062
EXHIBIT A

51

```
 1        storage box. I don't believe they have any
 2        VIN numbers or titles or anything like that.
 3         But I believe I purchased those about 20
 4        years ago.
 5            Q.  Well, I don't think that's correct
 6        because those were all sitting on the
 7        property when the property was owned by the
 8        Schur estate, and those items were assigned
 9        to you by the Schur estate in conjunction
10        with the transfer of title by the Schur
11        estate.  So those containers appear to be
12        owned by U Lock, not George Snyder?
13            A.  Yeah, that's incorrect.  I saw that
14        in one of the (Inaudible).
15            Q.  And you've already testified in
16        court on the first hearing that those
17        containers are worth $6,000 apiece?
18            A.  No, I was talking about the -- the
19        white water tank.  They're 10,000-gallon
20        tanks.  They're white poly tanks.  That's
21        what I was referring to, not the shipping.
22            Q.  No, we were -- no, you were
23        specifically talking about, about
24        containers, the shipping containers.
25            A.  When was that?
```

341 (a) MEETING OF CREDITORS  -  9/9/2022

52

1          Q.  At the first hearing.

2          A.  Okay.  If someone asked me the

3     value, I don't know what that -- the value

4     the changes over time with those, but the

5     (Inaudible).

6          Q.  Well, the question is, do you have

7     any proof that title of those containers and

8     trailers was transferred to you, as opposed

9     to being still owned by U Lock?

10         A.  Yeah, they were -- well, there's no

11    proof as far as the title goes or whatever,

12    but I had -- I was a tenant at U Lock when

13    the -- the old man who owned it, his name

14    was Nick Schur, and I've been a tenant there

15    for I believe 22 years.  So when you -- I

16    saw that aerial picture you showed with tops

17    of tractor-trailers and tanks and containers

18    and things. Just because there was an aerial

19    photo doesn't mean -- like most, a lot of

20    that stuff belonged to tenants.  And so that

21    was --

22         Q.  Do you have any proof that they were

23    -- that they belonged to you before the

24    property was purchased from the Schur

25    estates?

BIROS_APPENDIX_0064
EXHIBIT A

53

1          A.  I'm not sure.  I'd have to look.  I

2     mean, that's going back 22 years.  But I

3     could see if I have any records of it.  But

4     a lot of that big heavy equipment there was

5     mine.  And as you know, a lot of the big

6     heavy equipment that Glenn Mowry is claiming

7     himself, there was a guy named Vince and

8     there was all kind of other tenants there,

9     and there's another tractor-trailer I think

10    just left today out of there that belonged

11    to someone from Maryland.  So that aerial

12    photo isn't really proof that or that's not

13    really showing ownership of anything.  In

14    fact, it's very misleading.  It's very

15    (Inaudible).

16         Q.  Let me -- let me jump into that

17    since you brought it up.  Let me ask you

18    about the orange trailer.  Who was the

19    renter who had that stored on your site?

20         A.  I believe the company's name is

21    Schapiro Whitehouse.

22         Q.  No, because they -- we've -- we've

23    spoken to them and they had told us that

24    they rented to someone else.  And so the

25    question is not -- it's not Whitehouse &

341 (a) MEETING OF CREDITORS  -  9/9/2022

54

1       Schapiro.  They own the trailer, but they

2       rented it to somebody else who then stored

3       it on your site.  So the question is, who

4       was renting space on your site to store that

5       trailer?

6          A.  They -- they were the contact.  They

7       were the ones who made the arrangements.

8       But they did tell me now recently, you know,

9       this past couple days or this month, that

10      there was some thirty or some third party

11      involved.  But that's -- they said that's

12      between them, not on our end.  So they --

13      they were the ones who (Inaudible).

14         Q.  Well, it's my understanding -- it's

15      my understanding that Whitehouse & Schapiro

16      now is claiming that they shouldn't have to

17      have paid the rent because they rented the

18      trailer to somebody else who stored it on

19      your site.  Did you ever have any direct

20      contact with Whitehouse & Schapiro when that

21      trailer was originally put on your site?

22         A.  That was my only contact.  And she

23      just told me the other day she didn't want

24      to pay 'cause she said the Biros family

25      damaged the trailer and they made it

341 (a) MEETING OF CREDITORS  -  9/9/2022

55

1       inaccessible.  She said she had to pay a

2       thousand dollars for a truck to come out to

3       not be able to pick, get her -- get her

4       trailer.  So she said she (Inaudible), that

5       they had to pay, someone's going to have to

6       pay for that.

7       But she never told me that she didn't want

8       to pay it because it wasn't hers.  In fact,

9       she said it's their trailer, they want it

10      back, and they want -- they want to pay and

11      square up, and she did immediately.  And

12      then it got -- Biros damaged it.  And we

13      have video footage (Inaudible).

14          Q.  How long -- how long was -- how long

15      was that trailer on the site?

16          A.  I believe two years, maybe two years

17      and two months.

18          Q.  So that, that trailer showed up on

19      the site in 2020?

20          A.  I believe it was November of 2020 if

21      my memory serves me right.

22          Q.  And you don't know who entered into

23      a rental agreement with you to (Inaudible) a

24      trailer there?

25          A.  (Inaudible).

BIROS_APPENDIX_0067
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

56

1          Q.  Because you apparently never

2     collected any rent for it?

3          A.  Pardon me?

4          Q.  Well, Whitehouse & Schapiro paid the

5     Trustee for a couple of years of rent.  So

6     if they had paid you, then they would

7     certainly object to paying the Trustee and

8     they would -- they would have claimed that

9     they had paid you.  But apparently they

10    didn't pay you, and apparently whoever

11    entered into the agreement with you didn't

12    pay you either, unless you accepted cash for

13    it?

14         A.  No, they -- they --

15         Q.  But you still haven't -- who, who is

16    -- who is the person, who is the individual

17    who, who negotiated with you to store that

18    trailer on the site?

19         A.  It was a girl from Whitehouse &

20    Schapiro.

21         Q.  Okay.

22         A.  I believe her (Inaudible).

23         Q.  So when we call Whitehouse &

24    Schapiro and ask them if they negotiated for

25    that truck to be there, they're going to say

57

```
 1      yep, we talked to George?
 2           A.  I don't know what they're going to
 3      say.
 4           Q.  'Cause you know we are going to ask
 5      them.  We are going to ask them that
 6      question.
 7           A.  But I could clarify that if you'll
 8      let me.  I spoke with a girl Loretta at
 9      Whitehouse --
10           Q.  Oh, please do.
11           A.  Pardon me?
12           Q.  I said please clarify 'cause we're
13      all confused.
14           A.  Well, I answered you already, but
15      I'll say it, you know, more clearly
16      hopefully.  The only person I dealt with was
17      Whitehouse & Schapiro. I believe a woman
18      named Loretta called and made all the
19      arrangements.  Never met her in person.
20      They're from out of state.  She did all this
21      over the phone.  A couple days later
22      (Inaudible).
23           Q.  And this was in 2020?
24           A.  Yes.
25           Q.  Okay.
```

BIROS_APPENDIX_0069
EXHIBIT A

58

```
1              A.   The trailer showed up on the lot.  I
2        never collected any rent from them ever in
3        the two years.  Then when I spoke with
4        Whitehouse & Schapiro most recently, a woman
5        named Doll (Phonetic spelling) is who I
6        spoke with.  She said Loretta no longer
7        works for them, she said, but it is their
8        trailer and they want to square up and
9        they'll send out a check immediately, which
10       they did, and they sent it to Mr. Slone.
11             That was it.  I don't know -- I didn't
12       talk to or meet or know this third party
13       that they talked about.  Supposedly they
14       told me that it's their trailer.  Sometimes
15       they rent their trailers and third parties
16       do business out of their trailers.  But I
17       never met that guy, never seen him.  Never
18       seen him, never talked to him on the phone.
19       And that was it. That's all the knowledge I
20       have on that.
21             Q.   During, during the Biros versus U
22       Lock state case, did you disclose that you
23       were the president and Kash Snyder I believe
24       was secretary?  You now tell us that Kash
25       Snyder is president and you're vice
```

BIROS_APPENDIX_0070
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

59

```
1        president, and you don't have a secretary or
2        a treasurer; is that correct?
3            A.  No, I -- I said I was the -- I said
4        we fill all the roles, me and my brother.
5        There's no other members other than my
6        brother.  And I think I said I was president
7        and that Kash was vice president.
8            Q.  I didn't understand that answer.
9        Can you repeat it?
10           A.  I think you just had it flip-
11       flopped.  You said Kash was president, I was
12       the vice president. I think I'm the
13       president and Kash is the vice president.
14       That's (Inaudible).
15           Q.  Okay, so, so your testimony now is
16       that you are president of -- president of U
17       Lock; is that correct?
18           A.  Pardon me?
19           Q.  You -- you are currently the
20       president of U Lock; is that correct?
21           A.  Yes.  Now I am because my brother
22       Kash is in a medical facility and he won't
23       be out for, you know, maybe the end of the
24       month.
25           Q.  And you do not have a secretary or
```

BIROS_APPENDIX_0071
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

60

1        treasurer?

2            A.  No, we -- we're also -- we hold all

3        the positions, so I'm everything.

4            Q.  So you're both -- you are -- you are

5        the secretary and treasurer?

6            A.  Yes.

7            Q.  Is that right?  Okay.

8            A.  Yes.

9            Q.  This morning you told us that you

10        own 90 percent of U Lock; right?

11            A.  Yeah, I think you were asking -- no,

12        I'm not -- I wasn't really sure of the

13        percentages.  I know more the -- you were

14        talking about something very specific, and

15        we were -- I had a meeting with Kash over

16        the phone because he hasn't been available.

17        You were talking about the motion to

18        convert.  So I had a meeting with him, and

19        we, you know, we both agreed to the motion

20        to convert, so --

21            Q.  Well, you -- you have --

22            A.  (Inaudible).

23            Q.  You have a corporate resolution of U

24        Lock.  It says that a meeting of

25        shareholders on June 30, 2022, among other

BIROS_APPENDIX_0072
EXHIBIT A

61

```
1          things, George Snyder owns 345 million
2          shares, Kash Snyder owns 75 million shares,
3          and you had 98.82 percent of the
4          shareholders -- or I'm sorry -- 1.18 percent
5          of the shareholders were not present.
6          That's the 5 million shares that you sold to
7          ABC; is that correct?
8               A.  That's correct.
9               Q.  Okay.  Have you ever communicated
10         anything to those shareholders?
11              A.  No.
12              Q.  So in fact, if you made a ton of
13         money, then those shareholders could have
14         some tax liability for which they are
15         completely unaware; is that correct?
16              A.  That would be a different scenario.
17         If we did, if we made a ton of money, that
18         would be a different scenario.  That doesn't
19         mean --
20              Q.  I'm sorry, your response was a
21         little garbled. Could you repeat that,
22         please?
23              A.  I'm sorry.  That would be a
24         different situation.  And so if they were
25         paid dividends, they would owe taxes on the
```

341 (a) MEETING OF CREDITORS  -  9/9/2022

62

1        dividends, but we didn't issue any dividends

2        because there was no profit.

3            Q.   But you had them listed as

4        shareholders but never informed them that

5        they were shareholders; is that correct?

6            A.   No, they're aware they're

7        shareholders.  We just didn't notify them of

8        the --

9            Q.   Really?

10           A.   -- the motion to convert because it

11       was a unanimous vote anyways that we had 98

12       percent approval, so --

13           Q.   Well, I can tell you that I have

14       spoken to one of your shareholders, and his

15       first question when I asked him if he was an

16       owner of U Lock shares was, who is U Lock?

17       And I can assure you that he knows -- he

18       knew nothing when I asked him in 2019, and

19       he knew -- he knew nothing when I asked him

20       two months ago.  So if you have any evidence

21       that you've informed all your shareholders,

22       you might want to gather it up, because

23       these people don't know.

24           A.   So we didn't notify them, so

25       (Inaudible).

63

1              Q.   Let me move on to my next -- my next

2        area. You've told us that in the last four

3        years you have not had any employees; is

4        that correct? That was your testimony this

5        morning?

6              A.   Yes.

7              Q.   Okay.  So I come back to your

8        sister.  If you had no employees in that

9        four-year period, how does she have a claim

10       to maintain?

11             A.   Well, I guess the answer to that

12       question --

13             Q.   Why didn't you defend it?

14             A.   -- is we have no -- we had no

15       employees on the payroll.  So maybe that was

16       a better answer. Maybe I, you know, should

17       have said it that way.

18             Q.   Well, does that mean you have

19       employees who are not on the payroll?

20             A.   I explained my sister's situation,

21       yes.

22             Q.   Well, let me ask the question again.

23        Does that mean that you had employees who

24       were not on your payroll?

25             A.   We had workers.  They were people

341 (a) MEETING OF CREDITORS  -  9/9/2022

64

1        that worked there that weren't employees;

2        they weren't on the payroll, but they were

3        people that worked.

4            Q.  Well, let -- let me -- let me ask it

5        this way. I concede that you had independent

6        contractors for whom you paid some amount

7        for small jobs and periodically, okay?

8            A.  Yeah.

9            Q.  But Shanni Snyder claims that she,

10       she worked for you for an extended period of

11       time on a continuous four-year basis.  And

12       you're now telling us that you didn't have

13       any employees on the payroll.  So my

14       question is, did you have employees who were

15       not on the payroll?

16           A.  Yes, me, Kash, and Shanni all

17       worked.

18           Q.  And you were not on a payroll?  Did

19       you report taxes to the IRS, payroll taxes?

20           A.  We, no, never received any pay.  We

21       just worked.  Shanni, you know, we didn't --

22       she worked for U Lock, but we didn't really

23       consider her an employee.  She's my sister,

24       and I thought it was more of a favor and the

25       understanding was when we developed the

65

1          property, she would get something.  As I

2          said in court, you know, I think my brother

3          might have said that he thought it was

4          sisterly love. But anyhow, she was doing the

5          camera stuff and she was driving through,

6          you know, ten times a week (Inaudible).

7              Q.  Well, you said in discovery that was

8          provided as a result of a request from me to

9          your counsel, Mr. Roth, you signed, you

10         personally, George Snyder, signed a document

11         that said you had no employees; U Lock has

12         no employees?

13             A.  Yeah, at that time (Inaudible).

14             Q.  What's that?

15             A.  Yes, and at that time that was the

16         (Inaudible).

17             Q.  Well --

18             A.  I didn't hear anything about this

19         lawsuit (Inaudible).

20             Q.  Well, Shanni Snyder, your sister

21         claims that she worked for you continuously

22         from 2016 to 2020, and that covers the

23         period of time that I asked the question.

24         And in court I asked your brother if she had

25         any connection to U Lock and he said no.

341 (a) MEETING OF CREDITORS  -  9/9/2022

66

1         That sounds pretty clear to me that she

2         didn't have a position as an employee or --

3         or in any fashion.

4         But you're now telling us that in fact she

5         was an employee and that she is entitled to

6         a salary of 130,000, which has now been

7         doubled by the Federal Court to $260,000,

8         which you did not defend on U Lock's behalf?

9             A.  I think if I recall (Inaudible).

10            Q.  Even though, even though your

11        testimony is that she was not an employee?

12            A.  Well, I think, I think, like I said,

13        it's been a couple years, but if I remember

14        correctly, I think you asked this, these

15        same questions of me and my brother Kash,

16        and I think we did tell you that she worked

17        there, and you said why, and I think someone

18        said sisterly love and helping us out or

19        whatever.  And that's what we thought at the

20        time.  She wasn't (Inaudible).

21            Q.  No, that's -- that's incorrect.  I

22        asked the question whether she helped on the

23        legal pleadings, and then I asked whether

24        she had anything to do with U Lock.  And the

25        answer to the second question, which is

BIROS_APPENDIX_0078
EXHIBIT A

67

1         whether she had anything to do with U Lock,

2         and the answer to that question is no.

3              A.  (Inaudible).

4              Q.  There were two parts to that

5         question.  One was her involvement in the

6         pleadings and the legal filing, and the

7         second was whether she had any involvement

8         with U Lock, and the answer to whether she

9         had anything to do with U Lock was no.  And

10        your statement --

11             A.  I don't recall.

12             Q.  -- in discovery was you had no -- U

13        Lock had no employees?

14             A.  Yeah, employees get wages, and she

15        wasn't getting any wages.  She got nothing.

16        So that's probably why, if that's how I

17        answered it, if it is (Inaudible).

18             Q.  Okay.  It still begs the question

19        why you didn't defend it in court, but let's

20        move on. You claim that, that you had an

21        outstanding loan from U Lock or to U Lock,

22        that you loaned U Lock some amount of money

23        for which you repaid yourself when you sold

24        the Kubota tractor and you got $38,000; is

25        that right? That's what you testified this

341 (a) MEETING OF CREDITORS  -  9/9/2022

68

1       morning?

2              Are you there?  Hello?  Anybody there?

3                     MS. SHANNI SNYDER:  I'm here.

4                     MR. SLONE:  Allen, Allen, are you

5       there, Allen and George?

6                     MR. OTTO:  Mr. Slone, that's

7       twice in two days, or in one day.

8                     MS. SHANNI SNYDER:  Do you have

9       to call them?

10                     MR. SLONE:  We'll have to call

11      Allen's office again.  Shoot, where's his

12      number?  Here it is. (Phone dialing.)

13                     UNIDENTIFIED SPEAKER ON PHONE:

14      Get disconnected again?

15                     MR. SLONE:  Yes, we did.

16                     UNIDENTIFIED SPEAKER ON PHONE:

17      Hold on.  Hang up.

18                     MR. ROTH:  Yeah, hello.

19                     UNIDENTIFIED SPEAKER ON PHONE:

20      No, hang up.

21                     MR. SLONE:  Allen, are you back?

22                     MR. GEORGE SNYDER:  Yeah, we're

23      back.  Can you hear me?  We're good.

24                     MR. SLONE:  Yes, we can hear you.

25      Go ahead.

BIROS_APPENDIX_0080
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

                                                              69

1              MR. GEORGE SNYDER:  Okay, we must

2        have got disconnected.

3  CONTINUATION OF EXAMINATION OF GEORGE SNYDER:

4  BY MR. OTTO

5        Q.  Mr. Snyder, my last question was,

6        you paid -- you paid yourself back in, after

7        you got payment for the Kubota; is that

8        correct?

9        A.  But not -- not for wages.  I didn't

10       pay anything for wages.

11       Q.  No, I'm just -- but you said you had

12       a loan outstanding --

13       A.  Yes, a loan.

14       Q.  -- that you had made to U Lock, and

15       that, and you repaid yourself back for that;

16       is that correct?

17       A.  Correct.

18       Q.  Okay.  Were there -- did anybody

19       else loan money to the company?

20       A.  Yeah, my sister Tammy.

21       Q.  Was that the money for the taxes?

22       A.  Yes, the --

23       Q.  Okay.

24       A.  I believe it was 7,000.

25       Q.  Anybody else?

BIROS_APPENDIX_0081
EXHIBIT A

70

1          A.   I believe my brother Kash did.

2     Biros did.

3          Q.   How much did you brother loan?

4          A.   I'm not really sure.

5          Q.   Okay.  Let's see.  In your

6     statement, there's a question of whether the

7     -- whether U Lock has any accounts

8     receivable, and you answered no; and yet you

9     have this list of tenants, many of which

10    have never made rental payments.  Don't you

11    keep any records of who pays you?

12         A.   Well --

13         Q.   And who hasn't paid you?

14         A.   Yeah, there are some records.  I was

15    kind of playing catch-up 'cause my brother

16    was, you know, my brother was, you know, he

17    wasn't around.  So we provided the Trustee

18    with everything we had, and then I discussed

19    it personally with Mr. Slone, a couple

20    things, like when that truck came up and,

21    you know, we contacted them and --

22         Q.   So there are a lot of renters that,

23    that have not paid money, so you never made

24    any, took any effort to collect from them or

25    to get rid of their property; is that

BIROS_APPENDIX_0082
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

71

1    correct?

2         A.  Well, we're attempting that now.  A

3    lot of -- a lot of the tenants are --

4         Q.  Well, why did -- why did it --

5         A.  (Inaudible).

6         Q.  Why did it take bankruptcy to get

7    you to start taking action?

8         A.  I'm sorry, I couldn't hear anything.

9     I was talking.

10             MR. SLONE:  Let's one talk, one

11    person at a time here.

12        Q.  Why did it take --

13            MR. SLONE:  Go ahead.

14        Q.  Why, why did it take the bankruptcy

15    for you to start trying to collect past

16    rents?

17        A.  Well, because Christine didn't want

18    her name on anything, so she told us not to

19    sue anybody and she didn't want any, you

20    know, anything coming up in court or

21    anything like that until after, so we just

22    didn't do anything.

23        Q.  You understand that Christine is

24    going to tell you that that's not true?

25    And, and whether it's true or not --

BIROS_APPENDIX_0083
EXHIBIT A

72

1          A.   (Inaudible).

2          Q.   -- you're supposed to be president

3      -- you're supposed to be president of this

4      corporation, and you're responsible for

5      trying to make it work, and it apparently

6      has not?

7          A.   Well, like I said, most of those

8      people are willing to pay.  Anybody, in my

9      experience, anybody that has stuff stored

10     there is more than willing to pay.  Even a

11     great example is the lady who just paid

12     $3,000 because they want their stuff.  But

13     it's very difficult 'cause Bob Biros and

14     Christine and their family and Andy and

15     everybody is down there destroying all the

16     tenants' things, blocking access to their

17     stuff.  And I'm getting all kind of threats

18     now that they're not going to pay and

19     they're going to sue and they're making some

20     (Inaudible).

21         Q.   Have you ever -- have you referred

22     all these communications to the Trustee?

23         A.   I let the Trustee know what I've

24     been going through, yeah.

25         Q.   So you've been receiving threats

BIROS_APPENDIX_0084
EXHIBIT A

73

1        because of damage?  Who, who specifically

2        has threatened you?

3             A.  I don't know, there's several

4        tenants.  Every time I pull down there and

5        there's a different tenant, they complain

6        that they can't get their stuff, they can't

7        get access.  There's people running around

8        with dozers.

9             Q.  Well, who --

10            A.  (Inaudible) and other tractors.

11            Q.  Who are they?  Who are these people?

12            A.  They're tenants.

13            Q.  I understand they're tenants.  What

14       are their names?

15            A.  You know what, I don't know every

16       single person there by, by name or face.

17       When I -- when I come in and I see them, I

18       wave and I say hi. That's about it.  My

19       brother dealt with most of the, you know, a

20       lot of those people, so, but --

21            Q.  It's beginning to sound like your

22       brother is the one we should have had in the

23       341 meeting?

24            A.  Well, he wasn't available.  He's

25       been in a facility for several months, so

74

1          he, he's going to be discharged I think

2          later this month.  So we -- we didn't even

3          have money to collect or to sue people.  And

4          Christine didn't want -- you know, she's the

5          one that had the money, but she didn't

6          provide any for us to go after these people

7          (Inaudible).

8               Q.  So the long and the short of it is,

9          this is not a viable company unless you get

10         Christine Biros to jump in and pay for

11         everything?

12              A.  No.

13              Q.  Is that what you're telling us?

14              A.  There -- no, not at all.  There's

15         plenty of people with money that would love

16         to be involved.  But Christine got involved

17         saying she'd take the money or, you know,

18         she was going to give us the money, and then

19         she tried to take over the whole property by

20         saying what she said in court and switching

21         this whole thing around.

22              So she -- we tried to pay her back the

23         money we owed her.  Ever since the beginning

24         she will not take the money back.  We

25         offered her interest, everything to make her

BIROS_APPENDIX_0086
EXHIBIT A

75

1          whole, and they just keep saying they want

2          the -- they want the property, they want the

3          property. They said it's a loan but we don't

4          want paid back; we just want the property.

5          So that instead of just foreclosing on the

6          loan, which would have enabled us to pay

7          them off, she did this, this crazy whole

8          thing saying she didn't know who we were.

9          We went to court.  They got a default

10         judgment on us. Then we had to open the

11         judgment.  Then we end up in court and they

12         just, they weren't truthful on almost

13         anything they've said on the stand, so --

14              Q.  Mr. Snyder, your recollection of

15         this legal case is, is not the same as

16         either mine or Ms. Biros.  And I think

17         before you continue to misstate the actions

18         involved, you might want to go back and look

19         at things like the docket and talk to your

20         counsel who was also there.

21              A.  Well, this is true (Inaudible).

22              Q.  Who maintains all -- who maintains

23         all of your -- who maintains all of your

24         books and records; is it you?

25              A.  No, Kash does more of that than me.

76

1          I have some access.  I have access now to

2          some records, but I haven't been able to,

3          you know, really see him in person because

4          he's at a medical facility.  But when --

5               Q.  One of the questions --

6               A.  (Inaudible).

7               Q.  One of the questions here is, list

8          all firms or individuals who were in

9          possession of the debtor's books of account

10         and records when this case was filed, and

11         your answer was none.  And you gave no

12         explanation of why they were unavailable.

13              A.  (Inaudible.)

14              Q.  Is it -- is it -- is it your

15         testimony -- is it your testimony that Kash

16         Snyder has all this stuff and you just can't

17         get to it 'cause he's in an institution?

18              A.  I have some stuff, but if there's

19         anything missing, then he would be the -- he

20         would be the one to have that.

21              Q.  Okay.  In your statement there's a

22         question of, within one year before filing

23         this case, did the debtor provide an insider

24         with the value in any form, including

25         salary, other compensation, draws, bonuses,

341 (a) MEETING OF CREDITORS  -  9/9/2022

77

```
1        loans, credits on loans, stock redemptions
2        and options exercised, and you say no; is
3        that correct?
4             A.  Are you looking at the schedule?
5             Q.  I am.
6             A.  What page is that?  I was trying to
7        follow along with you.
8             Q.  That is Page, hold on, Page 13 of
9        19, Document No. 65, Question 30.
10            A.  This is Page 13?
11            Q.  That's correct.
12            A.  And what is your question?
13                 MR. SLONE:  Question No. 30.
14            Q.  I'm -- you just -- I'm just asking
15       you if your answer to No. 30 is correct?
16            A.  I'm sorry, trying to find Page 13.
17            Q.  Yep, down at the bottom.  Question
18       30.
19            A.  I didn't get a salary and I had --
20       you know, everything, I received repayments
21       on the loans, but no compensation, no
22       salary.
23            Q.  So, so this --
24            A.  (Inaudible).
25            Q.  This question, your answer to this
```

78

```
 1      question is not correct?

 2          A.  Yeah, the way I read it, the way I

 3      read it, I thought it meant salary, and I

 4      didn't receive any salary or any payments,

 5      no dividends.

 6          Q.  Let me move on.  What, what

 7      utilities are at the property at 14140?

 8          A.  I believe electric service.  I think

 9      there are sewage and water taps there, but I

10      don't believe U Lock gets a bill for those.

11          Q.  How about cable?

12          A.  I don't -- no, no cable.

13          Q.  Okay.  Do you have a camera system

14      at the -- at the property?

15          A.  Yes.

16          Q.  Where are the cameras located?

17          A.  We kind of have cameras there to,

18      you know, because the Biros are still

19      (Inaudible) for a lot of things.  I don't

20      know, do I have to tell you the exact

21      locations as to those cameras since your

22      client are the perpetrator?

23              MR. SLONE:  Just say how many

24      cameras are there.

25          A.  I believe there's -- I believe
```

BIROS_APPENDIX_0090
EXHIBIT A

79

```
 1        there's about ten cameras there.  And they

 2        face --

 3            Q.  Well, let me ask you this, Mr. --

 4            A.  (Inaudible).

 5            Q.  Mr. Snyder.

 6            A.  (Inaudible).

 7            Q.  How -- how does information from

 8        those cameras get to some other location if

 9        you don't have cable?

10            A.  Well, there's -- I believe there's

11        WiFi at the property, but I think it's the

12        motel's WiFi or someone else's and --

13            Q.  Oh, so you -- you --

14            A.  (Inaudible).

15            Q.  You tap into the -- you tap into

16        somebody else's WiFi?  Did -- did they give

17        you consent to do that?

18            A.  No, I don't -- no, I don't control

19        that camera system, so the one I --

20            Q.  Who does?

21            A.  The one I control is closed circuit

22        and it's not -- it does not go over WiFi.

23            Q.  So it's not remotely available?

24            A.  The one that I --

25            Q.  Is that correct?
```

BIROS_APPENDIX_0091
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

80

1          A.  That's correct.

2          Q.  Okay.  So how could Shanni Snyder

3      monitor your camera system, if it's closed-

4      circuit and not remotely available, how

5      could she do that for four years?

6          A.  Well, she had the -- no, I, the one

7      I control is closed-circuit and not -- I

8      don't do it, you know, 'cause my sister

9      does, I believe.

10         Q.  Well, where -- but it's -- but it's

11     U Lock's system; right?  So you're telling

12     me she owns the cameras that monitor U Lock?

13         A.  I believe so.

14         Q.  So she owns the camera system at the

15     U Lock property; is that correct?

16         A.  Some of their -- there's multiple

17     camera systems there, because some of the

18     tenants even have their own systems, I

19     believe.  But, yes, she owns her own system,

20     and then the one I have access to is

21     (Inaudible).

22         Q.  How, how is her -- how is her system

23     accessible remotely?  Where is the WiFi

24     system that, that allows that to happen?

25         A.  I'm not sure.  I know we don't have

BIROS_APPENDIX_0092
EXHIBIT A

341 (a) MEETING OF CREDITORS - 9/9/2022

81

```
 1        WiFi at the time, but, you know, since -- I
 2        don't think we've had it (Inaudible).
 3            Q.  Well, that was a four-year period
 4        where, where she had -- she claims she had
 5        access to cameras.  You're telling me that
 6        you only have a closed-circuit camera, so
 7        that couldn't have been -- that couldn't
 8        have been what she was using.  So she's got
 9        her own camera system; is that, is that what
10        you're telling us?
11            A.  Yes, she has her own.  I think she
12        has a -- I think it's called a Dropcam
13        system.  She's a little more technological
14        savvy than me. Mine's kind of like old-
15        school camera, I mean, but it's -- hers has
16        I think (Inaudible).
17            Q.  So if we get into the details of
18        this camera system with her when her claim
19        is, is heard by the District Court, which
20        she's appealed, then she'll understand
21        perfectly how this camera system works?
22            A.  Well, I know she understands better
23        than me. I'm not -- I'm not real -- like I
24        said, mine's the old-fashioned kind.  It's
25        not old-fashioned; it's a high-resolution, I
```

BIROS_APPENDIX_0093
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

82

1          mean, but it's just not -- I don't -- I

2          don't look at my camera systems on like my

3          cell phone.  She does all that.  She has all

4          the cellular service and she does that sort

5          of thing.

6               Q.  Okay.

7               A.  I don't know the (Inaudible) on

8          that.

9               Q.  There is currently located on the

10         property a red car?

11              A.  Yes.

12              Q.  Pretty hard to miss if you drive on

13         -- who owns that?

14              A.  The Honda, are you referring to the

15         Honda, the red Honda?

16              Q.  I'm only -- I don't remember what

17         brand it was. I'm only aware of one red car

18         on that site at this point.

19              A.  Yeah, right in front of the

20         building?  That would be --

21              Q.  Yeah, who owns that?

22              A.  My brother Kash.  That's his car.

23              Q.  That's Kash's car?  Why is his car

24         still there? It's obviously not operable?

25              A.  Yeah, I'm not sure.  Like, like I

BIROS_APPENDIX_0094
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

83

1          told you before, I don't want to keep

2          repeating.  I mean, I feel bad having to

3          keep repeat it, but, you know, there's so

4          much contention there. Biros come down

5          there, kicked me off the property, kicked

6          people off the property.  They blocked his

7          car in.  You can't get a -- I don't even

8          know if you can get a tow truck back to his

9          car at this point.

10         They covered almost all the roads except

11         for one, and so it's very difficult for

12         anybody to get anything down there.  The

13         whole family shows up, Bob Biros, Christine

14         Biros, her son Scotty Biros, Andy Biros,

15         John Biros.  They're like a swarm of bees

16         down there and they're harassing everybody,

17         and they're moving stuff around with dozers

18         and backhoes and taking people's property

19         and damaging it.  They're pushing everything

20         into a pile.  One minute they say it's

21         garbage (Inaudible).

22              Q.  You're prepared -- you're prepared

23         to back up these statements in court, I

24         assume, with evidence?

25              A.  Pardon me?

84

```
 1        Q.  But the mean -- but in the meantime
 2    --
 3        A.  (Inaudible).
 4        Q.  -- the Trustee has, Mr. Snyder, the
 5    Trustee has allowed you pretty much
 6    unlimited access to the site, and you've --
 7    and you've moved a lot of stuff off this
 8    site without interference from the Biros.
 9    So the question is --
10        A.  That's not true.  I (Inaudible).
11        Q.  -- why is Kash Snyder's broken --
12    excuse me, let me finish my question,
13    please.
14        A.  (Inaudible).
15        Q.  Why is Mr. -- your brother's red car
16    still on the site?  It's clearly not
17    operable and it could be moved just as the
18    other cars were?
19        A.  Well, I -- it -- that probably --
20    I'm guessing it wasn't moved by Kash because
21    he's been in a facility since I believe June
22    or July.  I could probably get, you know,
23    permission from Kash and work with Mr. Slone
24    to get that car out of there, but it's very
25    difficult to do anything. And I disagree
```

BIROS_APPENDIX_0096
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

85

```
 1        with you saying I got a lot of stuff out of

 2        there.  I don't think I got a couple percent

 3        of stuff out of there.  We took one

 4        truckload of pallets (Inaudible).

 5            Q.  All of those -- all of those

 6        shipping containers are gone and most of the

 7        trailers are gone?

 8            A.  Yeah, I don't --

 9            Q.  So --

10            A.  I don't agree with you.  I don't

11        think there was -- I think there was only

12        one trailer that I know of that left the

13        site.  And the shipping containers were

14        moved months ago.  I'm not in agreement with

15        you on your, you know, what you're --

16            Q.  Who paid -- who paid the insurance

17        premium for the insurance on the site?

18            A.  I paid that personally.

19            Q.  Okay.  Who is the principal of USAAG

20        that you've been dealing with?

21            A.  Well, I was talking to Mike Lavinsky

22        (Phonetic spelling).

23            Q.  Do you have contact information for

24        him?

25            A.  Not in front of me.
```

BIROS_APPENDIX_0097
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

86

1          Q.   What -- what state was USAAG

2     incorporated in, do you know?

3          A.   No, I don't.

4          Q.   Is there anybody -- is there anybody

5     else associated with USAAG that you're aware

6     of?

7          A.   Yeah, I talked to someone else, but

8     (Inaudible).  There's several people.

9     They're slipping my mind right now.  There

10    was Mike Lavinsky.

11         Q.   How -- how do you know this Mr. Mike

12    Lavesky (Phonetic spelling)?

13         A.   You know what, several years ago, he

14    had -- he had called.  I don't know if you

15    saw the number on the sideline or whatever.

16    He called and he came and he wanted to meet,

17    and we came out and we looked at the

18    properties.  And he's come back a couple

19    times since.

20         Q.   Okay.  Why have you never applied

21    for an occupancy permit for U Lock on that

22    site?

23         A.   I'm not sure.  Like I said, Kash, my

24    brother Kash handled most of that stuff.

25    And then I think we were kind of

87

```
1        grandfathered in with, you know, the storage
2        facility, is kind of what the Township told
3        us there, so --
4            Q.  I can -- I can assure you that
5        according to North Huntingdon Township, that
6        you are not grandfathered in.
7            A.  (Inaudible).
8            Q.  Do you pay business privilege tax to
9        North Huntingdon Township?
10           A.  Pardon me?
11           Q.  Do you pay business privilege tax to
12       North Huntingdon Township?
13           A.  I don't think so, but --
14           Q.  Any reason why not?
15           A.  No, just like we said before, we
16       haven't paid anything.  We didn't have the
17       money, so we didn't pay any of the taxes
18       yet.  But we don't (Inaudible).  We're going
19       to file them.
20           Q.  Now, when you had the Kubota
21       machinery, you -- you borrowed -- you
22       entered into a loan agreement, U Lock
23       entered into a loan agreement to purchase
24       that equipment; is that correct?
25           A.  In 2016 you mean?
```

88

```
 1          Q.  Yes.

 2          A.  Yes.

 3          Q.  Okay.  And I assume that U Lock made

 4     payments to keep the loan current; is that

 5     correct?

 6          A.  Yes.

 7          Q.  Okay.  And you then sold the Kubota

 8     property or equipment and received $45,000

 9     for it, so you must have paid at least

10     $45,000 from U Lock to Kubota; is that

11     correct?

12          A.  Well, a lot of times if U Lock

13     didn't make enough money sometimes to cover

14     it, and I always -- I always put the money

15     in to cover the payments, so I put quite a

16     bit of money towards the payments.

17          Q.  Is it -- is it correct that you

18     rented that equipment out periodically?

19          A.  I don't know that we ever -- I don't

20     know that we ever rented it out.  We put a

21     sign there that, for rent, but we didn't

22     rent that machine out.  That stayed on the

23     property.  But we have another machine like

24     that, so when someone would call and say,

25     hey, can I rent an excavator, yeah, we did
```

BIROS_APPENDIX_0100
EXHIBIT A

89

```
 1        do that a couple times, but only a handful
 2        of times.
 3           Q.  When you say we had another piece of
 4        equipment, who is the we you're talking
 5        about, U Lock?
 6           A.  No, no, I'm sorry, no.  Personally I
 7        had another piece of equipment that was
 8        almost identical to that, that one.  And
 9        this is going back years.  I mean, I think
10        that was, if it was in like 2016 or
11        something.  We put that there and we
12        (Inaudible) for rent, but what we rented was
13        a machine that was almost identical to that
14        one.  But I don't -- I think -- I can't even
15        remember the charge.  We rented, I think it
16        was rented to a friend just a couple times.
17        But as far as I know, I don't think that
18        particular machine owned by U Lock was
19        rented out ever.
20           Q.  What is -- what is the involvement
21        of Eric Martin in U Lock?
22           A.  None.  He had -- I think he loaned
23        -- he loaned the down money for U Lock in
24        the beginning, but he was --
25           Q.  And in fact, he was repaid by the --
```

BIROS_APPENDIX_0101
EXHIBIT A

90

```
 1        by the -- at the closing, or he was repaid
 2        with money out of I believe Henry Moore's
 3        escrow.  So what, what did you pay Mr.
 4        Martin; what did you pay Mr. Martin to loan
 5        you the down payment for this property?
 6             A.  I don't -- I don't think anything.
 7             Q.  So he -- he did it as a -- as a
 8        friendship?
 9             A.  Yes.
10             Q.  Out of friendship?
11             A.  Yeah.
12             Q.  Okay.  Let's see.  Have you given a
13        complete list of all of the renters on that
14        property to the Trustee?
15             A.  At the time I gave him all, you
16        know, when we filed the schedules, we gave
17        -- I gave him everything I knew about.  And
18        as things came up, like, I believe the
19        tractor-trailer we were talking about
20        earlier was not on the schedule, but I
21        updated him on that.  If anything did come
22        to light after the fact, we'd let him know.
23             Q.  Well, you've controlled -- you've
24        controlled that property from 2015 up until
25        at least when the bankruptcy petition was
```

91

1        filed, so it would seem logical that you

2        would have a list of tenants for all your --

3        all your lockers and there wouldn't be

4        people who had stuff stored there that you

5        wouldn't know about, even if you didn't know

6        them personally, so --

7            A.  Yeah.

8            Q.  So are you telling us that there are

9        tenants or renters that you don't know

10       about?

11           A.  Well, there were -- I wasn't the one

12       -- when you're saying I was in control of

13       the property, I didn't do every task there

14       at the property, nor was I in control of

15       every aspect of it, so my brother kind of --

16           Q.  Well, U Lock was, and you're the

17       president of U Lock, so it's your

18       responsibility?

19           A.  Yeah, so like I said, Kash was the

20       (Inaudible) with the tenants and myself.

21           Q.  Oh, so you're telling me Kash was in

22       charge of all the renters and had a complete

23       list of the tenants, of the renters?

24           A.  I don't know exactly what he has.  I

25       think you asked him that question before on

BIROS_APPENDIX_0103
EXHIBIT A

92

```
 1      the stand.  I can't remember what he

 2      answered, but I -- yeah, he did that way

 3      more than I did.  I just, like I said, I've

 4      been trying to play catch-up here in the

 5      past few months and, you know, like I said,

 6      I didn't do every single task on that

 7      property.  So, yeah, he would -- he would

 8      have more of a complete list than I have.

 9      But I think we're -- we're pretty, pretty

10      much, I'd have to say 90, 98 percent or

11      something, you know, accurate when we give

12      Mr. Slone the statements, would be my guess.

13       But like I said --

14                  MR. OTTO:  Mr. Slone, we've had a

15      number of questions which in my view are

16      fairly important that Mr. Snyder has said he

17      can't answer because his brother Kash has

18      the information.

19                  MR. SLONE:  Well, we can take --

20      you can schedule a 2004 Examination of Kash

21      Snyder. Maybe that's what should be done.

22                  MR. OTTO:  I -- I was going to

23      ask, I'm not sure what the mechanism would

24      be, to do that or to continue the 341

25      meeting until Mr. Snyder, Mr. Kash Snyder is
```

93

```
1      available.
2                    MR. SLONE:  Well, I won't close
3      --
4                    MR. OTTO:  I'll leave that to
5      your discretion.
6                    MR. SLONE:  I won't close -- I
7      will not close the meeting today.  So we can
8      reschedule a continuation of it when we get
9      a date for Mr. Kash, or you can take a 2004
10     Examination, either way.
11                   MR. OTTO:  Okay.  Let me -- let
12     me talk to Sarah Wenrich separately and --
13     and --
14                   MR. SLONE:  Yeah, I will not
15     close this.
16                   MR. OTTO:  Either I will --
17                   MR. SLONE:  I will not close the
18     meeting today.  The meeting will be held
19     open.
20                   MR. OTTO:  That's all the
21     questions I have for now, but --
22                   MR. SLONE:  Okay.
23                   MR. OTTO:  -- I don't know if
24     Sarah or Christine have any.
25                   MR. SLONE:  Any other questions?
```

94

1              MS. BIROS:  I have one, Bill.

2        Bill I had one.

3              MR. OTTO:  Yes, go ahead.

4              MS. BIROS:  Is Biros on the

5        checking account for U Lock?

6              MR. OTTO:  Mr. Snyder, did you

7        hear that question?

8              MR. GEORGE SNYDER:  No, I'm

9        sorry.

10             MR. OTTO:  Who, who has the --

11       who is authorized to sign, with Citizens

12       Bank to sign checks for U Lock?

13             MR. GEORGE SNYDER:  Kash Snyder,

14       my brother.

15             MR. OTTO:  Only Kash, not you?

16             MR. GEORGE SNYDER:  Not me;

17       correct.

18             MR. OTTO:  Only Kash, okay.

19             MR. GEORGE SNYDER:  Yes.

20             MR. OTTO:  Sarah, do you have any

21       questions?

22             MS. WENRICH:  I do not have any

23       further questions at this time.  Thank you.

24             MR. SLONE:  Okay, what I'm going

25       to do, if there's no further questions, I

95

```
 1        will keep the meeting open and then --
 2                   MS. SHANNI SNYDER:  I -- excuse
 3        me, this is Shanni.
 4                   MR. SLONE:  Yes.
 5                   MS. SHANNI SNYDER:  I have
 6        questions.
 7                   MR. SLONE:  Okay, I'm giving --
 8                   MS. SHANNI SNYDER:  (Inaudible).
 9                   MR. SLONE:  Okay.  Is it going to
10        be lengthy or within the next ten minutes?
11                   MS. SHANNI SNYDER:  No.  Yes, we
12        should be good.
13                   MR. SLONE:  Okay, go.
14   EXAMINATION OF GEORGE SNYDER:
15   BY MS. SHANNI SNYDER
16        Q.  Okay.  George, you were the primary
17        officer of U Lock; isn't that right?
18        A.  Yes.
19        Q.  Did you answer?
20        A.  Yes.
21                   MR. SLONE:  He said yes.
22        Q.  Hello?
23        A.  Correct.
24        Q.  Okay.  You were the primary
25        shareholder of U Lock; isn't that right?
```

96

1          A.  Yes, majority shareholder.

2          Q.  When you started U Lock, did it have

3     any money?

4          A.  No.  We were (Inaudible).

5          Q.  When you formed U Lock, did you

6     discuss the name with Christine and John

7     Biros?

8          A.  I didn't finish answering your other

9     question when you said we didn't have any

10    money.  We were supposed to, was promised

11    money by Biros to keep U Lock, you know, to,

12    to develop U Lock, so, but when they didn't

13    put up the money, then, no, we didn't have

14    any.  So I'm sorry, what's your next

15    question?

16         Q.  Okay.  When you -- when you formed U

17    Lock, did you discuss the name with

18    Christine and John Biros?

19         A.  Yes, we discussed everything

20    together.  We met almost daily, but at the

21    very least weekly.

22         Q.  Okay, when did U Lock open its bank

23    account?

24         A.  I'm not sure exactly.  I think we

25    purchased it in like 5/2015, something like

97

```
 1         that.  It was sometime after that.
 2                  MR. OTTO:  I'm sorry, I didn't
 3         hear that date.
 4              Q.  (Inaudible).
 5              A.  I believe, I think just right after
 6         we -- we purchased it.  So I think probably,
 7         if we bought it in July, I would say we had
 8         the bank account by September.  That's --
 9              Q.  The whole idea of U Lock was to get
10         this property and develop it; isn't that
11         right?
12              A.  Correct.
13              Q.  Christine Biros promised to put up
14         the money to help you with that; isn't that
15         right?
16              A.  Yes.
17              Q.  Did you have silent partners from
18         2015 to 2018?
19              A.  Yeah, Christine Biros and John
20         Biros.
21              Q.  And how often did you have meetings
22         with John and Christine Biros from 2015
23         through 2018 then?
24              A.  I would -- 2015 to '18?  I would say
25         with John, I would say almost every day.
```

98

1       And then he was -- he relayed whatever

2       Christine would say to me.  And then

3       Christine, and I wanted to clarify a

4       question I didn't get to finish answering

5       before.  When I met Christine, it was every

6       Wednesday, and she would ask me to come down

7       to meet with her at her place of business,

8       which happened to be a bar or a tavern.  And

9       I didn't drink; we don't drink.  We didn't

10      sit at the bar.  We'd sit in the office and

11      talk.  And so it wasn't that just we just

12      ran into each other at some bar somewhere.

13      It was, she was the owner of this business.

14      We were meeting at her request there.

15          Q.  Did you discuss the U Lock and its

16      plans at these meetings?

17          A.  Yes, we always, we sat there for

18      hours.  That's all we talked about.

19          Q.  And you're saying it was a bar.

20      What was the name of the bar?

21          A.  Caesar's Tavern.  Well, we didn't

22      always meet at a bar.  There -- we met

23      different places, wherever they requested.

24      You know, there were different places we

25      met, but a lot of it was at that -- at her

99

1      place of business, Caesar's Tavern.

2          Q.  Okay, so you discussed the U Lock

3      and its plans with them at those meetings,

4      and when did the meetings stop?

5          A.  I'm not really sure.  As far as the

6      -- as far as with Christine, it kind of

7      stopped a little earlier, like maybe in

8      2018.  John I talked to a little bit less,

9      less, but I've met up with John just as

10     recently as last year (Inaudible). Maybe

11     even this year.

12         Q.  And did you have progress updates

13     and meetings even after Christine Biros sued

14     you?

15         A.  Yes.  Yeah, we always did.  Even I

16     think at one point they even, you know,

17     paused the lawsuit so we could talk about

18     moving forward.

19         Q.  When you had these meetings during

20     the lawsuit, was Ms. Biros' attorney, was

21     Ms. Biros' attorney present with you?

22         A.  No.

23         Q.  Did you consider Ms. Biros the

24     control person of U Lock?

25         A.  Yes.

100

```
 1              MR. SLONE:  At what point?

 2         Q.  Even after the lawsuit, even after

 3      the lawsuit, did you feel that Ms. Biros was

 4      -- Ms. Biros was making the shots, calling

 5      the shots in U Lock, making the decisions?

 6         A.  Yes.  The whole time.

 7         Q.  U Lock had a company car it used; is

 8      that correct?

 9         A.  Yes, truck, pickup truck.

10         Q.  Who owned the company car?

11         A.  I believe it's the Biros family.

12      I'm not exactly sure who it's titled to, but

13      I'm -- I believe someone in the Biros

14      family, Bob or John or I'm not sure.

15         Q.  When did U Lock return it?

16         A.  Just in recent years.  We used it

17      from, I believe, I think 2015 maybe from the

18      beginning till I think '20, sometime in

19      2020.  '21, '22. Yeah, so not the past two

20      years.  Somewhere in 2020 they (Inaudible)

21      take it back.

22         Q.  Okay, so from 2015 to 2020 the

23      company car belonged to the Biros family?

24         A.  Yes.

25         Q.  Can you hear me?
```

BIROS_APPENDIX_0112
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

101

```
 1            A.  Yeah, I can hear you.

 2            Q.  (Inaudible).

 3            A.  I'm sorry.  Did I miss a question?

 4       Go ahead.

 5            Q.  So from 2015 through the beginning

 6       of 2020, the company car belonged to the

 7       Biros family?

 8            A.  Oh, yeah, I thought I answered that.

 9        Yes, yeah, we knew -- there was -- there

10       was a truck that was used on the facility,

11       and it belonged, to them and we used it

12       quite a bit.  And then when it would need

13       any maintenance or anything, John would pick

14       up the truck, take it to the -- to get

15       inspected or whatever needed done, brakes

16       done or something, and he would bring it

17       back to the property.

18            Q.  And did the Biros family place

19       trailers onto the property at U Lock?

20            A.  Yes, two (Inaudible) like maybe 70-

21       foot mobile homes.

22            Q.  Did you ask them to do that?

23            A.  No.

24            Q.  So the whole time, even after the

25       lawsuit, you considered Ms. Biros to be part
```

102

1      of U Lock?

2          A.   Yeah.  And I believe they put those

3      trailers there after the lawsuit.  They

4      just, yeah, she was always in control.

5          Q.  And when Christine Biros sued U

6      Lock, did she ask the Court to order

7      repayment or payment to her for rent?

8          A.  Oh, you mean this most recent thing

9      where they're asking for me, George Snyder,

10     to pay U Lock rent?  Or U Lock to pay her

11     rent?

12         Q.  No, I said when Christine Biros sued

13     U Lock, did she ask the Court to order

14     payment to her for rent?

15         A.  No.  She never mentioned that.

16         Q.  Did Christine Biros ever send you a

17     bill for rent?

18         A.  No, she did not.

19         Q.  Did Christine Biros ever ask you to

20     pay her rent?

21         A.  No, there was no mention of

22     (Inaudible).

23         Q.  When U Lock purchased --

24         A.  The other court (Inaudible).

25         Q.  When U Lock purchased the property,

341 (a) MEETING OF CREDITORS  -  9/9/2022

                                                            103

1         did it have tires on it?

2              A.  Yes, there were a lot of tires

3         there.

4              Q.  What did U Lock do to improve this

5         property from 2015 to 2020?

6              A.  I apologize, can you repeat that

7         question?

8              Q.  What did U Lock do to improve the

9         property from 2015 to 2020?

10             A.  No.

11                  MR. SLONE:  Where are we -- where

12        are we going with this?  Just give me a

13        heads-up.

14                  MS. SHANNI SNYDER:  I only -- I

15        only have -- I only have a few more

16        questions, but I'm trying to determine

17        whether Christine Biros and the Biros

18        insurance trust are co-debtors or insiders

19        of U Lock.

20                  MR. SLONE:  Okay, you can ask a

21        few more questions.

22                  MS. BIROS:  I think that's

23        already been determined, so --

24             A.  I'll answer pretty quickly.  We did

25        everything there, from changing light bulbs

104

1          to electrical service to guide wires, over a

2          couple hundred tons of substrate for the

3          parking lot.  We fixed garage doors.  We had

4          garage door openers installed.  We met with

5          tenants.  Developed roads to go down below,

6          a road going up to the highway.  We did --

7          we did all, you know, all kind of stuff.  We

8          removed a lot of the garbage from there,

9          cleaned up tires, recycled things.

10              There was dozens and dozens of TV's and

11          different things there.  So the list is

12          quite extensive, but I'll keep it brief

13          since we want to move on here.  So, but,

14          yeah, anything that was entailed down there,

15          we did the work.  I did a lot of work

16          personally.

17              Q.  Okay, I only have a few more

18          questions.  U Lock had me watching its

19          Dropcamera; isn't that correct?

20              A.  Yes.

21              Q.  U Lock never paid me anything; isn't

22          that correct?

23              A.  That's correct.

24              Q.  Did Christine Biros know I was

25          helping?

BIROS_APPENDIX_0116
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

105

```
 1          A.  Yes, she knew every step of the way,
 2      every --
 3          Q.  Did you tell her during your weekly
 4      meetings?
 5          A.  Yes.  I went over everything.
 6          Q.  And you considered my work to be a
 7      favor; isn't that right?
 8          A.  Yes, at the time.
 9          Q.  You called it sisterly love; isn't
10      that right?
11          A.  Oh, something like that.  I think
12      Kash used those words.
13          Q.  And Christine Biros didn't object to
14      me doing this work, did she?  When I sued
15      you, someone handed you the summons; isn't
16      that right?
17          A.  That's correct.
18          Q.  You knew about the lawsuit, but you
19      didn't answer it; right?
20          A.  Yes.
21          Q.  Did I discuss the lawsuit with you?
22          A.  No.
23          Q.  Did I ask you not to hire an
24      attorney?
25              MR. OTTO:  I'm sorry, I didn't
```

BIROS_APPENDIX_0117
EXHIBIT A

106

1      hear the answer.  I'm sorry, what?

2           A.  I'm sorry.

3           Q.  Did I discuss the lawsuit --

4               MR. OTTO:  What was the answer to

5      your first question?  Did you discuss the

6      lawsuit --

7           A.  No, I did not.

8               MR. OTTO:  -- with Ms. Snyder?

9           A.  I did not discuss the lawsuit.  I

10     did not discuss the lawsuit with her.

11              MR. OTTO:  Okay.

12          Q.  Did I ask you not to hire an

13     attorney?

14          A.  No.

15          Q.  Did I tell you to default?

16          A.  No.

17              MS. SHANNI SNYDER:  That's all my

18     questions.

19              MR. SLONE:  Okay, thank you.

20     Okay.

21              MS. SHANNI SNYDER:  You're

22     welcome.

23              MR. SLONE:  I will hold the

24     meeting open for the possible questions for

25     Kash Snyder, or if you want to schedule a

341 (a) MEETING OF CREDITORS  -  9/9/2022

107

1         2004 Examination, let me know.  And let me

2         know when Mr. Snyder, Kash Snyder would be

3         available, and then we'll get something

4         scheduled.  Any other questions?

5                   MR. GEORGE SNYDER:  Okay, Mr. --

6         and also, Mr. Slone, if there's some of

7         those things, I could probably get some

8         answers for some things either maybe by

9         phone with Kash or I could, you know, look,

10        look for some answers for some of the things

11        (Inaudible) might be -- might have been

12        omitted today.

13                  MR. SLONE:  Well, get, all the

14        things that have been asked for, get that

15        information either filed or sent to me and

16        then, then we'll see what we're going to do

17        with -- when we're going to schedule Kash

18        Snyder.

19                  MR. GEORGE SNYDER:  Okay, sounds

20        --

21                  MR. SLONE:  Okay.

22                  MS. BIROS:  Mr. Slone, Christine

23        Biros here.  I have a question.

24                  MR. SLONE:  Yes.

25                  MS. BIROS:  I just want -- I just

108

1         want it on the record that most of this that

2         I just heard is not correct and I knew

3         nothing about (Inaudible).

4                    MR. SLONE:  Okay, well, we're --

5         this is only to ask questions of the

6         representative of U Lock.

7                    MS. BIROS:  Okay.

8                    MR. SLONE:  We're not -- we're

9         not trying the case here.

10                    MS. BIROS:  Okay.

11                    MR. SLONE:  But your comments are

12        received.  So we're -- I'm going to -- I'm

13        going to close the -- I'm going to stop the

14        recording now and we'll reschedule later.

15        Thank you. (End of recording.)

16

17

18

19

20

21

22

23

24

25

BIROS_APPENDIX_0120
EXHIBIT A

109

1

2

3              C E R T I F I C A T E

4

5      I, Mary J. Carney, a Court Reporter and Notary

6  Public in and for the Commonwealth of Pennsylvania,

7  do hereby certify that the foregoing is a true and

8  correct transcription of the recorded proceedings of

9  the 341(a) Meeting and constitutes a true record.

10

11  This 27th day of January, 2023.

12

13

14  _____

             Notary Public

15

16

17

18

19

20

21

22

23

24

25

BIROS_APPENDIX_0121
EXHIBIT A

Case 22-20823-GLT Doc 337 Doc 337 Filed 02/24/23 Entered 02/24/23 09:41:54 Desc
Exhibit A   Page 111 of 124
341 (a) MEETING OF CREDITORS  -  9/9/2022

Page 110

**A**
**ABC** 61:7
**able** 55:3 76:2
**absolutely** 48:15
**accepted** 56:12
**access** 72:16 73:7
  76:1,1 80:20
  81:5 84:6
**accessible** 80:23
**account** 76:9 94:5
  96:23 97:8
**accountant** 17:1
  17:25
**accounts** 70:7
**Accredited** 13:10
  13:14,21
**accumulation**
  38:3
**accurate** 92:11
**accurately** 6:4
**acres** 8:3
**action** 7:17 33:15
  43:20 44:5,6
  71:7
**actions** 75:17
**administrative**
  37:18
**advertising** 31:20
**aerial** 52:16,18
  53:11
**afternoon** 35:23
**ago** 51:4 62:20
  85:14 86:13
**agree** 23:12 85:10
**agreed** 60:19
**agreement** 21:5
  21:18 30:21
  31:8 33:17
  55:23 56:11
  85:14 87:22,23
**ahead** 68:25
  71:13 94:3
  101:4
**alleged** 26:6
**Allen** 2:9 4:5 10:2

11:6,8,9,22,25
  12:1,8,10 19:13
  35:13 68:4,4,5
  68:21
**Allen's** 46:10
  68:11
**allowed** 48:19,21
  84:5
**allows** 80:24
**amend** 25:5
**amended** 14:23
  15:2
**amount** 29:14
  64:6 67:22
**Andy** 72:14 83:14
**answer** 39:6
  43:10,12 44:16
  44:24 46:8,15
  46:20 59:8
  63:11,16 66:25
  67:2,8 76:11
  77:15,25 92:17
  95:19 103:24
  105:19 106:1,4
**answered** 40:1
  57:14 67:17
  70:8 92:2 101:8
**answering** 42:15
  96:8 98:4
**answers** 107:8,10
**anticipate** 18:3
  19:22
**anybody** 9:19
  47:20 68:2
  69:18,25 71:19
  72:8,9 83:12
  86:4,4
**anyway** 43:25
**anyways** 62:11
**apiece** 51:17
**apologies** 5:7
**apologize** 29:1
  103:6
**apparently** 56:1
  56:9,10 72:5

**appealed** 81:20
**appear** 24:14
  51:11
**applied** 86:20
**approval** 62:12
**approximately**
  9:18 19:19
**area** 63:2
**arguing** 48:9
**arm's** 48:9,17
  49:15
**arrangement**
  27:19
**arrangements**
  54:7 57:19
**asked** 18:14,15
  42:16 46:3 52:2
  62:15,18,19
  65:23,24 66:14
  66:22,23 91:25
  107:14
**asking** 18:16
  36:22 42:19,20
  42:23 46:2,10
  60:11 77:14
  102:9
**aspect** 91:15
**assert** 48:6
**asserting** 34:4
**assertion** 34:8
**assets** 6:5,17 9:5
  9:14 37:14
**assigned** 51:8
**associated** 86:5
**assume** 83:24
  88:3
**assure** 62:17 87:4
**attempting** 71:2
**attention** 6:12
**attorney** 4:6
  17:16 20:16
  21:23 40:11
  45:8 99:20,21
  105:24 106:13
**authorized** 94:11

**available** 60:16
  73:24 79:23
  80:4 93:1 107:3
**aware** 21:25
  39:21 62:6
  82:17 86:5

**B**
**back** 7:4 11:12,14
  11:16,21 12:2,8
  12:12 13:24
  18:10,14 19:17
  19:18 22:9
  28:20 36:4,9,17
  39:25 53:2
  55:10 63:7
  68:21,23 69:6
  69:15 74:22,24
  75:4,18 83:8,23
  86:18 89:9
  100:21 101:17
**background**
  35:10
**backhoes** 83:18
**backup** 12:10
**bad** 83:2
**bank** 17:21,25
  94:12 96:22
  97:8
**bankruptcy** 1:1,2
  8:17,21,24 9:16
  14:4,9 15:4
  16:8 17:22
  20:17 34:19
  39:1,23 44:13
  44:25 46:1 47:4
  71:6,14 90:25
**bar** 31:2,10 32:15
  98:8,10,12,19
  98:20,22
**basis** 64:11
**bees** 83:15
**beginning** 31:18
  31:23 73:21
  74:23 89:24

100:18 101:5
**begs** 67:18
**behalf** 5:3,5 26:4
  66:8
**believe** 20:22
  39:13 42:4 50:8
  51:1,3 52:15
  53:20 55:16,20
  56:22 57:17
  58:23 69:24
  70:1 78:8,10,25
  78:25 79:10
  80:9,13,19
  84:21 90:2,18
  97:5 100:11,13
  100:17 102:2
**belonged** 52:20
  52:23 53:10
  100:23 101:6,11
**best** 39:13
**better** 63:16
  81:22
**big** 53:4,5
**bill** 10:7,11 78:10
  94:1,2 102:17
**billed** 44:12
**Biros** 2:7 5:4,5,8
  7:10 8:5 13:24
  14:7,19 17:11
  17:11 30:17
  32:8 38:7,19,23
  42:5 43:20
  48:17 49:10,17
  49:18,18,22
  54:24 55:12
  58:21 70:2
  72:13 74:10
  75:16 78:18
  83:4,13,14,14
  83:14,15 84:8
  94:1,4,4 96:7,11
  96:18 97:13,19
  97:20,22 99:13
  99:23 100:3,4
  100:11,13,23

BIROS_APPENDIX_0122
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

Page 111

101:7,18,25
102:5,12,16,19
103:17,17,22
104:24 105:13
107:22,23,25
108:7,10
**Biros'** 99:20,21
**bit** 39:18 45:4
88:16 99:8
101:12
**blank** 11:13
**blocked** 83:6
**blocking** 72:16
**board** 46:13
**Bob** 11:4 32:8
44:19 49:18
72:13 83:13
100:14
**bona** 47:23
**bonuses** 76:25
**books** 26:14
75:24 76:9
**borrowed** 87:21
**bother** 47:9,14
**bottom** 77:17
**bought** 97:7
**box** 51:1
**brakes** 101:15
**brand** 82:17
**brief** 24:25
104:12
**bring** 6:12 101:16
**broken** 84:11
**brother** 13:1
16:15 31:3
47:15 48:11
59:4,6,21 65:2
65:24 66:15
70:1,3,15,16
73:19,22 82:22
86:24 91:15
92:17 94:14
**brother's** 84:15
**brought** 7:6,7
12:21 53:17

**building** 25:16
42:12,22,24
82:20
**bulbs** 103:25
**business** 6:16,20
7:1 13:11,14
43:25 58:16
87:8,11 98:7,13
99:1

___

**C**

**C** 109:3,3
**C-A-R-L** 20:2
**cable** 78:11,12
79:9
**Caesar's** 31:2
98:21 99:1
**call** 4:1 11:1,2,3
11:12,14,16
12:2 32:16 36:3
36:9 41:21
56:23 68:9,10
88:24
**called** 13:10,13
57:18 81:12
86:14,16 105:9
**calling** 11:5,20
100:4
**camera** 65:5
78:13 79:19
80:3,14,17 81:6
81:9,15,18,21
82:2
**cameras** 78:16,17
78:21,24 79:1,8
80:12 81:5
**car** 82:10,17,22
82:23,23 83:7,9
84:15,24 100:7
100:10,23 101:6
**Carney** 109:5
**cars** 84:18
**case** 4:2,3 6:18
8:14 20:24
36:18 38:20

44:3 45:6 47:6
47:24 48:9,16
58:22 75:15
76:10,23 108:9
**cases** 22:9 35:24
**cash** 56:12
**catch-up** 70:15
92:4
**cause** 7:16 11:12
12:21 15:23
18:3 27:14
41:20 45:21
50:12 54:24
57:4,12 70:15
72:13 76:17
80:8
**cell** 11:2,16 12:6
82:3
**cellular** 82:4
**certainly** 32:13
40:17 56:7
**certificates** 30:24
**certify** 109:7
**changed** 23:5
25:6
**changes** 52:4
**changing** 103:25
**Chapter** 1:3
**charge** 23:3
89:15 91:22
**charging** 46:11
**check** 9:10 33:11
33:12 58:9
**checking** 94:5
**checks** 94:12
**child** 49:11,13,13
**Christine** 2:7 5:3
7:10 17:11 23:2
23:3 30:17 31:4
31:22 32:7,15
38:7,23 42:5
48:17 71:17,23
72:14 74:4,10
74:16 83:13
93:24 96:6,18

97:13,19,22
98:2,3,5 99:6,13
102:5,12,16,19
103:17 104:24
105:13 107:22
**circuit** 79:21 80:4
**circumstances**
48:8
**citation** 39:20,24
40:4,8
**cited** 38:1,16,17
38:24,24
**Citizens** 94:11
**claim** 7:16 8:6
22:25 26:6
32:23 35:1 44:3
46:7 63:9 67:20
81:18
**claimed** 31:17
56:8
**claiming** 23:18
23:21,22 53:6
54:16
**claims** 9:15 47:18
64:9 65:21 81:4
**clarify** 24:4 40:17
45:25 57:7,12
98:3
**clean** 40:5
**cleaned** 25:13,15
39:14,15 104:9
**clear** 66:1
**clearly** 57:15
84:16
**client** 32:12 78:22
**close** 24:21 33:2
49:16,17,17
93:2,6,7,15,17
108:13
**closed** 79:21
**closed-** 80:3
**closed-circuit**
80:7 81:6
**closing** 90:1
**co-debtors**

103:18
**code** 38:7
**collect** 70:24
71:15 74:3
**collected** 7:15
56:2 58:2
**come** 22:9,25
46:24 55:2 63:7
73:17 83:4
86:18 90:21
98:6
**coming** 14:25
71:20
**comment** 38:25
**comments** 108:11
**Commissioner**
42:6,17
**Commonwealth**
109:6
**communicated**
61:9
**communications**
72:22
**company** 6:6,16
7:2,12,23 9:25
12:16 13:10,13
14:4,11 15:3,7
16:25 17:3,6
19:20 20:22,23
22:25 23:15
24:5,8,11 29:3,4
29:12 31:9 34:5
48:22 69:19
74:9 100:7,10
100:23 101:6
**company's** 28:6
53:20
**compensation**
23:9,25 24:15
25:19,24 26:12
27:8 28:12
76:25 77:21
**complain** 73:5
**complete** 90:13
91:22 92:8

BIROS_APPENDIX_0123
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

Page 112

| | | | |
|---|---|---|---|
| **completely** 61:15 | 79:18,21 80:7 | 39:1 41:4 43:19 | 76:23 |
| **concede** 64:5 | 91:12,14 99:24 | 44:5 45:12,16 | **debtor's** 76:9 |
| **concerned** 18:4 | 102:4 | 48:25 51:16 | **debtors** 14:14 |
| **confirm** 37:2 | **controlled** 24:11 | 65:2,24 66:7 | **December** 20:10 |
| **confused** 57:13 | 90:23,24 | 67:19 71:20 | 37:3 |
| **conjunction** 51:9 | **controlling** 14:16 | 74:20 75:9,11 | **deciding** 48:11 |
| **connection** 65:25 | 25:7 | 81:19 83:23 | **decisions** 100:5 |
| **consent** 79:17 | **convert** 60:18,20 | 102:6,13,24 | **deeds** 50:1 |
| **consider** 21:3,11 | 62:10 | 109:5 | **default** 20:22 |
| 21:15 27:17 | **copies** 15:20 | **cover** 32:25 88:13 | 27:24 48:22,23 |
| 28:4,10 40:4 | **copy** 5:21 29:8 | 88:15 | 49:4 75:9 |
| 47:25 48:1,5 | **Corp** 13:11,14 | **covered** 33:5 | 106:15 |
| 64:23 99:23 | **corporate** 33:14 | 83:10 | **defend** 20:24 |
| **considered** | 60:23 | **covers** 65:22 | 21:12,22 45:7 |
| 101:25 105:6 | **corporation** | **crazy** 75:7 | 47:10 63:13 |
| **Consolidators** | 12:20 21:24 | **creditor** 45:22,23 | 66:8 67:19 |
| 13:11,14 | 72:4 | **creditors** 1:13 | **defense** 47:12,23 |
| **constitutes** 109:9 | **correct** 8:7,10,12 | 4:24 11:5 13:22 | 48:6 |
| **constructive** 25:9 | 30:6 37:4,10,13 | 22:4 | **defenses** 9:15,16 |
| **contact** 54:6,20 | 51:5 59:2,17,20 | **credits** 77:1 | 21:1 47:11 |
| 54:22 85:23 | 61:7,8,15 62:5 | **current** 48:1 88:4 | **denied** 31:22 |
| **contacted** 41:10 | 63:4 69:8,16,17 | **currently** 13:25 | **denies** 32:12 |
| 70:21 | 71:1 77:3,11,15 | 39:24 59:19 | **department** 41:5 |
| **contained** 6:2 | 78:1 79:25 80:1 | 82:9 | 41:10,15,16,21 |
| **containers** 50:2,5 | 80:15 87:24 | **customers** 25:14 | 42:2,13,25 |
| 50:10,16,19,25 | 88:5,11,17 | **cut** 25:15 | **deposition** 32:6,7 |
| 51:11,17,24,24 | 94:17 95:23 | | **describe** 25:1 |
| 52:7,17 85:6,13 | 97:12 100:8 | **D** | **destroying** 72:15 |
| **contention** 83:4 | 104:19,22,23 | **daily** 96:20 | **details** 32:10 |
| **contest** 8:11,18 | 105:17 108:2 | **damage** 73:1 | 81:17 |
| **contested** 8:21 | 109:8 | **damaged** 54:25 | **determination** |
| **continuation** | **correctly** 66:14 | 55:12 | 38:19 |
| 12:13 36:19,24 | **counsel** 65:9 | **damaging** 83:19 | **determine** 103:16 |
| 69:3 93:8 | 75:20 | **date** 29:19,19 | **determined** |
| **continue** 9:12 | **county** 48:14 | 37:2 39:9 93:9 | 103:23 |
| 47:6 75:17 | **couple** 22:22 | 97:3 | **develop** 96:12 |
| 92:24 | 28:12 37:25 | **day** 31:6 42:3 | 97:10 |
| **continuous** 64:11 | 42:14 50:3,4 | 43:9 54:23 68:7 | **developed** 25:14 |
| **continuously** | 54:9 56:5 57:21 | 97:25 109:11 | 64:25 104:5 |
| 65:21 | 66:13 70:19 | **days** 19:23 42:14 | **dialing** 11:3,23 |
| **contractors** 15:24 | 85:2 86:18 89:1 | 54:9 57:21 68:7 | 68:12 |
| 22:19 26:16 | 89:16 104:2 | **dealing** 85:20 | **different** 15:11 |
| 64:6 | **course** 6:16 | **dealt** 57:16 73:19 | 24:6,7 26:3 |
| **control** 14:16,17 | **court** 1:1 20:21 | **debtor** 1:8 14:18 | 28:14 61:16,18 |
| 23:15,20 30:18 | 27:25 32:12 | 37:21 40:22 | 61:24 73:5 |

| | |
|---|---|
| 98:23,24 104:11 | |
| **difficult** 72:13 | |
| 83:11 84:25 | |
| **direct** 54:19 | |
| **directing** 31:9 | |
| **direction** 17:13 | |
| 25:10 | |
| **directors** 14:15 | |
| **disagree** 84:25 | |
| **disagreeing** 26:1 | |
| **disappeared** 11:7 | |
| 11:10 | |
| **disbursed** 20:13 | |
| **discharged** 74:1 | |
| **disclose** 40:2 | |
| 58:22 | |
| **disclosure** 41:1 | |
| **disconnected** | |
| 10:16 68:14 | |
| 69:2 | |
| **discovery** 65:7 | |
| 67:12 | |
| **discretion** 93:5 | |
| **discuss** 40:10 | |
| 96:6,17 98:15 | |
| 105:21 106:3,5 | |
| 106:9,10 | |
| **discussed** 40:12 | |
| 70:18 96:19 | |
| 99:2 | |
| **District** 1:1 27:25 | |
| 81:19 | |
| **dividends** 61:25 | |
| 62:1,1 78:5 | |
| **docket** 75:19 | |
| **document** 37:24 | |
| 65:10 77:9 | |
| **documentation** | |
| 31:13 | |
| **documents** 6:4,9 | |
| **doing** 21:5 65:4 | |
| 105:14 | |
| **Doll** 58:5 | |
| **dollars** 26:24 | |
| 27:11 28:13 | |

BIROS_APPENDIX_0124
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

Page 113

55:2
**door** 104:4
**doors** 104:3
**doubled** 66:7
**dozen** 15:10
22:21 41:17
**dozens** 104:10,10
**dozers** 73:8 83:17
**drag** 22:7
**draws** 76:25
**drink** 33:21 98:9
98:9
**drive** 82:12
**driving** 41:13
65:5
**Dropcam** 81:12
**Dropcamera**
104:19

**E**

**E** 109:3,3
**earlier** 22:17 45:5
47:7 90:20 99:7
**easy** 47:11
**effort** 17:23 70:24
**either** 24:9 30:17
42:1 56:12
75:16 93:10,16
107:8,15
**elaborate** 12:20
**electric** 78:8
**electrical** 25:17
104:1
**else's** 35:12 79:12
79:16
**employee** 21:4,12
21:17 24:17
26:6 27:18 28:5
28:10 47:13
48:1,6 64:23
66:2,5,11
**employees** 15:3,7
15:16 16:1
22:18 24:13,19
26:5,13,14,17

47:17 63:3,8,15
63:19,23 64:1
64:13,14 65:11
65:12 67:13,14
**employment**
47:20 48:10
**enabled** 75:6
**enforcement** 38:7
**entailed** 104:14
**entered** 55:22
56:11 87:22,23
**entitled** 27:6 66:5
**environmental**
37:17 39:16
**equipment** 37:3
53:4,6 87:24
88:8,18 89:4,7
**Eric** 89:21
**errors** 6:11
**escrow** 90:3
**Esquire** 2:3,5,6,9
**estate** 7:24,24
48:13 51:8,9,11
**estates** 50:1 52:25
**estimate** 16:19
**event** 42:2,7,13
43:1
**everybody** 9:11
10:4 72:15
83:16
**evidence** 30:19
31:7,16,17 32:5
47:16 62:20
83:24
**exact** 29:14 33:3
78:20
**exactly** 91:24
96:24 100:12
**Examination** 3:6
3:7,8,9 5:16
12:13 22:14
29:24 36:24
69:3 92:20
93:10 95:14
107:1

**example** 72:11
**excavator** 88:25
**excuse** 4:9 32:20
32:20 38:15
84:12 95:2
**exercised** 77:2
**EXHIBITS** 3:12
**existence** 31:22
**expect** 7:2,12
**experience** 72:9
**explain** 23:17
50:10
**explained** 63:20
**explanation**
76:12
**extended** 64:10
**extensive** 104:12

**F**

**F** 109:3
**face** 73:16 79:2
**facility** 59:22
73:25 76:4
84:21 87:2
101:10
**fact** 31:19 41:4
41:10 53:14
55:8 61:12 66:4
89:25 90:22
**fairly** 92:16
**familiar** 6:1
**family** 54:24
72:14 83:13
100:11,14,23
101:7,18
**far** 18:16 19:17
30:20,20 31:8
44:13 52:11
89:17 99:5,6
**fashion** 66:3
**father** 32:8
**favor** 64:24 105:7
**Federal** 20:20
66:7
**feel** 83:2 100:3

**fees** 28:8 44:4
**fide** 47:23
**fight** 28:7
**figured** 49:1
**file** 14:22 15:1
17:3,6,14 18:2
24:25 26:5
40:15 48:12
87:19
**filed** 8:16,16,17
15:4 17:22
20:21 33:15
39:2 40:24 44:2
44:3 45:6 76:10
90:16 91:1
107:15
**filing** 6:18 8:13
12:25 67:6
76:22
**fill** 59:4
**final** 38:18
**find** 28:23 45:21
77:16
**fine** 36:6 39:21
40:8
**finish** 42:15
84:12 96:8 98:4
**fire** 41:5,10,12,14
41:15,21 42:2
42:13,25
**firms** 76:8
**first** 22:16 37:1
38:1 51:16 52:1
62:15 106:5
**five** 26:24 27:11
**fixed** 25:17 104:3
**flip-** 59:10
**flopped** 59:11
**follow** 21:9 77:7
**foot** 101:21
**footage** 55:13
**foreclosing** 75:5
**foregoing** 109:7
**form** 76:24
**formed** 96:5,16

**forward** 99:18
**four** 6:18 15:21
16:5 18:11,13
27:12 63:2 80:5
**four-year** 63:9
64:11 81:3
**fraudulent** 28:1
**free** 46:13,25
**friend** 89:16
**friendship** 90:8
90:10
**front** 28:22 33:3
82:19 85:25
**fulfill** 30:11
**further** 40:21
45:4 94:23,25

**G**

**game** 25:20
**garage** 104:3,4
**garbage** 38:4
39:14,18 40:5
83:21 104:8
**garbled** 61:21
**gather** 62:22
**gathering** 17:25
**general** 14:15
17:16
**George** 2:4 3:5
4:9,10,22 5:16
10:2 11:6 12:13
13:4 22:14
29:24 36:24
50:21 51:12
57:1 61:1 65:10
68:5,22 69:1,3
94:8,13,16,19
95:14,16 102:9
107:5,19
**getting** 19:22
46:14 67:15
72:17
**girl** 56:19 57:8
**give** 4:20 6:17
15:20 22:10

BIROS_APPENDIX_0125
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

28:20,21 29:2
38:14 74:18
79:16 92:11
103:12
**given** 47:15 90:12
**giving** 95:7
**Glenn** 53:6
**GLT** 36:19
**go** 18:10 21:8
35:22,23 39:25
41:25 42:11
43:2 45:4,11
47:9,21 48:25
49:1,3 68:25
71:13 74:6
75:18 79:22
94:3 95:13
101:4 104:5
**goes** 44:13 52:11
**going** 4:24 12:19
13:23 18:2 21:9
22:3,7,7 32:9
35:21,22 38:13
38:14 44:7,14
45:16 53:2 55:5
56:25 57:2,4,5
71:24 72:18,19
72:24 74:1,18
87:18 89:9
92:22 94:24
95:9 103:12
104:6 107:16,17
108:12,13,13
**good** 36:12 68:23
95:12
**governmental**
37:20,22 40:22
41:3 43:11
**grandfathered**
87:1,6
**grass** 25:15
**great** 5:9 12:9
20:14 72:11
**greater** 34:2
**gross** 16:9

**ground** 21:21
**guess** 16:20 28:17
30:8 32:2 63:11
92:12
**guessing** 84:20
**guide** 104:1
**guy** 53:7 58:17
**guys** 10:2 11:9
41:11

**H**

**H** 2:3
**half** 15:10 22:21
**hand** 4:19
**handed** 105:15
**handful** 89:1
**handled** 86:24
**hang** 9:7 68:17
68:20
**happen** 80:24
**happened** 10:13
11:13 32:15
42:20,21 98:8
**harassing** 83:16
**hard** 82:12
**hazardous** 37:23
39:17 40:23
43:12
**he'll** 46:12
**heads-up** 103:13
**hear** 65:18 68:23
68:24 71:8 94:7
97:3 100:25
101:1 106:1
**heard** 22:20
35:25 81:19
108:2
**hearing** 51:16
52:1
**heavy** 53:4,6
**held** 33:16 93:18
**hello** 9:19 10:3
11:22 68:2,18
95:22
**help** 26:25 97:14

**helped** 28:11
66:22
**helpful** 29:7
**helping** 15:9,10
22:21 27:19
66:18 104:25
**Henry** 90:2
**hey** 88:25
**hi** 5:2 11:4,8
73:18
**high-resolution**
81:25
**highway** 41:13
104:6
**hire** 105:23
106:12
**hold** 12:4 43:22
60:2 68:17 77:8
106:23
**holding** 17:18
**homes** 101:21
**Honda** 82:14,15
82:15
**hopefully** 57:16
**hours** 15:13
22:22 98:18
**hundred** 26:24
27:11 28:13
104:2
**Huntingdon** 38:2
38:8,25 41:25
42:11 87:5,9,12

**I**

**idea** 10:20 11:12
47:3 97:9
**identical** 89:8,13
**immediately**
55:11 58:9
**important** 92:16
**improve** 103:4,8
**inaccessible** 55:1
**Inaudible** 8:19,25
9:3 11:13 16:19
16:24 19:22

21:16 25:20,24
27:22 29:2,10
30:9 32:5,19,22
33:23 34:24
35:3,5 40:17,19
42:9,18,22 47:3
48:4,20 49:5,7,8
49:23 51:14
52:5 53:15
54:13 55:4,13
55:23,25 56:22
57:22 59:14
60:22 62:25
65:6,13,16,19
66:9,20 67:3,17
71:5 72:1,20
73:10 74:7
75:21 76:6,13
77:24 78:19
79:4,6,14 80:21
81:2,16 82:7
83:21 84:3,10
84:14 85:4 86:8
87:7,18 89:12
91:20 95:8 96:4
97:4 99:10
100:20 101:2,20
102:22,24
107:11 108:3
**inception** 14:20
17:18
**including** 76:24
**incorporated**
9:17,18,25
12:16 86:2
**incorrect** 34:8
35:2 43:13
51:13 66:21
**independent** 64:5
**INDEX** 3:1
**indicted** 17:15
**indictment** 32:4
**individual** 28:21
32:14 56:16
**individuals** 76:8

**inform** 33:18
**information** 6:2
19:10 20:11
29:5,18 79:7
85:23 92:18
107:15
**informational**
5:21
**informed** 62:4,21
**initial** 41:12
**initiated** 38:23
**insider** 76:23
**insiders** 103:18
**inspected** 101:15
**installed** 104:4
**instigated** 39:4
**institution** 76:17
**insurance** 85:16
85:17 103:18
**interest** 74:25
**interference** 84:8
**interim** 4:5
**interruption**
30:14
**INTRODUCED**
3:12
**involuntary** 8:8
8:17,24
**involved** 37:16,18
54:11 74:16,16
75:18
**involvement** 67:5
67:7 89:20
**irrelevant** 34:18
43:24
**IRS** 64:19
**issue** 32:11 39:16
62:1
**issued** 13:16,16
15:16 30:23
39:5
**issues** 24:7
**items** 51:8

**J**

BIROS_APPENDIX_0126
EXHIBIT A

Case 22-20823-GLT Doc 337 Doc 337 Filed 02/24/23 Entered 02/24/23 09:32:45 Desc
Exhibit A    Page 116 of 124
341 (a) MEETING OF CREDITORS  -  9/9/2022

Page 115

**J** 2:9 109:5
**January** 109:11
**Jesus** 10:18
**jobs** 64:7
**John** 14:6,13,19
  17:11 30:17
  31:5,21,21 32:6
  32:15 48:17
  83:15 96:6,18
  97:19,22,25
  99:8,9 100:14
  101:13
**Journal** 31:21
**Judge** 18:3
**judgment** 20:23
  27:24 47:10
  48:12,22,23
  49:4 75:10,11
**judicial** 37:18
**July** 40:24 84:22
  97:7
**jump** 53:16 74:10
**June** 38:17 39:10
  60:25 84:21

--- **K** ---

**Kash** 13:1,2
  14:21 30:8 34:1
  34:6,10,22 35:3
  58:23,24 59:7
  59:11,13,22
  60:15 61:2
  64:16 66:15
  70:1 75:25
  76:15 82:22
  84:11,20,23
  86:23,24 91:19
  91:21 92:17,20
  92:25 93:9
  94:13,15,18
  105:12 106:25
  107:2,9,17
**Kash's** 82:23
**keep** 31:12 36:8
  70:11 75:1 83:1

83:3 88:4 95:1
  96:11 104:12
**kept** 27:21
**kicked** 83:5,5
**kind** 8:24 12:21
  16:19 17:17
  21:8 25:12 46:9
  53:8 70:15
  72:17 78:17
  81:14,24 86:25
  87:2 91:15 99:6
  104:7
**knew** 31:25 62:18
  62:19,19 90:17
  101:9 105:1,18
  108:2
**know** 9:5 10:1,21
  13:23 14:4,8,23
  15:11,13,24
  16:13,16 17:14
  21:4,6,7,20
  24:10,14 25:12
  25:14,23,23
  28:25 29:8,14
  31:14,19 32:10
  33:8 34:17
  35:15 38:11
  41:7 42:17 46:5
  46:18,21 48:23
  52:3 53:5 54:8
  55:22 57:2,4,15
  58:11,12 59:23
  60:13,19 62:23
  63:16 64:21
  65:2,6 70:16,16
  70:21 71:20
  72:23 73:3,15
  73:15,19 74:4
  74:17 75:8 76:3
  77:20 78:18,20
  80:8,25 81:1,22
  82:7 83:3,8
  84:22 85:12,15
  86:2,11,13,14
  87:1 88:19,20

89:17 90:16,22
  91:5,5,9,24 92:5
  92:11 93:23
  96:11 98:24
  99:16 104:7,24
  107:1,2,9
**knowledge** 58:19
**known** 49:10,11
  49:12
**knows** 62:17
**Kubota** 7:6 18:20
  19:12 20:7
  28:18,19 37:2
  67:24 69:7
  87:20 88:7,10

--- **L** ---

**lady** 72:11
**land** 25:15
**Lavesky** 86:12
**Lavinsky** 85:21
  86:10
**law** 30:3 31:20
**lawsuit** 8:16
  17:19 20:20
  21:25 23:6
  31:18,20 47:2
  65:19 99:17,20
  100:2,3 101:25
  102:3 105:18,21
  106:3,6,9,10
**leave** 23:25 93:4
**left** 36:22 53:10
  85:12
**legal** 28:8,8 44:10
  44:22 66:23
  67:6 75:15
**length** 48:9,17
  49:15
**lengthy** 95:10
**let's** 18:17 67:19
  70:5 71:10
  90:12
**liabilities** 6:5
  37:15

**liability** 61:14
**liable** 37:21
**lien** 48:13
**light** 90:22
  103:25
**limit** 22:7
**limited** 15:12
**line** 5:8 10:3,5,10
  10:12 12:11
**list** 14:2,5,14
  34:15 70:9 76:7
  90:13 91:2,23
  92:8 104:11
**listed** 7:25 13:22
  14:18,21,21,22
  23:1 25:2 33:25
  34:12 62:3
**little** 39:18 45:4
  61:21 81:13
  99:7,8
**Liz** 49:18
**loan** 67:21 69:12
  69:13,19 70:3
  75:3,6 87:22,23
  88:4 90:4
**loaned** 19:19
  67:22 89:22,23
**loans** 18:23 19:8
  77:1,1,21
**located** 78:16
  82:9
**location** 79:8
**locations** 78:21
**Lock** 1:7 4:2,6,8
  5:19 9:17 11:6
  18:23 22:18
  24:9,18 26:2,4
  30:2,18,19
  36:18 37:17
  38:1,16,20,24
  43:20 44:8,10
  44:21 45:6,9,10
  45:22,23 46:6
  47:17 49:25
  50:17 51:12

52:9,12 58:22
  59:17,20 60:10
  60:24 62:16,16
  64:22 65:11,25
  66:24 67:1,8,9
  67:13,21,21,22
  69:14 70:7
  78:10 80:12,15
  86:21 87:22
  88:3,10,12 89:5
  89:18,21,23
  91:16,17 94:5
  94:12 95:17,25
  96:2,5,11,12,17
  96:22 97:9
  98:15 99:2,24
  100:5,7,15
  101:19 102:1,6
  102:10,10,13,23
  102:25 103:4,8
  103:19 104:18
  104:21 108:6
**Lock's** 66:8 80:11
**lockers** 25:13
  91:3
**logical** 91:1
**long** 55:14,14,14
  74:8
**longer** 58:6
**look** 53:1 75:18
  82:2 107:9,10
**looked** 86:17
**looking** 17:24
  77:4
**loop** 24:12
**Loretta** 57:8,18
  58:6
**lost** 47:22
**lot** 41:14 52:19
  53:4,5 58:1
  70:22 71:3,3
  73:20 78:19
  84:7 85:1 88:12
  98:25 103:2
  104:3,8,15

BIROS_APPENDIX_0127
EXHIBIT A

Case 22-20823-GLT Doc 337 Doc 337 Filed 02/24/23 Entered 02/24/23 09:32:45 Desc
Exhibit A    Page 117 of 124
341 (a) MEETING OF CREDITORS  -  9/9/2022

Page 116

**love** 65:4 66:18
74:15 105:9

**M**

**M-C-** 20:1
**machine** 88:22,23
89:13,18
**machinery** 87:21
**maintain** 63:10
**maintains** 75:22
75:22,23
**maintenance**
25:16 101:13
**majority** 13:16
33:22,23 96:1
**making** 24:24
72:19 100:4,5
**man** 52:13
**managing** 14:15
**Martin** 89:21
90:4,4
**Mary** 109:5
**Maryland** 53:11
**match** 26:9
**material** 37:23
39:17 43:12
**materials** 40:23
**matter** 4:21
45:15
**McCarl** 20:1
**mean** 8:16,20
24:8 30:21
31:11 32:17
41:8 48:16
52:19 53:2
61:19 63:18,23
81:15 82:1 83:2
84:1 87:25 89:9
102:8
**means** 46:12
**meant** 26:12,13
78:3
**mechanism** 92:23
**medical** 59:22
76:4

**meet** 31:4 58:12
86:16 98:7,22
**meeting** 1:13 4:2
4:4 11:5 32:16
33:18,19 34:14
36:20 60:15,18
60:24 73:23
92:25 93:7,18
93:18 95:1
98:14 106:24
109:9
**meetings** 31:1,5
97:21 98:16
99:3,4,13,19
105:4
**members** 14:15
14:16 59:5
**memory** 55:21
**mention** 25:4
102:21
**mentioned** 7:5
18:3,20 102:15
**met** 25:13 31:5
31:10,15 57:19
58:17 96:20
98:5,22,25 99:9
104:4
**metal** 50:25
**middle** 25:21
**Mike** 85:21 86:10
86:11
**million** 34:10,11
61:1,2,6
**mind** 49:8 86:9
**mine** 53:5 75:16
**mine's** 35:20
81:14,24
**minimum** 24:1
24:10 27:7
**minute** 7:5 38:15
83:20
**minutes** 22:10
31:12 34:13,13
95:10
**misleading** 53:14

**missing** 24:23
76:19
**misspoke** 41:19
**misstate** 75:17
**mistake** 40:16
**misunderstood**
41:9,18
**mobile** 101:21
**moment** 30:12
47:7
**money** 7:18 9:14
18:21 19:12,20
20:12,17 21:22
24:20 27:21
28:8 44:21
45:24 46:6
47:20 61:13,17
67:22 69:19,21
70:23 74:3,5,15
74:17,18,23,24
87:17 88:13,14
88:16 89:23
90:2 96:3,10,11
96:13 97:14
**monitor** 80:3,12
**month** 40:25 54:9
59:24 74:2
**months** 7:3,13
50:3,4 55:17
62:20 73:25
85:14 92:5
**Moore's** 90:2
**morning** 35:25
36:20 60:9 63:5
68:1
**motel's** 79:12
**mother** 49:18
**motion** 60:17,19
62:10
**move** 28:17 32:18
32:21 43:17
49:19 50:7 63:1
67:20 78:6
104:13
**moved** 84:7,17,20

85:14
**moving** 50:9,12
83:17 99:18
**Mowry** 53:6
**multiple** 80:16
**music** 10:24
12:10
**mute** 9:2 35:20

**N**

**name** 4:25 28:23
29:4,4,20 52:13
53:20 71:18
73:16 96:6,17
98:20
**name's** 14:20
**named** 31:2 53:7
57:18 58:5
**names** 14:21
73:14
**nature** 43:6
**need** 18:2 43:8
48:12 101:12
**needed** 21:22
27:1 39:14
101:15
**negotiated** 56:17
56:24
**never** 23:8 27:15
30:23 37:22
41:2,9,21 44:12
45:14 49:8 55:7
56:1 57:19 58:2
58:17,17,17,18
62:4 64:20
70:10,23 86:20
102:15 104:21
**Nick** 52:14
**North** 38:2,8,24
41:25 42:11
87:5,9,12
**Notary** 109:5,14
**notified** 37:19,22
40:22 41:2,5
43:11

**85**:14
**notify** 62:7,24
**November** 20:10
37:6,7 55:20
**number** 7:7 33:3
34:2,12 47:16
50:2,5,14 68:12
86:15 92:15
**numbers** 51:2

**O**

**object** 43:23 56:7
105:13
**Objection** 43:21
**obtained** 27:24
**obviously** 82:24
**occupancy** 86:21
**occurred** 42:14
**offered** 74:25
**offhand** 16:15
**office** 5:22 10:25
11:25 30:11
46:17 68:11
98:10
**officer** 4:12 23:9
23:25 26:12
27:8 38:8 95:17
**officers** 12:18,24
13:7 14:14 18:7
18:12 30:7
**Oh** 6:23,25 10:18
10:19 57:10
79:13 91:21
101:8 102:8
105:11
**okay** 4:11,15,17
4:23 5:6,9,12,15
5:18 6:15,25
7:9,21 9:8,12,13
9:23 10:4,13,21
11:3,14,17,20
11:22 12:4,9,10
12:12,15,19
14:24 15:1,18
15:22 16:5,8,21
16:25 19:13

BIROS_APPENDIX_0128
EXHIBIT A

Case 22-20823-GLT Doc 337 Filed 02/24/23 Entered 02/24/23 09:32:45 Desc
Exhibit A    Page 118 of 124
341 (a) MEETING OF CREDITORS  -  9/9/2022

Page 117

20:8,11,14,20
22:3,12,24
24:25 26:10
27:5,9 28:17,24
29:7,21 30:15
33:14 34:20
36:8,10,17 37:1
37:9,11,11,14
38:21 39:6,12
45:1,3 46:22
52:2 56:21
57:25 59:15
60:7 61:9 63:7
64:7 67:18 69:1
69:18,23 70:5
76:21 78:13
80:2 82:6 85:19
86:20 88:3,7
90:12 93:11,22
94:18,24 95:7,9
95:13,16,24
96:16,22 99:2
100:22 103:20
104:17 106:11
106:19,20 107:5
107:19,21 108:4
108:7,10
**old** 52:13
**old-** 81:14
**old-fashioned**
81:24,25
**omissions** 6:11
**omitted** 107:12
**once** 21:6 27:19
**ones** 54:7,13
**open** 22:4 75:10
93:19 95:1
96:22 106:24
**openers** 104:4
**operable** 82:24
84:17
**operation** 6:20
**opinion** 27:23
**opposed** 52:8
**options** 77:2

**orange** 53:18
**order** 48:12 102:6
102:13
**ordered** 17:14
**ordinary** 6:15,19
**originally** 29:12
54:21
**Otto** 2:6 3:8 5:4
9:22,24 10:8,11
10:11 14:5
29:22,23,25
36:1,7,12,22,23
36:25 47:5 68:6
69:4 92:14,22
93:4,11,16,20
93:23 94:3,6,10
94:15,18,20
97:2 105:25
106:4,8,11
**outfits** 41:18
**outside** 6:19,24
**outstanding**
67:21 69:12
**owe** 7:18 23:3
44:9,10,14,21
45:24 46:6
47:20 61:25
**owed** 9:14 24:16
24:20 25:3
74:23
**owes** 24:9
**owned** 31:2 51:7
51:12 52:9,13
89:18 100:10
**owner** 23:23,24
24:5,5 26:2
62:16 98:13
**owners** 25:22
**ownership** 24:7
53:13
**owns** 14:10 50:21
61:1,2 80:12,14
80:19 82:13,21

───────
**P**

**p.m** 36:10,21
**page** 3:6,7,8,9
77:6,8,8,10,16
**Pages** 37:24
**paid** 15:15 16:4
19:17,24 20:3
20:17 23:8
26:15 43:18
44:6 45:14
54:17 56:4,6,9
61:25 64:6 69:6
69:6 70:13,23
72:11 75:4
85:16,16,18
87:16 88:9
104:21
**pallets** 85:4
**paper** 19:14
**papers** 28:22
**Pardon** 21:13
46:19 49:7 56:3
57:11 59:18
83:25 87:10
**parking** 41:14
104:3
**part** 12:20 47:1
101:25
**particular** 89:18
**parties** 48:9
58:15
**partner** 14:20
15:1 23:4,13,14
23:16,19,22
26:1
**partners** 14:16
17:12 25:7,22
32:1,2 97:17
**partnership**
30:21
**parts** 67:4
**party** 54:10 58:12
**pattern** 17:18
**pause** 22:8
**paused** 99:17
**pay** 19:18 27:16

28:8 44:7 45:8
45:16 54:24
55:1,5,6,8,10
56:10,12 64:20
69:10 72:8,10
72:18 74:10,22
75:6 87:8,11,17
90:3,4 102:10
102:10,20
**paying** 56:7
**payment** 18:6
32:24 33:9 44:4
69:7 90:5 102:7
102:14
**payments** 18:11
18:16 70:10
78:4 88:4,15,16
**payroll** 63:15,19
63:24 64:2,13
64:15,18,19
**pays** 70:11
**PCB's** 41:1
**Pennsylvania** 1:1
30:3 109:6
**people** 14:17
15:10,19 22:21
28:11 62:23
63:25 64:3 72:8
73:7,11,20 74:3
74:6,15 83:6
86:8 91:4
**people's** 83:18
**percent** 13:20,24
13:25 14:1,10
14:19 34:3,5,8
35:1 60:10 61:3
61:4 62:12 85:2
92:10
**percentage** 13:19
**percentages**
33:25 60:13
**perfectly** 81:21
**period** 47:18 63:9
64:10 65:23
81:3

**periodically** 64:7
88:18
**perjure** 49:20
**permission** 84:23
**permit** 86:21
**perpetrator**
78:22
**person** 8:15
14:18 41:12
56:16 57:16,19
71:11 73:16
76:3 99:24
**person's** 29:19
**personal** 24:15
**personally** 6:1
50:21 65:10
70:19 85:18
89:6 91:6
104:16
**personnel** 41:17
**petition** 6:8 33:15
90:25
**petitions** 6:2
**phone** 9:9 11:3,3
11:16,22,24
12:3,6 35:13
57:21 58:18
60:16 68:12,13
68:16,19 82:3
107:9
**phones** 9:10
**Phonetic** 58:5
85:22 86:12
**photo** 52:19
53:12
**photographs**
31:14
**pick** 55:3 101:13
**pickup** 100:9
**picture** 52:16
**piece** 19:13 89:3
89:7
**pile** 83:20
**place** 4:4 10:18
98:7 99:1

BIROS_APPENDIX_0129
EXHIBIT A

101:18
**places** 98:23,24
**plans** 98:16 99:3
**play** 92:4
**playing** 9:4 10:24
    70:15
**pleadings** 66:23
    67:6
**please** 4:18 9:2
    13:12 57:10,12
    61:22 84:13
**plenty** 74:15
**plowed** 25:16
**Plus** 46:25
**point** 17:19 21:23
    34:21,22 44:12
    45:9 46:11 47:4
    82:18 83:9
    99:16 100:1
**police** 41:16 42:1
    42:12,25 43:5
**poly** 51:20
**position** 28:6,9
    28:15 66:2
**positions** 60:3
**possession** 76:9
**possible** 106:24
**post** 44:25 45:25
**premium** 85:17
**prepare** 17:23
**prepared** 5:22
    83:22,22
**preparing** 18:5
**present** 2:1 4:5,7
    4:24 5:10 33:23
    61:5 99:21
**president** 4:13,14
    5:19 13:3,4
    30:10 58:23,25
    59:1,6,7,11,12
    59:13,13,16,16
    59:20 72:2,3
    91:17
**pretty** 16:18
    17:12 37:5

40:12 66:1
    82:12 84:5 92:9
    92:9 103:24
**previous** 39:6
**primary** 95:16,24
**principal** 85:19
**prior** 6:18 16:21
    46:4
**private** 28:21
**privilege** 87:8,11
**probably** 14:8
    16:16,18 20:9
    67:16 84:19,22
    97:6 107:7
**proceedings** 1:12
    36:14 37:19
    109:8
**product** 45:19
**profit** 62:2
**progress** 99:12
**promised** 96:10
    97:13
**proof** 30:16 31:24
    52:7,11,22
    53:12
**properties** 86:18
**property** 7:11 8:3
    19:20 24:6 25:8
    25:9 32:23 33:6
    38:9 42:4 51:7
    51:7 52:24 65:1
    70:25 74:19
    75:2,3,4 78:7,14
    79:11 80:15
    82:10 83:5,6,18
    88:8,23 90:5,14
    90:24 91:13,14
    92:7 97:10
    101:17,19
    102:25 103:5,9
**provide** 31:16
    33:13 74:6
    76:23
**provided** 14:5
    18:23 65:8

70:17
**Public** 109:6,14
**pull** 73:4
**pulled** 41:14
**purchase** 29:13
    29:19 87:23
**purchased** 29:16
    51:3 52:24
    96:25 97:6
    102:23,25
**pushing** 83:19
**put** 11:15 12:6
    47:23 48:25
    50:15 54:21
    88:14,15,20
    89:11 96:13
    97:13 102:2
**puts** 25:23

**Q**

**question** 12:15
    14:13 18:14
    26:3 34:23 39:3
    39:22,25 40:21
    43:10,24 44:9
    44:18,20 45:21
    47:1 49:9 52:6
    53:25 54:3 57:6
    62:15 63:12,22
    64:14 65:23
    66:22,25 67:2,5
    67:18 69:5 70:6
    76:22 77:9,12
    77:13,17,25
    78:1 84:9,12
    91:25 94:7 96:9
    96:15 98:4
    101:3 103:7
    106:5 107:23
**questioning**
    35:24
**questions** 22:4,6
    22:11 29:22
    36:23 37:25
    66:15 76:5,7

92:15 93:21,25
    94:21,23,25
    95:6 103:16,21
    104:18 106:18
    106:24 107:4
    108:5
**quickly** 103:24
**quite** 88:15
    101:12 104:12

**R**

**R** 109:3
**raise** 4:18
**ran** 98:12
**range** 16:17
**read** 5:24 35:6,6
    78:2,3
**real** 7:24,24
    28:10 48:13
    81:23
**really** 9:5,13,15
    21:1,3 27:17
    28:15 44:16
    47:2 53:12,13
    60:12 62:9
    64:22 70:4 76:3
    99:5
**reason** 7:17 8:13
    8:15,20 47:7,9
    87:14
**recall** 41:20 50:12
    66:9 67:11
**recalling** 43:15
**receipts** 18:1
**receivable** 70:8
**receive** 5:21 7:2
    7:12 78:4
**received** 37:12
    64:20 77:20
    88:8 108:12
**receiving** 72:25
**recessed** 36:15
**recollection** 39:13
    75:14
**record** 4:25 33:12

36:18 108:1
    109:9
**recorded** 1:12
    109:8
**recording** 108:14
    108:15
**records** 15:14,18
    15:23 16:3 53:3
    70:11,14 75:24
    76:2,10
**recycled** 104:9
**red** 82:10,15,17
    84:15
**redemptions** 77:1
**referred** 72:21
**referring** 50:11
    50:18 51:21
    82:14
**reflect** 6:4
**regard** 22:16
**regarding** 19:11
**Regardless** 39:4
**regular** 26:15
**reimburse** 18:22
    19:6 20:3
**related** 6:3,9
**relationship**
    49:21
**relayed** 98:1
**release** 37:23
    40:23 41:3
    43:12
**relevant** 44:1
**remember** 29:3
    33:4,24 66:13
    82:16 89:15
    92:1
**remotely** 79:23
    80:4,23
**removed** 104:8
**rendered** 44:22
**rent** 54:17 56:2,5
    58:2,15 88:21
    88:22,25 89:12
    102:7,10,11,14

BIROS_APPENDIX_0130
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

102:17,20
**rental** 55:23
70:10
**rented** 53:24 54:2
54:17 88:18,20
89:12,15,16,19
**renter** 53:19
**renters** 70:22
90:13 91:9,22
91:23
**renting** 54:4
**rents** 7:14 71:16
**reorganization**
33:16
**repaid** 67:23
69:15 89:25
90:1
**repayment** 102:7
**repayments**
77:20
**repeat** 59:9 61:21
83:3 103:6
**repeating** 83:2
**report** 38:4,5
39:2,3 40:15
42:12,24 43:3,5
43:8 64:19
**reported** 43:4,7
**Reporter** 109:5
**represent** 45:8,12
46:12,24
**representation**
43:19
**representative**
108:6
**represented**
45:10,13
**representing**
46:10
**request** 44:4 65:8
98:14
**requested** 98:23
**required** 30:3
**reschedule** 93:8
108:14

**resolution** 60:23
**resolved** 39:19
**response** 61:20
**responsibility**
91:18
**responsible** 72:4
**rest** 35:23
**result** 23:6 65:8
**resume** 35:22
36:23
**return** 100:15
**returns** 17:4,7,15
17:23 18:2,4
24:15
**revenues** 16:9
**rid** 70:25
**right** 4:19 5:13
8:6,9 10:5
11:16,19 12:7
12:23 16:15
20:7 22:1,20,22
24:8 27:13
29:21 30:13
32:14 36:12
44:23 55:21
60:7,10 67:25
80:11 82:19
86:9 95:17,25
97:5,11,15
105:7,10,16,19
**ringing** 9:10
**road** 104:6
**roads** 83:10
104:5
**Robert** 2:3 4:4
**roles** 30:11 59:4
**Roth** 2:9 4:5,7,9
4:13,16 10:1,2
10:14 11:2,6,8
11:11,17,19,22
12:7 20:16
40:11 43:18,21
43:23 44:2,10
44:21 45:10,13
46:3,6 65:9

68:18
**Roth's** 11:25
**roughly** 33:6
**rubbish** 38:3
**running** 73:7

_____

**S**

**salary** 23:25 66:6
76:25 77:19,22
78:3,4
**sale** 19:1,11 20:7
20:12 29:17,19
37:2
**sanitation** 38:3
**Sarah** 2:5 5:1,3
10:7 22:5,11
93:12,24 94:20
**sat** 98:17
**satisfied** 40:7
**savvy** 81:14
**saw** 41:13 51:13
52:16 86:15
**saying** 8:2 24:17
25:8 28:4 41:20
45:23 50:15,20
74:17,20 75:1,8
85:1 91:12
98:19
**says** 7:21 14:10
14:19 60:24
**scenario** 61:16,18
**Schapiro** 53:21
54:1,15,20 56:4
56:20,24 57:17
58:4
**schedule** 7:20
77:4 90:20
92:20 106:25
107:17
**scheduled** 107:4
**schedules** 6:3
7:23 13:22
14:23 16:8 23:1
25:3,6 90:16
**school** 81:15

**Schur** 50:1 51:8,9
51:10 52:14,24
**Scotty** 83:14
**second** 12:4
28:22 33:21
47:19 66:25
67:7
**secret** 32:1
**secretary** 30:2,5
30:9 58:24 59:1
59:25 60:5
**section** 4:1 40:21
**see** 7:21,23 13:21
28:23 41:12
53:3 70:5 73:17
76:3 90:12
107:16
**seen** 58:17,18
**sell** 6:16 28:18,19
**send** 6:21 14:2
58:9 102:16
**sense** 24:24
**sent** 58:10 107:15
**separately** 93:12
**September** 1:14
36:21 38:17
39:8,10 97:8
**serial** 7:7
**served** 8:23,23
22:2 31:20
**serves** 55:21
**service** 25:17
78:8 82:4 104:1
**services** 44:11,22
46:5
**seven** 18:24 23:7
23:23 24:2
25:11
**sewage** 78:9
**Shanni** 2:8 3:9
5:10,11,14 9:3
10:9,10,15,19
10:23 20:21
27:10 35:16,19
35:20 45:5

47:18 64:9,16
64:21 65:20
68:3,8 80:2
95:2,3,5,8,11,15
103:14 106:17
106:21
**share** 30:24
**shareholder**
13:17 14:2 34:1
95:25 96:1
**shareholders**
13:9,15 14:17
18:7,12 33:17
33:18,19,22,23
34:14,16 60:25
61:4,5,10,13
62:4,5,7,14,21
**shares** 13:16
30:23 34:2,7,10
34:25 61:2,2,6
62:16
**she'd** 21:8 49:1
74:17
**she'll** 81:20
**sheet** 5:21,24
**shipping** 50:19
50:25 51:21,24
85:6,13
**Shoot** 68:11
**short** 74:8
**shots** 100:4,5
**showed** 52:16
55:18 58:1
**showing** 53:13
**shows** 83:13
**sideline** 86:15
**sign** 5:20 6:8
88:21 94:11,12
**signed** 65:9,10
**silent** 14:19 15:1
17:11 23:4,13
23:14,16,19,22
32:1 97:17
**simply** 47:21
**single** 31:1,3,6

BIROS_APPENDIX_0131
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

Page 120

73:16 92:6
**sister** 19:17 27:10
  27:18 33:10
  45:17 48:11,19
  48:21 49:4,6,12
  49:16 63:8
  64:23 65:20
  69:20 80:8
**sister's** 47:6
  63:20
**sisterly** 65:4
  66:18 105:9
**sit** 98:10,10
**site** 41:1 42:21
  50:3,6,17 53:19
  54:3,4,19,21
  55:15,19 56:18
  82:18 84:6,8,16
  85:13,17 86:22
**sitting** 35:13 51:6
**situation** 48:10
  61:24 63:20
**six** 7:3,13 18:24
  26:24 27:11
  40:25
**slipping** 86:9
**Slone** 2:3 3:6 4:1
  4:4,11,14,17,23
  5:2,6,9,12,15,17
  9:1,9 10:4,7,13
  10:17,21 11:1,4
  11:4,9,14,18,20
  12:1,5,9,14 22:3
  22:13 24:3 25:2
  29:16 35:8,21
  36:3,8,13,17
  40:18 44:18,20
  44:24 45:20
  46:2,4,15,18,20
  50:8 58:10 68:4
  68:6,10,15,21
  68:24 70:19
  71:10,13 77:13
  78:23 84:23
  92:12,14,19

93:2,6,14,17,22
  93:25 94:24
  95:4,7,9,13,21
  100:1 103:11,20
  106:19,23 107:6
  107:13,21,22,24
  108:4,8,11
**small** 64:7
**snow** 25:16
**Snyder** 2:4,8 3:5
  3:9 4:10,12,18
  4:22 5:10,11,14
  5:16,18 9:3,7,12
  10:2,9,14,15,19
  10:23 11:6
  12:13,15 13:1,5
  19:25 20:21
  22:14,16 24:12
  25:25 27:9,10
  29:24 30:1,16
  32:20 34:1,6,6
  34:22 35:16,19
  36:24 37:1
  38:15,16 41:24
  47:18 50:21
  51:12 58:23,25
  61:1,2 64:9
  65:10,20 68:3,8
  68:22 69:1,3,5
  75:14 76:16
  79:5 80:2 84:4
  92:16,21,25,25
  94:6,8,13,13,16
  94:19 95:2,5,8
  95:11,14,15
  102:9 103:14
  106:8,17,21,25
  107:2,2,5,18,19
**Snyder's** 45:6
  84:11
**sold** 7:8 18:21
  29:11 61:6
  67:23 88:7
**somebody** 11:1
  54:2,18 79:16

**Somebody's** 9:9
**someone's** 55:5
**son** 83:14
**sorry** 6:23,25
  30:14 33:17
  61:4,20,23 71:8
  77:16 89:6 94:9
  96:14 97:2
  101:3 105:25
  106:1,2
**sort** 82:4
**sound** 48:8 73:21
**sounds** 28:11
  48:10 66:1
  107:19
**space** 54:4
**speak** 13:12
  42:16
**SPEAKER** 11:24
  12:3 35:4,14,17
  68:13,16,19
**speaking** 35:8,10
**specific** 60:14
**specifically** 51:23
  73:1
**spelling** 58:5
  85:22 86:12
**spoke** 57:8 58:3,6
**spoken** 53:23
  62:14
**square** 55:11
  58:8
**staff** 26:15
**stand** 75:13 92:1
**standing** 42:8
**start** 5:1 22:5
  50:8 71:7,15
**started** 36:20
  96:2
**state** 4:25 32:12
  43:19 44:5
  47:22 57:20
  58:22 86:1
**stated** 33:16 44:5
**statement** 6:22

14:13 22:17
  37:14 39:1,23
  67:10 70:6
  76:21
**statements** 6:3
  18:1 83:23
  92:12
**States** 1:1 2:3
**stayed** 88:22
**stem** 23:10
**step** 40:20 105:1
**stock** 77:1
**stop** 99:4 108:13
**stopped** 99:7
**storage** 51:1 87:1
**store** 54:4 56:17
**stored** 53:19 54:2
  54:18 72:9 91:4
**strategy** 38:11
**stuff** 25:18 52:20
  65:5 72:9,12,17
  73:6 76:16,18
  83:17 84:7 85:1
  85:3 86:24 91:4
  104:7
**subject** 8:5
**submitted** 47:16
**substantial** 34:2
**substrate** 104:2
**sue** 71:19 72:19
  74:3
**sued** 99:13 102:5
  102:12 105:14
**summons** 105:15
**supposed** 72:2,3
  96:10
**Supposedly** 58:13
**sure** 22:19 23:16
  24:19 31:6 37:6
  41:23 53:1
  60:12 70:4
  80:25 82:25
  86:23 92:23
  96:24 99:5
  100:12,14

**swarm** 83:15
**swear** 4:18,19
**switched** 25:20
  25:21
**switching** 74:20
**sworn** 47:16
**system** 78:13
  79:19 80:3,11
  80:14,19,22,24
  81:9,13,18,21
**systems** 80:17,18
  82:2

**T**

**T** 109:3,3
**take** 22:8 33:21
  40:20 71:6,12
  71:14 74:17,19
  74:24 92:19
  93:9 100:21
  101:14
**taken** 20:23
**talk** 42:1 49:6
  58:12 71:10
  75:19 93:12
  98:11 99:17
**talked** 7:5 57:1
  58:13,18 86:7
  98:18 99:8
**talking** 27:14
  34:22 38:21
  39:7,8 42:7
  51:18,23 60:14
  60:17 71:9
  85:21 89:4
  90:19
**Tammy** 19:18,24
  19:24 20:1,1
  33:11 69:20
**tank** 51:19
**tanks** 51:20,20
  52:17
**tap** 79:15,15
**taps** 78:9
**task** 91:13 92:6

BIROS_APPENDIX_0132
EXHIBIT A

341 (a) MEETING OF CREDITORS  -  9/9/2022

**tavern** 98:8,21
99:1
**tax** 17:3,6,15,23
18:2,4 24:15
32:23 61:14
87:8,11
**taxes** 15:15,16
19:20,23 20:4
33:6 61:25
64:19,19 69:21
87:17
**technological**
81:13
**tell** 30:4 54:8
58:24 62:13
66:16 71:24
78:20 105:3
106:15
**telling** 64:12 66:4
74:13 80:11
81:5,10 91:8,21
**ten** 50:18 65:6
79:1 95:10
**tenant** 52:12,14
73:5
**tenants** 52:20
53:8 70:9 71:3
73:4,12,13
80:18 91:2,9,20
91:23 104:5
**tenants'** 72:16
**terminology**
26:11
**testified** 34:24
41:4,11 51:15
67:25
**testify** 4:7 47:12
**testifying** 5:19
26:4
**testimony** 4:20
59:15 63:4
66:11 76:15,15
**thank** 9:11 11:18
36:11,13 94:23
106:19 108:15

**Thanks** 22:13
**thing** 48:16 74:21
75:8 82:5 102:8
**things** 23:5 25:6
27:20 28:20
37:15 47:8 50:9
52:18 61:1
70:20 72:16
75:19 78:19
90:18 104:9,11
107:7,8,10,14
**think** 10:23 13:20
17:24 19:16
21:9 25:3 26:2
26:23 29:8,15
31:17,21 33:1,1
34:10 35:11,14
35:17 37:3,5
38:10 39:19
40:4,7 41:7,8,11
42:3 44:14,18
44:20 45:18
46:8,9,22,23,25
47:2 51:5 53:9
59:6,10,12
60:11 65:2 66:9
66:12,12,14,16
66:17 74:1
75:16 78:8
79:11 81:2,11
81:12,16 85:2
85:11,11 86:25
87:13 89:9,14
89:15,17,22
90:6 91:25 92:9
96:24 97:5,6
99:16 100:17,18
103:22 105:11
**third** 54:10 58:12
58:15
**Thirteen** 16:13
**thirty** 54:10
**thought** 8:25
21:8 64:24 65:3
66:19 78:3

101:8
**thousand** 13:15
19:5 55:2
**threatened** 73:2
**threats** 72:17,25
**three** 18:10,13
**till** 15:8 45:2
100:18
**time** 4:3 6:13
12:24 15:6
17:13 20:13,18
21:3 22:6 27:7
36:1 41:24
44:22 45:9
47:18 48:1 52:4
64:11 65:13,15
65:23 66:20
71:11 73:4 81:1
90:15 94:23
100:6 101:24
105:8
**times** 15:11 31:15
65:6 86:19
88:12 89:1,2,16
**tires** 103:1,2
104:9
**title** 49:25 50:23
50:24 51:10
52:7,11
**titled** 100:12
**titles** 51:2
**today** 4:8 26:4
36:10 45:5
49:14 53:10
93:7,18 107:12
**told** 32:2 40:14
53:23 54:23
55:7 58:14 60:9
63:2 71:18 83:1
87:2
**ton** 61:12,17
**tons** 104:2
**tops** 52:16
**tow** 83:8
**Township** 38:2

38:12,25 39:5
40:7 42:1,6,11
42:22,24 87:2,5
87:9,12
**track** 27:21
**tractor** 7:6 18:20
19:1 28:18,19
29:11 67:24
**tractor-trailer**
53:9 90:19
**tractor-trailers**
52:17
**tractors** 73:10
**trailer** 53:18 54:1
54:5,18,21,25
55:4,9,15,18,24
56:18 58:1,8,14
85:12
**trailers** 50:2,6,11
50:12 52:8
58:15,16 85:7
101:19 102:3
**TRANSCRIPT**
1:12
**transcription**
109:8
**transfer** 6:17
34:7,25 50:6
51:10
**transferred** 49:25
50:5,23 52:8
**treasurer** 30:2,5
30:8,10 59:2
60:1,5
**trial** 41:19
**tried** 74:19,22
**truck** 55:2 56:25
70:20 83:8
100:9,9 101:10
101:14
**truckload** 85:4
**true** 71:24,25
75:21 84:10
109:7,9
**trust** 25:9 103:18

**Trustee** 2:3 4:5
5:22 29:8 56:5
56:7 70:17
72:22,23 84:4,5
90:14
**truth** 4:21 41:6,8
49:16
**truthful** 27:25
75:12
**trying** 11:11 12:2
24:20 28:5 32:1
38:10 45:21
71:15 72:5 77:6
77:16 92:4
103:16 108:9
**turn** 12:11,12
**turned** 44:8
**TV's** 104:10
**twice** 38:2 68:7
**two** 16:13 18:7,17
19:5 24:6,7
30:7 41:17 48:9
55:16,16,17
58:3 62:20 67:4
68:7 100:19
101:20
**type** 31:7,16
**types** 31:15

| U |
|---|

**U** 1:7 4:2,6,8 5:19
9:17 11:6 18:23
22:17 24:9,18
26:2,4 30:2,18
30:19 36:18
37:17 38:1,16
38:20,24 43:20
44:8,10,20 45:6
45:8,9,22,23
46:5 47:17
49:25 50:17
51:12 52:9,12
58:21 59:16,20
60:10,23 62:16
62:16 64:22

AKF Technologies
412-261-2323
BIROS_APPENDIX_0133
EXHIBIT A

Case 22-20823-GLT Doc 137 Filed 02/24/23 Entered 02/24/23 09:32:45 Desc
Exhibit A    Page 123 of 124
341 (a) MEETING OF CREDITORS  -  9/9/2022

Page 122

65:11,25 66:8
66:24 67:1,8,9
67:12,21,21,22
69:14 70:7
78:10 80:11,12
80:15 86:21
87:22 88:3,10
88:12 89:5,18
89:21,23 91:16
91:17 94:5,12
95:17,25 96:2,5
96:11,12,16,22
97:9 98:15 99:2
99:24 100:5,7
100:15 101:19
102:1,5,10,10
102:13,23,25
103:4,8,19
104:18,21 108:6
**U.S** 5:22
**unanimous** 62:11
**unavailable**
76:12
**unaware** 61:15
**understand** 28:3
41:24 48:3,7
59:8 71:23
73:13 81:20
**understanding**
38:6 54:14,15
64:25
**understands**
81:22
**UNIDENTIFIED**
11:24 12:3 35:4
35:14,17 68:13
68:16,19
**unit** 37:20,23
40:23 41:3
43:11
**United** 1:1 2:3
**unlimited** 84:6
**updated** 90:21
**updates** 99:12
**USAAG** 85:19

86:1,5
**utilities** 78:7

_____

**V**

**v** 38:19
**value** 7:3,13 44:8
52:3,3 76:24
**verbal** 38:14
**versus** 43:20
58:21
**viable** 74:9
**vice** 4:13,14 5:19
13:4 30:9 58:25
59:7,12,13
**video** 55:13
**view** 92:15
**VIN** 51:2
**Vince** 53:7
**violations** 38:9
**vote** 62:11

_____

**W**

**W-2's** 15:17,20
15:25 26:18,19
**wage** 24:1,10
27:7
**wages** 23:10 24:1
67:14,15 69:9
69:10
**wait** 17:16
**walk** 32:14 46:23
**want** 22:19 24:4
44:16 49:20
54:23 55:7,9,10
55:10 58:8
62:22 71:17,19
72:12 74:4 75:1
75:2,2,4,4,18
83:1 104:13
106:25 107:25
108:1
**wanted** 17:16
18:4 86:16 98:3
**wants** 29:16
**warning** 39:20

40:5
**wasn't** 23:1 25:2
27:14 48:23
55:8 60:12
66:20 67:15
70:17 73:24
84:20 91:11
98:11
**watching** 104:18
**water** 51:19 78:9
**wave** 73:18
**way** 23:5 26:15
44:1 45:4 46:9
50:15 63:17
64:5 78:2,2
92:2 93:10
105:1
**we'll** 11:3,15,19
12:5,6 15:1
22:4,8,8,9 68:10
107:3,16 108:14
**we're** 12:8,12
14:25 17:25
18:1,5 22:6,7
36:17 45:21
57:12 60:2
68:22,23 71:2
87:18 92:9,9
107:16,17 108:4
108:8,8,12
**we've** 32:11
49:11,12 53:22
53:22 81:2
92:14
**Wednesday** 31:1
31:4 98:6
**weeds** 25:15
**week** 27:3 65:6
**weekly** 30:25
96:21 105:3
**weeks** 40:25
**welcome** 106:22
**Wenrich** 2:5 3:7
5:1,2,3,7 9:20
10:6 22:5,12,15

29:21 36:5,11
93:12 94:22
**went** 11:13 25:21
31:1,3 38:7,12
42:4,24 43:5
75:9 105:5
**weren't** 16:1
26:22 64:1,2
75:12
**WESTERN** 1:1
**whatsoever** 25:19
41:25
**When's** 15:6
**white** 51:19,20
**Whitehouse**
53:21,25 54:15
54:20 56:4,19
56:23 57:9,17
58:4
**WiFi** 79:11,12,16
79:22 80:23
81:1
**William** 2:6 5:4
**willing** 72:8,10
**wires** 104:1
**wish** 6:12
**withholding**
15:15
**WITNESS** 3:5
**woman** 57:17
58:4
**words** 46:5
105:12
**work** 21:2,5 23:7
25:1,11 27:3
45:19 72:5
84:23 104:15,15
105:6,14
**worked** 15:19
27:7,12 47:19
64:1,3,10,17,21
64:22 65:21
66:16
**workers** 63:25
**works** 23:16 36:7

58:7 81:21
**worry** 45:15
**worth** 51:17
**wouldn't** 15:22
23:14 47:21
48:24 91:3,5
**write** 38:8,9,13
**written** 30:19
31:8,12
**wrong** 26:11
44:19

_____

**X**

_____

**Y**

**yeah** 7:19 8:18
11:11 14:3
16:23,23 17:21
19:16 20:14
26:21 29:7
30:25 35:7 36:5
39:6 46:22
48:15 51:13
52:10 60:11
64:8 65:13
67:14 68:18,22
69:20 70:14
72:24 78:2
82:19,21,25
85:8 86:7 88:25
90:11 91:7,19
92:2,7 93:14
97:19 99:15
100:19 101:1,8
101:9 102:2,4
104:14
**year** 7:8 15:13
18:15 19:20
20:22 22:22,22
26:24 27:12
28:13 33:5,6,7
40:25 76:22
99:10,11
**years** 6:18 15:12
15:21 16:5,21

**BIROS_APPENDIX_0134**
**EXHIBIT A**

18:8,10,17,24
23:8,23 24:2
25:11 27:12
32:25 40:13
49:12 51:4
52:15 53:2
55:16,16 56:5
58:3 63:3 66:13
80:5 86:13 89:9
100:16,20
**yep** 57:1 77:17

**Z**

**0**

**1**

**1.18** 61:4
**10** 34:3 37:24
**10,000** 21:23 45:8
**10,000-gallon**
51:19
**100** 48:24
**1099's** 26:17,20
26:22
**12,000** 16:10
**13** 77:8,10,16
**13,000** 16:10
**130,000** 48:24
66:6
**14** 35:24
**14140** 78:7
**15** 37:6,7
**18** 97:24
**19** 37:25 77:9

**2**

**2,000** 27:13
**2:30** 36:3,4,9,10
36:21
**20** 18:18 43:10
51:3 100:18
**2004** 92:20 93:9
107:1
**2015** 12:17 17:10
90:24 97:18,22

97:24 100:17,22
101:5 103:5,9
**2016** 29:16 65:22
87:25 89:10
**2017** 45:13
**2018** 97:18,23
99:8
**2019** 16:14,20
38:17 39:10
62:18
**2020** 16:10 17:4
55:19,20 57:23
65:22 100:19,20
100:22 101:6
103:5,9
**2021** 16:9 17:4
18:19 20:10,10
37:4,6 38:18
39:11 45:14
**2022** 1:14 40:24
60:25
**2023** 109:11
**21** 8:3 16:13
18:18 38:17
39:10 100:19
**22** 3:7 18:18
52:15 53:2
100:19
**22-20823-** 36:18
**22-20823-GLT**
1:2 4:3
**25** 14:10,19
**260,000** 28:1 66:7
**27th** 109:11
**28** 14:14
**29** 3:8

**3**

**3,000** 72:12
**30** 60:25 77:9,13
77:15,18
**341** 73:23 92:24
**341(a)** 1:13 4:2
36:19 109:9
**345** 61:1

**38,000** 67:24

**4**

**4** 34:11
**40-hour** 27:3
**400** 34:10
**45** 49:12
**45,000** 19:1,2
29:9 37:12 88:8
88:10

**5**

**5** 3:6 38:17 39:8
39:10 61:6
**5/2015** 96:25
**51** 13:20,24

**6**

**6,000** 51:17
**65** 37:24 77:9
**65,000** 29:15

**7**

**7** 1:3
**7,000** 19:19 20:3
33:2,7 69:24
**70-** 101:20
**75** 61:2

**8**

**800-plus** 33:19

**9**

**9** 1:14 36:21
37:24
**90** 13:25 14:1
19:23 34:4,8
35:1 60:10
92:10
**95** 3:9
**98** 62:11 92:10
**98.82** 61:3
**99,000** 22:24 23:2
25:4

BIROS_APPENDIX_0135
EXHIBIT A

Transcript of the Testimony of

# CONT 341 MEETING OF CREDITORS

January 17, 2023

## IN RE: U LOCK, INC.



**412-261-2323**
**depo@akf.com**
**www.akf.com**

**BIROS_APPENDIX_0136**
**EXHIBIT A**

1

```
        IN THE UNITED STATES BANKRUPTCY COURT
       FOR THE WESTERN DISTRICT OF PENNSYLVANIA

            Bankruptcy No. 22-20823-GLT

                    Chapter 7



In re:                             )
                                   )
U LOCK INC.,                       )
                                   )
          Debtor.                  )
_____/



            TRANSCRIPT OF RECORDED PROCEEDINGS:

         CONTINUED 341 MEETING OF CREDITORS

                 January 6, 2023
```

**BIROS_APPENDIX_0137**
**EXHIBIT A**

CONT 341 MEETING OF CREDITORS - 1/17/2023

2

1                       PRESENT:

2

3

Robert H. Slone, Esquire, United States Trustee

4

Charles O. Zebley, Jr., Esquire, Trustee for
5        Shanni Snyder

6   Kash Snyder

7   George Snyder

8   Kirk B. Burkley, Esquire

9   Sarah Wenrich, Esquire

10  William Otto, Esquire

11  Christine Biros

12  John B. Joyce, Esquire

13  Beth L. Slaby, Esquire

14  Jeremy J. Kobeski, Esquire

15  J. Allen Roth, Esquire

16

17

18

19

20

21

22

23

24

25

BIROS_APPENDIX_0138
EXHIBIT A

```
                                                                     3
 1                              INDEX

 2

 3

 4    EXAMINATION OF KASH SNYDER BY MR. SLONE - PAGE 5

 5    EXAMINATION OF KASH SNYDER BY MR. BURKLEY - PAGE 16

 6    EXAMINATION OF KASH SNYDER BY MR. ZEBLEY - PAGE 25

 7    EXAMINATION OF GEORGE SNYDER BY MR. ZEBLEY - PAGE 27

 8

 9

10    EXHIBITS INTRODUCED:   (NONE)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

BIROS_APPENDIX_0139
EXHIBIT A

4

```
 1                    MR. SLONE:  I'll call the -- this
 2          will be a meeting of creditors in the case of
 3          U Lock Inc., Case 22-20823-GLT.  This is the
 4          time of a continued meeting of creditors in the
 5          U Lock case.  The original meeting of creditors
 6          was held September 9, 2022.  I am Robert Slone,
 7          the interim Trustee.
 8              We specifically scheduled this for the
 9          testimony of Kash Snyder.  Is Kash Snyder
10          present?
11                    MR. KASH SNYDER:  Here, present.
12                    MR. SLONE:  Okay.  You've got to
13          speak up so we can all hear you.  There's a
14          bunch of creditors present.  I'm going to ask
15          you to put your name on for the record,
16          starting with Mr. Zebley.  Mr. Zebley?
17                    MR. ZEBLEY:  Yes, this is Charles
18          Zebley.  I am the Chapter 7 Trustee for Shanni
19          Snyder.
20                    MR. SLONE:  Okay.  Next Beth and
21          Jeremy?
22                    MS. SLABY:  Yes, Beth Slaby and
23          Jeremy Kobeski for Shanni Snyder.
24                    MR. SLONE:  Okay.  Mr. Burkley?
25                    MR. BURKLEY:  Yes, Kirk Burkley,
```

BIROS_APPENDIX_0140
EXHIBIT A

5

```
 1      Sarah Wenrich, and William Otto for
 2      Christine Biros.
 3                  MR. SLONE:  And Christine Biros
 4      is also present?
 5                  MS. BIROS:  Yes.
 6                  MR. BURKLEY:  That's correct.
 7                  MR. SLONE:  And George Snyder,
 8      you're present also?
 9                  MR. GEORGE SNYDER:  Yes, present.
10                  MR. SLONE:  Okay.  And attorney
11      for U Lock?
12                  MR. ROTH:  Allen Roth here.
13                  MR. SLONE:  Okay.  And Kash
14      Snyder, Mr. Snyder, please raise your right
15      hand.  Do you swear that the testimony
16      you're about to give in this matter to be
17      the truth?
18                  MR. KASH SNYDER:  I do.
19                  MR. SLONE:  Mr. Snyder, you've
20      got to speak up so we can all hear you,
21      okay?
22                  MR. KASH SNYDER:  All right.  I
23      -- I do.
24                  MR. SLONE:  Good, you're --
25      you're coming in strong and clear now.
```

BIROS_APPENDIX_0141
EXHIBIT A

CONT 341 MEETING OF CREDITORS  -  1/17/2023

6

```
1              MR. KASH SNYDER:  Okay.
2    EXAMINATION OF KASH SNYDER:
3    BY MR. SLONE
4          Q.  Okay, Mr. Snyder, when -- what
5        relationship do you have with U Lock Inc.?
6          A.  I worked there and I was a corporate
7        officer there since the beginning.
8          Q.  Okay.  And when -- when did the
9        company start?
10         A.  That would be 2015, July I believe.
11         Q.  Okay.  And who are the other
12       officers beside yourself?
13         A.  To the best of my recollection, and
14       this, this is -- this could be wrong, but I
15       don't remember ever writing down.  My
16       brother George, Christine Biros, John Biros,
17       and myself were officers or owners or -- I
18       mean, when I wrote things that I, to my
19       recollection, I started a bank account, I
20       think I wrote myself as the director.  And
21       the truth is, the only thing I ever remember
22       writing when I attached my name to something
23       was director.
24            So we were going to do an official
25       corporate structure or something like that,
```

BIROS_APPENDIX_0142
EXHIBIT A

7

1      but it was, you know, sort of treading water

2      for a few years, really at Christine's

3      direction, which was fine with me; and in

4      the end I think we were all four just going

5      to split that, you know, split the officer

6      roles or whatever.

7          Q.  Okay.

8          A.  I don't know where I ever ended up.

9      Vice president I believe I had been named as

10     being before.  But like I said, that, that,

11     I remember, I mean, I thought Christine

12     maybe was vice at one time also.  So that's

13     really unclear to me.  But I know that I

14     signed off personally on things as director.

15         Q.  What -- who are the shareholders of

16     the corporation?

17         A.  That would be myself, that would be

18     John, that would be Christine, that would be

19     George.  Then there is like minor

20     shareholders to my knowledge, and that's, I

21     don't know a whole lot about that end of it.

22      I -- I don't know about even the majority

23     shareholder end it very, very much, but I

24     know, like I said, the four of us were

25     always, you know, a big part of it.

BIROS_APPENDIX_0143
EXHIBIT A

8

1          Q.  Did the corporation have employees?

2          A.  No, we never had employees.  We

3     always had people helping us, but never

4     anything official or long-term or anything

5     like that.

6          Q.  Did you have 1099 workers, people

7     that you gave 1099 forms to?

8          A.  No, we never did that.

9          Q.  Never did?

10         A.  No, sir.

11         Q.  Now, you said you had people help

12    out, but they weren't paid then; is that

13    correct?

14         A.  Yeah, everyone, anyone who helped --

15    well, there was always -- Christine said to

16    pay people less than 600.  She said her

17    employees I guess for her machine business,

18    you know, that would -- that would help, you

19    know, they would -- I don't know what the

20    reason was.  I guess it was for, to keep

21    things simple.  But so it was limited hours

22    on people where, you know, I think the

23    number was, well, I'm almost positive the

24    number was $600 per year, everyone had to be

25    below that.

CONT 341 MEETING OF CREDITORS  -  1/17/2023

9

1          Q.  Okay, so you never issued any W-2's

2     or 1099's; is that correct?

3          A.  That's correct.

4          Q.  Did the corporation have an

5     accountant?

6          A.  No, we didn't.  We talked to one one

7     time, and it just, I think at the time I

8     think we were ahead of ourselves.  I didn't

9     get the go-ahead, well, U Lock didn't get

10    the go-ahead from Christine to go ahead and

11    file and put names on things.  And what we

12    were told at the time was that of course we

13    should file, but there's no harm because we

14    were operating at a loss, but we have to do

15    it.  That's what, I mean, that's what he

16    told us.

17    So we, you know, we didn't hire him, but

18    we just thought that the penalty on zero

19    dollars that we made would be zero, so we

20    were just relying on Christine to pull the

21    trigger on it, which we had to wait till,

22    they had a lawsuit going on or something

23    that we had to wait for.  So it was sort of

24    like --

25         Q.  Okay, the question was, did you have

BIROS_APPENDIX_0145
EXHIBIT A

10

1          an accountant; you answered no?

2               A.  I don't know.

3               Q.  Did the corporation ever file any

4          tax returns?

5               A.  No.

6               Q.  What would be the gross, on your

7          bankruptcy schedules for 2021 and 2020, I

8          believe the gross revenue for one year was

9          13,000, approximately 13,000, and for 2020

10         approximately 12,000.  Are those numbers

11         accurate?

12              A.  That's, I think that's very

13         accurate.  Anytime, it always seemed like a

14         thousand a month, is estimations.

15              Q.  Would that be consistent over the

16         life of the corporation?

17              A.  It was.

18              Q.  So the corporation you're saying

19         operated at a loss; is that correct?

20              A.  Yes.

21              Q.  Were the officers and insiders, that

22         would be the shareholders, given payments of

23         salary or anything else?

24              A.  No.  I would -- I would think more

25         I'm owed some money, but I don't know if

BIROS_APPENDIX_0146
EXHIBIT A

CONT 341 MEETING OF CREDITORS - 1/17/2023

11

 1      that's the time, the time and place for

 2      that.

 3          Q.  Did any of the officers or insiders

 4      make loans to U Lock, give U Lock money?

 5          A.  Yes.

 6          Q.  Okay.

 7          A.  That would be myself, that would be

 8      George, John, Chris.  All of us put in money

 9      through the years.

10          Q.  And did the corporation pay, pay

11      back any of these people that gave loans?

12          A.  Yes, U Lock did, and I don't know

13      the exact figures on that.  I know I got

14      repaid a decent amount last year.  Or no,

15      no, I'm sorry, two years ago.  But, you

16      know, the exact things, I would think maybe

17      send those questions towards George.  I can

18      hand him the phone if --

19          Q.  We're taking your testimony right

20      now.  I'm going to ask, now I had given a

21      list of items to George Snyder to, to bring

22      to me, and we'll add this:  Any money that

23      was paid to any of the insiders over the

24      last four years, I want something to show

25      that.

BIROS_APPENDIX_0147
EXHIBIT A

                                                              12

1           A.  Okay.  There is several -- there are

2       several documents Allen's paralegal just

3       emailed you before the meeting.

4           Q.  Yeah, I didn't get a chance to look

5       at that.

6           A.  Okay.

7           Q.  I have it in front of me here, and

8       it shows some.  But just give me, you know,

9       I'll -- this will be good, but get me the

10      other stuff, too.

11          A.  We will.

12          Q.  That's the information that was

13      requested at the 9/19, or I mean the meeting

14      of creditors, and the list was given to

15      George Snyder and also sent to Allen Roth.

16      So I need that information.  Start bringing

17      that together.

18      There was a 2021 Kubota that was sold, or

19      in 2021 the Kubota was sold for $45,000.

20      Now, that Kubota was owned by the

21      corporation; is that correct?

22          A.  That's correct.

23          Q.  Okay, now where did that money go?

24          A.  Back into U Lock, to my knowledge

25      was most of it.  Some went to myself, which

CONT 341 MEETING OF CREDITORS  -  1/17/2023

13

1          unfortunately went back to U Lock.  But

2          specifics on that, they're included in what

3          was just emailed to you.

4              Q.  Okay, I'll need -- I'll need that

5          information. And then there was a question

6          about some of that money was used to pay

7          real estate taxes. I need something to show

8          what real estate taxes were paid.

9              A.  Okay.  That will be in an email that

10         you -- that was sent to you.

11             Q.  You mean the stuff that was sent to

12         me this morning?

13             A.  Correct.

14             Q.  Okay.  It just says it's a

15         promissory note signed by George Snyder, but

16         I need the receipt from the tax claimed,

17         from the tax.  There, look, there was

18         something here that didn't come out.  Maybe

19         that's the receipt that I'm looking for.  So

20         I need the receipt to show the payment of

21         the real estate taxes.

22             A.  Okay, I believe it is in there, and

23         if it's fuzzy, it will be re-sent.  George

24         will get you that.  Anything, anything that

25         there's a gap in, we'll send.

14

1          Q.  Okay.  Very good.  Were there any

2     other sales of assets other than the --

3     other than in the ordinary course of

4     business that were made?

5          A.  Nothing to my knowledge.  John took

6     the company car back.  That wasn't sold.  He

7     already owned that.  There was that tractor.

8      I don't think any, any -- nothing else

9     comes to mind.  I think it's no.  I think

10    the answer would be a no.

11         Q.  Okay.  Did U Lock make any payments

12    to Mr. Roth for this bankruptcy?

13         A.  No.

14         Q.  Did anybody pay Mr. Roth for work on

15    this bankruptcy case?

16         A.  No.

17         Q.  Shanni Snyder filed a lawsuit in

18    Federal Court for, I guess it was for wages.

19     Are you familiar with that case?

20         A.  I know that it was filed, but I'm

21    not familiar.

22         Q.  Who made the decision on behalf of U

23    Lock not to participate in that case?

24         A.  I don't know.  I -- I felt like we

25    were all in the same situation; nobody was

15

1        going to get paid -- developed and making

2        money.  And to my knowledge everybody, I

3        mean, it seems like Biroses were happy that

4        she was doing that work.  George was -- I

5        mean, I was fine with it; George was fine

6        with it.  It was really not, you know, you

7        know, if -- if Christine was okay with

8        things, we were okay with things.

9            Q.  Well, why didn't you just agree to

10       make a payment to her?  She filed a lawsuit.

11        If you all agreed, why didn't you just make

12       arrangements to pay her or do something?

13           A.  I had no money.  Christine cut off

14       the money. And I've -- I've been less hands-

15       on the last couple years because, just, you

16       know, because of that.  So as far as, as far

17       as Shanni goes, it just, I mean, I didn't

18       even think she was -- I don't -- I don't

19       know.  I don't know that -- nothing

20       happened, so she wasn't going to be -- you

21       know, she was volunteering and then, you

22       know, money never came.  So I thought that

23       was understood.  But that was -- that's

24       between George; that's between Christine.

25           Q.  George filed a, in this, in the

BIROS_APPENDIX_0151
EXHIBIT A

16

1    bankruptcy, filed a wage claim for $99,000.

2    Are you familiar with that?

3        A.  No.  Well, we may have -- I did see

4    that on the schedule, but I'm not familiar

5    with details on that.

6        Q.  There was an order of Court entered

7    in the U Lock case dated 12/20/22 for the

8    sale of tangible and intangible assets.

9    Now, an appeal was taken the other day

10   appealing that order. Who authorized that

11   appeal being filed?

12       A.  I -- I'm not familiar.  That would

13   most likely be George.

14       Q.  Would you know what the basis of the

15   appeal is?

16       A.  Say that again, please?

17       Q.  Do you know what the basis of that

18   appeal is?

19       A.  No, I'm not -- I'm not familiar.

20       Q.  Do you know who would -- who paid

21   the filing fee for the appeal?

22       A.  I do not know.

23           MR. SLONE:  Okay, I'm going to

24   let the other, other parties ask you

25   questions at this point.  Who wants to go

BIROS_APPENDIX_0152
EXHIBIT A

17

1      next?

2                      MR. BURKLEY:  I will go.  This is

3      Kirk Burkley.

4                      MR. SLONE:  Okay, Mr. Burkley, go

5      ahead.

6                      MR. BURKLEY:  Thank you.

7  EXAMINATION OF KASH SNYDER:

8  BY MR. BURKLEY

9          Q.  Mr. Snyder, I only have a few

10     questions for you here today.  But my first

11     question is, have you personally ever seen

12     written bylaws for U Lock?

13         A.  Not to my recollection.

14         Q.  Do you believe that any exist?

15         A.  I have to be honest, I'm iffy on

16     that because I just don't, I don't know.

17         Q.  Have you personally ever seen a

18     shareholder agreement for U Lock?

19         A.  I have not.

20         Q.  All right.  Same question, do you

21     believe that one exists?

22         A.  I do.

23         Q.  All right.  Why do you believe that?

24         A.  Because there were four of us in

25     there and we talked about percentages and

BIROS_APPENDIX_0153
EXHIBIT A

18

1          shares and things. But I could be wrong on

2          it, but I just, what I thought.

3               Q.  If one existed, who would be in

4          possession of it?

5               A.  That's a good question.  I don't

6          know. Maybe -- I don't know.  I'd just be

7          speculating.

8               Q.  All right, you testified previously

9          that you are in fact a shareholder of U

10         Lock; correct?

11              A.  I believe I am, yes, that is

12         correct.  That is what I testified.

13              Q.  And how many shares do you own?

14              A.  Oh, I believe it's in the millions,

15         like 4 million, but I think there's 100

16         million shares, so it amounts to not a lot.

17              Q.  Have you ever received a share, a

18         certificate for your shares?

19              A.  No, I have not.

20              Q.  Do you know if other shareholders

21         received certificates evidencing their

22         ownership?

23              A.  I don't know.

24              Q.  Who made the decision to issue 100

25         million shares for this corporation?

BIROS_APPENDIX_0154
EXHIBIT A

19

```
 1          A.  I would think that would be, well,
 2     George, Christine, John.  I don't know.
 3     Between the three of them.  I'd say maybe
 4     George or Christine would have to be who I
 5     would think.
 6          Q.  Do you know if George or Christine,
 7     do you know if either one of them or
 8     yourself received any advice from outside
 9     individuals to issue the 100 million shares?
10          A.  I don't know.
11          Q.  Did you ever talk to anybody other
12     than Christine, John, or George about the
13     number of shares to be issued for U Lock?
14          A.  I did not.
15          Q.  You testified that you've been an
16     officer since the beginning, and I believe
17     you said that you were the vice president;
18     is that correct?
19          A.  My testimony was sort of that that's
20     ambiguous to me.  But I know I've signed
21     things as director, and that's the best I
22     could do with that.  I apologize.
23          Q.  Is George also a director?
24          A.  I have seen him do that before, so I
25     guess so. I've seen him sign the same way.
```

BIROS_APPENDIX_0155
EXHIBIT A

20

1          Q.  What were George's duties as an

2     officer and director?

3          A.  Well, I don't know the official

4     capacity, but we just always all worked.  I

5     mean, he lined up -- he sort of seemed like

6     he quarterbacked the work to cleaning up the

7     property, the getting rid of garbage,

8     getting rid of, you know, things that we

9     would recycle.  He would, you know, fix

10     things that needed fixed.  He would pay

11     workers.  Between him and John they would

12     pay workers.  And then sometimes he dealt

13     with tenants.  Not much when I was around a

14     lot.  The less I've been around, the more he

15     does that.

16          Q.  Did George have check-signing

17     authority?

18          A.  I don't think so.  I think that was

19     just me.

20          Q.  That was just you?  Okay.

21          A.  As far as the bank, it was only me,

22     but I would do online stuff.  Let me think.

23     George sort of, with, as far as the working

24     end of things go, he would -- he would meet

25     with Christine. I was there probably 90

CONT 341 MEETING OF CREDITORS  -  1/17/2023

21

```
 1        percent of the time, but he was 100 percent
 2        as far as meeting with her weekly.  With
 3        John, that was almost daily. I'm sorry, I'm
 4        like --
 5             Q.  Where did the company bank?  Oh, go
 6        ahead, sorry.
 7             A.  Oh, that's okay.  Citizens.  I was
 8        -- I was still going over George's duties.
 9        Are we finished with that or, 'cause there
10        was, you know, the grass cutting, the
11        regular stuff that needs regular
12        maintenance.  But he did, you know, he
13        installed the roads and did the asphalt on
14        the property, a huge portion of the
15        property.  I mean, it might be almost half
16        the property.  But did electric work.
17             Q.  And how did --
18             A.  There was -- there were years of
19        work.
20             Q.  How did George's -- how did -- how
21        did his, if in fact they were different, how
22        did George's responsibilities and duties
23        differ from yours?
24             A.  Well, I'd say he was -- he was more
25        hands-on in maintenance and probably like a
```

CONT 341 MEETING OF CREDITORS - 1/17/2023

22

1    better skill set than me as far as that

2    goes.  As far as dealing with John and

3    Christine, George really found the deal and

4    included them.  So, you know, once Christine

5    invested, I mean, she was, fair is fair, she

6    was the boss.  They sort of jumped whenever

7    she said something, even if we had to leave

8    U Lock to go to her house and, you know, she

9    had him do excavating at her house and we

10   just, I mean, he jumped, took machines in

11   there and we (Inaudible) there.  That's

12   just, you know, so he was with -- him and

13   her were -- I'd say it was like, say it was

14   me and George and her and John.  I'd say she

15   was the boss of her and John, that he was

16   the boss of me and him, but that's -- that's

17   nothing official, but I -- just that's the

18   way it went.

19       Q.  Did you ever have Board of Directors

20   meetings?

21       A.  Yeah, the -- the Wednesdays that we

22   would meet at their -- at their business,

23   that was -- that was U Lock-related every

24   time, so that was every Wednesday.  And John

25   and George saw each other daily.  They

BIROS_APPENDIX_0158
EXHIBIT A

23

1          typically would go to Arby's and they'd,

2          same thing, it was, you know -- I don't -- I

3          don't know if that was more fluff than

4          anything, but at the -- at the weekly

5          meetings, Caesar's Bar down in Turtle Creek

6          was the -- that's where we talked about U

7          Lock. And that was without exception every

8          Wednesday. And like I said, if I -- I might

9          have missed one or two in the years that we

10         did it.  And the only time I quit going was

11         when they filed a lawsuit, which was, I

12         think we found out about it like a day after

13         we met with them and we were like --

14              Q.  Mr. Snyder.

15              A.  They didn't say anything.

16              Q.  Mr. Snyder, if we -- if we can stay

17         on, on the questions.

18              A.  Yeah, sorry.

19              Q.  Did you consider -- did you consider

20         those to be Board of Directors meetings?

21              A.  Yeah, I could -- I could label them

22         that.

23              Q.  All right.  Did you keep minutes

24         from those meetings?  Did the company keep

25         minutes from those Board of Directors

BIROS_APPENDIX_0159
EXHIBIT A

24

1     meetings?

2          A.   No, but she would keep notes and --

3          Q.   Who is she?

4          A.   Oh, I'm sorry.  Christine Biros at

5     times would keep notes, and once in a while

6     we would, but it wasn't -- it wasn't like

7     your typical meeting.  I know John did

8     things on napkins at different restaurants

9     and things like that, but at the weekly

10    meetings at Caesar's --

11         Q.   Are --

12         A.   Anything, anything I have would be

13    maybe with my things that are still at U

14    Lock.

15         Q.   Okay, so I was just going to ask

16    you, are you in possession of any minutes

17    that were sent out after any Board of

18    Directors meeting?

19         A.   Yes.  But I'm not calling -- I mean,

20    minutes, but they're -- you're calling them

21    minutes, and I understand like it's, you

22    could sort of like label them that way, but

23    they're basically just notes or like a to-

24    do list.

25         Q.   Did you -- did you ever attend or

BIROS_APPENDIX_0160
EXHIBIT A

25

1       were notices ever sent out notifying

2       directors that there would be a Board of

3       Directors meeting, written notices?

4           A.  No.  It was -- it was sort of hush-

5       hush and it was, you know, Christine was

6       under investigation.  I think maybe the

7       whole family was; I'm not sure.  But there

8       was just, we sort of kept things just quiet,

9       but it was, I mean, it was -- what was going

10      on was just sort of day to day running the

11      business waiting to develop this property,

12      so --

13          Q.  Did you ever attend an annual

14      meeting of the shareholders?

15          A.  Nothing labeled that way.

16          Q.  Do you know if a notice was ever

17      sent out to all shareholders notifying them

18      of an annual meeting?

19          A.  I know that I never received one.  I

20      would have to assume no --

21          Q.  Okay.

22          A.  -- to the rest.

23          Q.  Have you ever seen or are you in

24      possession of minutes from a shareholders

25      meeting?

CONT 341 MEETING OF CREDITORS - 1/17/2023

26

1        A.  No.

2        Q.  Did the company ever make

3   distributions to its shareholders or any

4   shareholder?

5        A.  There was no money to distribute.  I

6   know I personally never did.

7        Q.  Who all had -- you mentioned that

8   the bank account, that you would do most

9   things online. Who all had credentials to

10  sign on online to that bank account?  Or was

11  it just you?

12       A.  To my recollection, just me.

13       Q.  Mr. Slone asked you a question about

14  your counsel, Mr. Roth, and whether or not

15  you had paid him for this bankruptcy, and I

16  believe your answer was no, and he asked if

17  anyone had paid him and I believe your

18  answer is no.  So is it your understanding

19  as an officer of U Lock that Mr. Roth is

20  handling this matter for free?

21       A.  I never thought about it.  I would

22  think -- I don't -- I don't know how that

23  goes.  I really don't know.  I apologize.

24       Q.  Do you have any understanding of

25  whether or not he would be paid in the

CONT 341 MEETING OF CREDITORS  -  1/17/2023

27

1    future by U Lock or anyone else?

2         A.  I don't have any understanding of

3    that either.

4              MR. BURKLEY:  Okay, I don't have

5    any further questions.

6              MR. KASH SNYDER:  Thank you.

7              MR. SLONE:  Who, who else would

8    wish to ask some questions at this time?

9              MR. ZEBLEY:  Mr. Slone, this is

10   Zebley.  Can I -- I was getting back on from

11   the mute.  Could I ask a couple questions?

12             MR. SLONE:  Yes, sir.

13   EXAMINATION OF KASH SNYDER:

14   BY MR. ZEBLEY

15        Q.  Okay.  Mr. Snyder, I just want, this

16   is really kind of a follow-up or a different

17   variation of the questions you've just been

18   asked; but who is getting paid to give legal

19   advice in connection with the U Lock

20   bankruptcy?

21        A.  To my knowledge nobody has received

22   payment.

23        Q.  Who is going to get paid for giving

24   legal advice in connection with the U Lock

25   bankruptcy?

BIROS_APPENDIX_0163
EXHIBIT A

CONT 341 MEETING OF CREDITORS - 1/17/2023

28

1          A.  From what I know, Attorney Roth will

2      get paid if it's approved by the Court.

3          Q.  If what is approved by the Court?

4          A.  The payment to him.

5              MR. ZEBLEY:  What, Attorney Roth,

6      can you shed light on that?

7              MR. ROTH:  Well, look, I believe

8      it's their intention to pay me at some

9      point, and so that's where we are; but I

10     have not been paid anything to this point.

11         Q.  (BY MR. ZEBLEY)  Back to you, Mr.

12     Snyder.  Is there an agreement with Attorney

13     Roth regarding payment?

14         A.  None that I know of.

15         Q.  And this approval again is by the

16     Court approving payment from U Lock assets?

17         A.  That's something I don't know.  I

18     think there's an hourly fee that is being

19     requested from the Court or, you know, to be

20     approved by the Court or something, and so I

21     don't know about that.

22         Q.  Well, who does know about this?

23         A.  I don't know, but I know I can't pay

24     and so --

25         Q.  That wasn't my question.  Who knows

BIROS_APPENDIX_0164
EXHIBIT A

CONT 341 MEETING OF CREDITORS  -  1/17/2023

29

```
 1        about the arrangement with Mr. Roth?
 2             A.  (Inaudible) knows about the
 3        arrangement.  The Bankruptcy Court.
 4             Q.  Pardon?
 5             A.  The Bankruptcy Court would know.
 6             Q.  Well, Mr. Roth just isn't doing this
 7        on his own, is he?
 8             A.  I believe he is.  He's stuck in it,
 9        from what I gather.
10             Q.  And why is Mr. Roth stuck in this?
11             A.  It was because he was their
12        attorney.  That's something I don't know.
13             Q.  Who knows?
14             A.  I could give the phone to George
15        Snyder.  Maybe he does.
16                  MR. ZEBLEY:  That's -- Mr. Slone,
17        is that okay with you?
18                  MR. SLONE:  Yeah, we'll swear,
19        Mr. -- Mr. Snyder, George Snyder, you were
20        sworn in on 9/9/22 at the 341 Meeting.
21        You're still under oath.  Go ahead.
22                  MR. GEORGE SNYDER:  Okay.  I'm
23        not sure --
24   EXAMINATION OF GEORGE SNYDER:
25   BY MR. ZEBLEY
```

CONT 341 MEETING OF CREDITORS  -  1/17/2023

                                                              30
1          Q.  Mr. Snyder, have you heard my

2      questioning of -- this is Zebley -- have you

3      heard my questions directed to Mr. Kash

4      Snyder?

5          A.  Yes.

6          Q.  Who was authorized --

7          A.  Yes, I heard your question.  Pardon

8      me?

9          Q.  Okay, you heard those questions.

10     Can you shed some light on what --

11         A.  I'm not sure how much more light I

12     could shed on it.  But I believe Mr. Roth

13     filed notice with the Court, like his hourly

14     fee.  And we haven't paid him anything, and

15     I just, it's my understanding that if he --

16     if the Court -- that we're not allowed to

17     pay him anything. Everything has to go

18     through the Bankruptcy Court.  So it was my

19     understanding that he would, if the Court

20     approved it, then that's the only way he

21     would get paid for these services during

22     bankruptcy.

23         Q.  Is there an agreement with Mr. Roth?

24         A.  Well, I don't think we have a signed

25     agreement. I think it's just what the notice

CONT 341 MEETING OF CREDITORS  -  1/17/2023

31

```
1     at Court maybe he filed.
2          Q.  Well, who's authorizing Mr. Roth to
3     proceed?
4          A.  Well, I am.  We don't have any other
5     attorney and he's -- he's willing to do it.
6     I don't know that he's stuck doing it like
7     Kash said, but he -- he, you know, he filed
8     his appearance in this case and he's our
9     attorney, and so I authorized him to do
10    whatever he's doing.
11         Q.  So your testimony is, Mr. Snyder,
12    that any steps taken in this U Lock
13    bankruptcy or the Shanni Snyder bankruptcy,
14    you have authorized Mr. Roth to take?
15         A.  I didn't hear what you said about
16    Shanni.
17         Q.  Well, do you (Inaudible) Shanni
18    Snyder bankruptcy --
19              MR. JOYCE:  John, John Joyce.  I
20    just got here.  I was at a conference, so
21    I've jumped in for Beth Slaby.  Yeah, your
22    last question brought up Ms. Snyder's
23    bankruptcy, and there was no foundation or
24    anything about Roth, I mean, unless Roth has
25    filed something for U Lock in that case --
```

32

1          Q.  All right.

2                  MR. JOYCE:  -- he's not involved.

3          Q.  Then drop Shanni Snyder from the

4     question.

5          A.  Okay, I authorized what Mr. -- Mr.

6     Roth has done up and to this point, and he

7     has to seek the money from the Court.

8          Q.  Everything that Mr. Roth has done?

9          A.  Yes.

10          Q.  And there is no writing that exists

11     that memorializes an agreement between you

12     and Mr. Roth, between U Lock and Mr. Roth?

13          A.  Yes, that he filed with the Court.

14     It's on the docket, I believe.

15          Q.  Okay.  And you'll get that docket

16     number to everybody; correct?

17          A.  Yeah, I'll make a note of that if

18     you'd like that.

19          Q.  Is there any other person that is

20     giving legal advice in connection with this

21     case to U --

22          A.  No.

23          Q.  -- to the U Lock shareholders?

24          A.  No.  Just me.

25          Q.  Just Mr. Roth?

BIROS_APPENDIX_0168
EXHIBIT A

33

1          A.  Yes.  I'm not sure if Christine or

2      any of the other shareholders are, but just,

3      I just know about me.  I don't know about

4      Christine or Mr. Otto.

5          Q.  And was the -- when Shanni Snyder

6      filed her lawsuit, was that referred to

7      anybody for legal advice?

8          A.  Well, I spoke with Mr. -- I spoke

9      with Mr. Roth about it, and it was, at that

10     time I think he said it would be a $10,000

11     case to defend.  So I -- I didn't want to

12     pay for that.

13         Q.  Mr. Roth wanted $10,000 up front to

14     defend it?

15         A.  I don't even think we got that far.

16     We -- I discussed it and he says it would be

17     a $10,000 case.  And he didn't -- he didn't

18     necessarily say up front.

19         Q.  All right.  The last question, and

20     this may -- I may be repeating it a little

21     bit and I apologize.

22         A.  Okay.

23         Q.  Under what circumstances will Mr.

24     Roth get paid in connection with this case,

25     this bankruptcy?

34

1          A.   It's my understanding that if the

2     Court approves his hourly legal fee that is

3     in the docket that I'll be sending you, if

4     the Court approves it and if there's money,

5     if U Lock has money, then I guess he could

6     have to, you know, he'd have to ask the

7     Court to pay him.  If they don't, then I

8     guess he would not get paid.

9          Q.   Where does your understanding come

10    from?

11         A.   What do you mean?

12         Q.   Well, you say you have an

13    understanding. You're not a lawyer.  I'm

14    just curious as to how you would --

15         A.   Right, I mean --

16         Q.   -- come to that conclusion?

17         A.   Yeah, you're asking me like for

18    legal advice, and I'm not a lawyer, so I'm

19    really not sure, but that's my

20    understanding.  I just know --

21         Q.   Why do you have that understanding?

22         A.   I just thought I knew he couldn't

23    get paid without the Court approval, 'cause

24    I was told by Mr. Slone and by the Judge

25    that like I'm not -- you know, that sort of

CONT 341 MEETING OF CREDITORS  -  1/17/2023

35

1     Mr. Slone's in charge of everything.  I

2     can't take the money from U Lock and pay who

3     I choose to pay.  So it would be up to the

4     Court, is what I thought.

5         Q.  Well, wouldn't Mr. -- wouldn't Mr.

6     Roth be the appropriate person to tell you?

7         A.  Yeah, we -- we've talked about it,

8     that's what I -- that's what I said earlier.

9      I'm not sure if maybe I wasn't clear.  But

10    that, that's what me and Mr. Roth discussed.

11        Q.  Okay, and he has said that he will

12    get paid out of the assets of U Lock?

13        A.  I'm not sure if this is -- Allen's

14    here.  You might want to ask him.  I'm not

15    sure if this is privileged between me and my

16    attorney to tell you what we discussed and

17    (Inaudible).

18        Q.  Well, actually this is U Lock.  The

19    privilege belongs to the Chapter 7 Trustee.

20    So I don't think that's an appropriate

21    objection.

22        A.  Okay, I mean, I think, I believe at

23    one point Mr. Roth told me that he'd have to

24    ask the Court for the -- for the money, and

25    he said if the Court approves it, then, you

BIROS_APPENDIX_0171
EXHIBIT A

36

1          know, they get to decide all payments, and

2          if they approve it, then he'll get paid.  If

3          they do not approve it, he won't get paid.

4          So I don't really have any other research

5          into that or knowledge of that other than

6          kind of what Mr. Roth and I talked about or

7          what I heard in court with the Judge.

8               Q.  Well, when did you and Mr. Roth talk

9          about this?

10              A.  Over the past several months.

11              Q.  Before or after U Lock's bankruptcy

12         started?

13              A.  Well, it would have been after.  I

14         would have had no knowledge of this.  I

15         would have had no knowledge of this

16         bankruptcy until it came, so it would have

17         been after.

18              Q.  And up till that point Mr. Roth was

19         working for free?

20              A.  Well, the bankruptcy --

21              Q.  No.

22              A.  The bankruptcy was involuntary, so

23         --

24              Q.  You've been doing work before the

25         bankruptcy?

37

1          A.  Oh, before the bankruptcy?

2          Q.  Yes, sir.

3          A.  Yeah, we -- we didn't pay him

4     anything pre-bankruptcy.

5          Q.  Because he had agreed to work for

6     free?

7          A.  No, it wasn't all free.  I think he

8     got paid during the -- in the beginning of

9     the Biros litigation.  I think that was

10    prior to -- I don't know if that was 2017.

11    2000 -- I think it was around 2017.  But

12    then after that --

13         Q.  What did --

14         A.  -- yeah, he didn't receive any

15    payments.

16         Q.  What did you pay him in 2000 -- what

17    did you pay him in 2017?

18         A.  I'm sorry?

19         Q.  What did you pay him in 2017?

20         A.  I think it was around $5,000.  I'd

21    have to check.

22         Q.  And is there a writing memorializing

23    the payment arrangement with Mr. Roth for

24    the work he had done pre-bankruptcy?

25         A.  No.

CONT 341 MEETING OF CREDITORS  -  1/17/2023

38

1           MR. ZEBLEY:  All right, Mr.

2      Slone, that's all the questions I have.

3           MR. SLONE:  Thank you.  Who

4      wishes to go next?

5           MR. GEORGE SNYDER:  Should I --

6      I'll hand the phone back to Kash.

7           MR. SLONE:  Okay.  Anyone else

8      wish to ask questions?  Mr. Joyce, Mr.

9      Kobeski?

10           MR. JOYCE:  No, Mr. Slone, we're

11      -- we don't have any questions.

12           MR. SLONE:  Okay.  If no one else

13      has a question, we can close the meeting at

14      this time.  Thanks, everybody, for

15      participating.

16           MR. KASH SNYDER:  Thank you all

17      as well.

18           MR. SLONE:  Thank you, bye. (341

19      Meeting concluded.)

20

21

22

23

24

25

BIROS_APPENDIX_0174
EXHIBIT A

39

1

2

3              C E R T I F I C A T E

4

5      I, Mary J. Carney, a Court Reporter and Notary

6  Public in and for the Commonwealth of Pennsylvania,

7  do hereby certify that the foregoing is a true and

8  correct transcription of the recorded proceedings of

9  the January 6, 2023, Continued 341 Meeting of

10  Creditors and constitutes a true record.

11

12  This 17th day of January, 2023.

13

14

15  _____

          Notary Public
16

17

18

19

20

21

22

23

24

25

BIROS_APPENDIX_0175
EXHIBIT A

CONT 341 MEETING OF CREDITORS  -  1/17/2023

Page  40

| A |
|---|
| **account** 6:19 26:8 26:10 |
| **accountant** 9:5 10:1 |
| **accurate** 10:11 10:13 |
| **add** 11:22 |
| **advice** 19:8 27:19 27:24 32:20 33:7 34:18 |
| **ago** 11:15 |
| **agree** 15:9 |
| **agreed** 15:11 37:5 |
| **agreement** 17:18 28:12 30:23,25 32:11 |
| **ahead** 9:8,10 17:5 21:6 29:21 |
| **Allen** 2:15 5:12 12:15 |
| **Allen's** 12:2 35:13 |
| **allowed** 30:16 |
| **ambiguous** 19:20 |
| **amount** 11:14 |
| **amounts** 18:16 |
| **annual** 25:13,18 |
| **answer** 14:10 26:16,18 |
| **answered** 10:1 |
| **anybody** 14:14 19:11 33:7 |
| **Anytime** 10:13 |
| **apologize** 19:22 26:23 33:21 |
| **appeal** 16:9,11,15 16:18,21 |
| **appealing** 16:10 |
| **appearance** 31:8 |
| **appropriate** 35:6 35:20 |
| **approval** 28:15 34:23 |

| (A cont.) |
|---|
| **approve** 36:2,3 |
| **approved** 28:2,3 28:20 30:20 |
| **approves** 34:2,4 35:25 |
| **approving** 28:16 |
| **approximately** 10:9,10 |
| **Arby's** 23:1 |
| **arrangement** 29:1,3 37:23 |
| **arrangements** 15:12 |
| **asked** 26:13,16 27:18 |
| **asking** 34:17 |
| **asphalt** 21:13 |
| **assets** 14:2 16:8 28:16 35:12 |
| **assume** 25:20 |
| **attached** 6:22 |
| **attend** 24:25 25:13 |
| **attorney** 5:10 28:1,5,12 29:12 31:5,9 35:16 |
| **authority** 20:17 |
| **authorized** 16:10 30:6 31:9,14 32:5 |
| **authorizing** 31:2 |

| B |
|---|
| **B** 2:8,12 |
| **back** 11:11 12:24 13:1 14:6 27:10 28:11 38:6 |
| **bank** 6:19 20:21 21:5 26:8,10 |
| **bankruptcy** 1:1,2 10:7 14:12,15 16:1 26:15 27:20,25 29:3,5 30:18,22 31:13 31:13,18,23 |

| (B cont.) |
|---|
| 33:25 36:11,16 36:20,22,25 37:1 |
| **Bar** 23:5 |
| **basically** 24:23 |
| **basis** 16:14,17 |
| **beginning** 6:7 19:16 37:8 |
| **behalf** 14:22 |
| **believe** 6:10 7:9 10:8 13:22 17:14,21,23 18:11,14 19:16 26:16,17 28:7 29:8 30:12 32:14 35:22 |
| **belongs** 35:19 |
| **best** 6:13 19:21 |
| **Beth** 2:13 4:20,22 31:21 |
| **better** 22:1 |
| **big** 7:25 |
| **Biros** 2:11 5:2,3,5 6:16,16 24:4 37:9 |
| **Biroses** 15:3 |
| **bit** 33:21 |
| **Board** 22:19 23:20,25 24:17 25:2 |
| **boss** 22:6,15,16 |
| **bring** 11:21 |
| **bringing** 12:16 |
| **brother** 6:16 |
| **brought** 31:22 |
| **bunch** 4:14 |
| **Burkley** 2:8 3:5 4:24,25,25 5:6 17:2,3,4,6,8 27:4 |
| **business** 8:17 14:4 22:22 25:11 |
| **bye** 38:18 |
| **bylaws** 17:12 |

| C |
|---|
| **C** 39:3,3 |
| **Caesar's** 23:5 24:10 |
| **call** 4:1 |
| **calling** 24:19,20 |
| **capacity** 20:4 |
| **car** 14:6 |
| **Carney** 39:5 |
| **case** 4:2,3,5 14:15 14:19,23 16:7 31:8,25 32:21 33:11,17,24 |
| **cause** 21:9 34:23 |
| **certificate** 18:18 |
| **certificates** 18:21 |
| **certify** 39:7 |
| **chance** 12:4 |
| **Chapter** 1:3 4:18 35:19 |
| **charge** 35:1 |
| **Charles** 2:4 4:17 |
| **check** 37:21 |
| **check-signing** 20:16 |
| **choose** 35:3 |
| **Chris** 11:8 |
| **Christine** 2:11 5:2,3 6:16 7:11 7:18 8:15 9:10 9:20 15:7,13,24 19:2,4,6,12 20:25 22:3,4 24:4 25:5 33:1 33:4 |
| **Christine's** 7:2 |
| **circumstances** 33:23 |
| **Citizens** 21:7 |
| **claim** 16:1 |
| **claimed** 13:16 |
| **cleaning** 20:6 |
| **clear** 5:25 35:9 |
| **close** 38:13 |
| **come** 13:18 34:9 |

| (C cont.) |
|---|
| 34:16 |
| **comes** 14:9 |
| **coming** 5:25 |
| **Commonwealth** 39:6 |
| **company** 6:9 14:6 21:5 23:24 26:2 |
| **concluded** 38:19 |
| **conclusion** 34:16 |
| **conference** 31:20 |
| **connection** 27:19 27:24 32:20 33:24 |
| **consider** 23:19,19 |
| **consistent** 10:15 |
| **constitutes** 39:10 |
| **continued** 1:13 4:4 39:9 |
| **corporate** 6:6,25 |
| **corporation** 7:16 8:1 9:4 10:3,16 10:18 11:10 12:21 18:25 |
| **correct** 5:6 8:13 9:2,3 10:19 12:21,22 13:13 18:10,12 19:18 32:16 39:8 |
| **counsel** 26:14 |
| **couple** 15:15 27:11 |
| **course** 9:12 14:3 |
| **court** 1:1 14:18 16:6 28:2,3,16 28:19,20 29:3,5 30:13,16,18,19 31:1 32:7,13 34:2,4,7,23 35:4 35:24,25 36:7 39:5 |
| **credentials** 26:9 |
| **creditors** 1:13 4:2 4:4,5,14 12:14 39:10 |

BIROS_APPENDIX_0176
EXHIBIT A

Case 22-20823-GLT Doc 337-2 Filed 02/24/23 Entered 02/24/23 09:31:45 Desc
Exhibit B    Page 42 of 46
CONT 341 MEETING OF CREDITORS  -  1/17/2023

Page 41

**Creek** 23:5
**curious** 34:14
**cut** 15:13
**cutting** 21:10

**D**
**daily** 21:3 22:25
**dated** 16:7
**day** 16:9 23:12
  25:10,10 39:12
**deal** 22:3
**dealing** 22:2
**dealt** 20:12
**Debtor** 1:8
**decent** 11:14
**decide** 36:1
**decision** 14:22
  18:24
**defend** 33:11,14
**details** 16:5
**develop** 25:11
**developed** 15:1
**differ** 21:23
**different** 21:21
  24:8 27:16
**directed** 30:3
**direction** 7:3
**director** 6:20,23
  7:14 19:21,23
  20:2
**directors** 22:19
  23:20,25 24:18
  25:2,3
**discussed** 33:16
  35:10,16
**distribute** 26:5
**distributions**
  26:3
**DISTRICT** 1:1
**docket** 32:14,15
  34:3
**documents** 12:2
**doing** 15:4 29:6
  31:6,10 36:24
**dollars** 9:19

**drop** 32:3
**duties** 20:1 21:8
  21:22

**E**
**E** 39:3,3
**earlier** 35:8
**either** 19:7 27:3
**electric** 21:16
**email** 13:9
**emailed** 12:3 13:3
**employees** 8:1,2
  8:17
**ended** 7:8
**entered** 16:6
**Esquire** 2:3,4,8,9
  2:10,12,13,14
  2:15
**estate** 13:7,8,21
**estimations** 10:14
**everybody** 15:2
  32:16 38:14
**evidencing** 18:21
**exact** 11:13,16
**EXAMINATI...**
  3:4,5,6,7 6:2
  17:7 27:13
  29:24
**excavating** 22:9
**exception** 23:7
**EXHIBITS** 3:10
**exist** 17:14
**existed** 18:3
**exists** 17:21 32:10

**F**
**F** 39:3
**fact** 18:9 21:21
**fair** 22:5,5
**familiar** 14:19,21
  16:2,4,12,19
**family** 25:7
**far** 15:16,16
  20:21,23 21:2
  22:1,2 33:15

**Federal** 14:18
**fee** 16:21 28:18
  30:14 34:2
**felt** 14:24
**figures** 11:13
**file** 9:11,13 10:3
**filed** 14:17,20
  15:10,25 16:1
  16:11 23:11
  30:13 31:1,7,25
  32:13 33:6
**filing** 16:21
**fine** 7:3 15:5,5
**finished** 21:9
**first** 17:10
**fix** 20:9
**fixed** 20:10
**fluff** 23:3
**follow-up** 27:16
**foregoing** 39:7
**forms** 8:7
**found** 22:3 23:12
**foundation** 31:23
**four** 7:4,24 11:24
  17:24
**free** 26:20 36:19
  37:6,7
**front** 12:7 33:13
  33:18
**further** 27:5
**future** 27:1
**fuzzy** 13:23

**G**
**gap** 13:25
**garbage** 20:7
**gather** 29:9
**George** 2:7 3:7
  5:7,9 6:16 7:19
  11:8,17,21
  12:15 13:15,23
  15:4,5,24,25
  16:13 19:2,4,6
  19:12,23 20:16
  20:23 22:3,14

  22:25 29:14,19
  29:22,24 38:5
**George's** 20:1
  21:8,20,22
**getting** 20:7,8
  27:10,18
**give** 5:16 11:4
  12:8 27:18
  29:14
**given** 10:22 11:20
  12:14
**giving** 27:23
  32:20
**go** 9:10 12:23
  16:25 17:2,4
  20:24 21:5 22:8
  23:1 29:21
  30:17 38:4
**go-ahead** 9:9,10
**goes** 15:17 22:2
  26:23
**going** 4:14 6:24
  7:4 9:22 11:20
  15:1,20 16:23
  21:8 23:10
  24:15 25:9
  27:23
**good** 5:24 12:9
  14:1 18:5
**grass** 21:10
**gross** 10:6,8
**guess** 8:17,20
  14:18 19:25
  34:5,8

**H**
**H** 2:3
**half** 21:15
**hand** 5:15 11:18
  38:6
**handling** 26:20
**hands-** 15:14
**hands-on** 21:25
**happened** 15:20
**happy** 15:3

**harm** 9:13
**he'll** 36:2
**hear** 4:13 5:20
  31:15
**heard** 30:1,3,7,9
  36:7
**held** 4:6
**help** 8:11,18
**helped** 8:14
**helping** 8:3
**hire** 9:17
**honest** 17:15
**hourly** 28:18
  30:13 34:2
**hours** 8:21
**house** 22:8,9
**huge** 21:14
**hush** 25:5
**hush-** 25:4

**I**
**iffy** 17:15
**Inaudible** 22:11
  29:2 31:17
  35:17
**included** 13:2
  22:4
**INDEX** 3:1
**individuals** 19:9
**information**
  12:12,16 13:5
**insiders** 10:21
  11:3,23
**installed** 21:13
**intangible** 16:8
**intention** 28:8
**interim** 4:7
**INTRODUCED**
  3:10
**invested** 22:5
**investigation**
  25:6
**involuntary**
  36:22
**involved** 32:2

BIROS_APPENDIX_0177
EXHIBIT A

Case 22-20823-GLT Doc 337-2 Filed 02/24/23 Entered 02/24/23 09:32:45 Desc
Exhibit B    Page 43 of 46
CONT 341 MEETING OF CREDITORS  -  1/17/2023

Page  42

**issue** 18:24 19:9
**issued** 9:1 19:13
**items** 11:21

**J**

**J** 2:14,15 39:5
**January** 1:14
  39:9,12
**Jeremy** 2:14 4:21
  4:23
**John** 2:12 6:16
  7:18 11:8 14:5
  19:2,12 20:11
  21:3 22:2,14,15
  22:24 24:7
  31:19,19
**Joyce** 2:12 31:19
  31:19 32:2 38:8
  38:10
**Jr** 2:4
**Judge** 34:24 36:7
**July** 6:10
**jumped** 22:6,10
  31:21

**K**

**Kash** 2:6 3:4,5,6
  4:9,9,11 5:13,18
  5:22 6:1,2 17:7
  27:6,13 30:3
  31:7 38:6,16
**keep** 8:20 23:23
  23:24 24:2,5
**kept** 25:8
**kind** 27:16 36:6
**Kirk** 2:8 4:25
  17:3
**knew** 34:22
**know** 7:1,5,8,13
  7:21,22,24,25
  8:18,19,19,22
  9:17 10:2,25
  11:12,13,16
  12:8 14:20,24
  15:6,7,16,19,19

15:21,22 16:14
  16:17,20,22
  17:16 18:6,6,20
  18:23 19:2,6,7
  19:10,20 20:3,8
  20:9 21:10,12
  22:4,8,12 23:2,3
  24:7 25:5,16,19
  26:6,22,23 28:1
  28:14,17,19,21
  28:22,23,23
  29:5,12 31:6,7
  33:3,3 34:6,20
  34:25 36:1
  37:10
**knowledge** 7:20
  12:24 14:5 15:2
  27:21 36:5,14
  36:15
**knows** 28:25 29:2
  29:13
**Kobeski** 2:14
  4:23 38:9
**Kubota** 12:18,19
  12:20

**L**

**L** 2:13
**label** 23:21 24:22
**labeled** 25:15
**lawsuit** 9:22
  14:17 15:10
  23:11 33:6
**lawyer** 34:13,18
**leave** 22:7
**legal** 27:18,24
  32:20 33:7 34:2
  34:18
**life** 10:16
**light** 28:6 30:10
  30:11
**limited** 8:21
**lined** 20:5
**list** 11:21 12:14
  24:24

**litigation** 37:9
**little** 33:20
**loans** 11:4,11
**Lock** 1:7 4:3,5
  5:11 6:5 9:9
  11:4,4,12 12:24
  13:1 14:11,23
  16:7 17:12,18
  18:10 19:13
  22:8 23:7 24:14
  26:19 27:1,19
  27:24 28:16
  31:12,25 32:12
  32:23 34:5 35:2
  35:12,18
**Lock's** 36:11
**Lock-related**
  22:23
**long-term** 8:4
**look** 12:4 13:17
  28:7
**looking** 13:19
**loss** 9:14 10:19
**lot** 7:21 18:16
  20:14

**M**

**machine** 8:17
**machines** 22:10
**maintenance**
  21:12,25
**majority** 7:22
**making** 15:1
**Mary** 39:5
**matter** 5:16
  26:20
**mean** 6:18 7:11
  9:15 12:13
  13:11 15:3,5,17
  20:5 21:15 22:5
  22:10 24:19
  25:9 31:24
  34:11,15 35:22
**meet** 20:24 22:22
**meeting** 1:13 4:2

4:4,5 12:3,13
  21:2 24:7,18
  25:3,14,18,25
  29:20 38:13,19
  39:9
**meetings** 22:20
  23:5,20,24 24:1
  24:10
**memorializes**
  32:11
**memorializing**
  37:22
**mentioned** 26:7
**met** 23:13
**million** 18:15,16
  18:25 19:9
**millions** 18:14
**mind** 14:9
**minor** 7:19
**minutes** 23:23,25
  24:16,20,21
  25:24
**missed** 23:9
**money** 10:25 11:4
  11:8,22 12:23
  13:6 15:2,13,14
  15:22 26:5 32:7
  34:4,5 35:2,24
**month** 10:14
**months** 36:10
**morning** 13:12
**mute** 27:11

**N**

**name** 4:15 6:22
**named** 7:9
**names** 9:11
**napkins** 24:8
**necessarily** 33:18
**need** 12:16 13:4,4
  13:7,16,20
**needed** 20:10
**needs** 21:11
**never** 8:2,3,8,9
  9:1 15:22 25:19

26:6,21
**Notary** 39:5,15
**note** 13:15 32:17
**notes** 24:2,5,23
**notice** 25:16
  30:13,25
**notices** 25:1,3
**notifying** 25:1,17
**number** 8:23,24
  19:13 32:16
**numbers** 10:10

**O**

**O** 2:4
**oath** 29:21
**objection** 35:21
**officer** 6:7 7:5
  19:16 20:2
  26:19
**officers** 6:12,17
  10:21 11:3
**official** 6:24 8:4
  20:3 22:17
**Oh** 18:14 21:5,7
  24:4 37:1
**okay** 4:12,20,24
  5:10,13,21 6:1,4
  6:8,11 7:7 9:1
  9:25 11:6 12:1
  12:6,23 13:4,9
  13:14,22 14:1
  14:11 15:7,8
  16:23 17:4
  20:20 21:7
  24:15 25:21
  27:4,15 29:17
  29:22 30:9 32:5
  32:15 33:22
  35:11,22 38:7
  38:12
**once** 22:4 24:5
**online** 20:22 26:9
  26:10
**operated** 10:19
**operating** 9:14

BIROS_APPENDIX_0178
EXHIBIT A

CONT 341 MEETING OF CREDITORS  -  1/17/2023

Page  43

**order** 16:6,10
**ordinary** 14:3
**original** 4:5
**Otto** 2:10 5:1
  33:4
**outside** 19:8
**owed** 10:25
**owned** 12:20 14:7
**owners** 6:17
**ownership** 18:22

**P**

**PAGE** 3:4,5,6,7
**paid** 8:12 11:23
  13:8 15:1 16:20
  26:15,17,25
  27:18,23 28:2
  28:10 30:14,21
  33:24 34:8,23
  35:12 36:2,3
  37:8
**paralegal** 12:2
**Pardon** 29:4 30:7
**part** 7:25
**participate** 14:23
**participating**
  38:15
**parties** 16:24
**pay** 8:16 11:10,10
  13:6 14:14
  15:12 20:10,12
  28:8,23 30:17
  33:12 34:7 35:2
  35:3 37:3,16,17
  37:19
**payment** 13:20
  15:10 27:22
  28:4,13,16
  37:23
**payments** 10:22
  14:11 36:1
  37:15
**penalty** 9:18
**Pennsylvania** 1:1
  39:6

**people** 8:3,6,11
  8:16,22 11:11
**percent** 21:1,1
**percentages**
  17:25
**person** 32:19
  35:6
**personally** 7:14
  17:11,17 26:6
**phone** 11:18
  29:14 38:6
**place** 11:1
**please** 5:14 16:16
**point** 16:25 28:9
  28:10 32:6
  35:23 36:18
**portion** 21:14
**positive** 8:23
**possession** 18:4
  24:16 25:24
**pre-bankruptcy**
  37:4,24
**present** 2:1 4:10
  4:11,14 5:4,8,9
**president** 7:9
  19:17
**previously** 18:8
**prior** 37:10
**privilege** 35:19
**privileged** 35:15
**probably** 20:25
  21:25
**proceed** 31:3
**proceedings** 1:12
  39:8
**promissory** 13:15
**property** 20:7
  21:14,15,16
  25:11
**Public** 39:6,15
**pull** 9:20
**put** 4:15 9:11
  11:8

**Q**

**quarterbacked**
  20:6
**question** 9:25
  13:5 17:11,20
  18:5 26:13
  28:25 30:7
  31:22 32:4
  33:19 38:13
**questioning** 30:2
**questions** 11:17
  16:25 17:10
  23:17 27:5,8,11
  27:17 30:3,9
  38:2,8,11
**quiet** 25:8
**quit** 23:10

**R**

**R** 39:3
**raise** 5:14
**re-sent** 13:23
**real** 13:7,8,21
**really** 7:2,13 15:6
  22:3 26:23
  27:16 34:19
  36:4
**reason** 8:20
**receipt** 13:16,19
  13:20
**receive** 37:14
**received** 18:17,21
  19:8 25:19
  27:21
**recollection** 6:13
  6:19 17:13
  26:12
**record** 4:15 39:10
**recorded** 1:12
  39:8
**recycle** 20:9
**referred** 33:6
**regarding** 28:13
**regular** 21:11,11
**relationship** 6:5
**relying** 9:20

**remember** 6:15
  6:21 7:11
**repaid** 11:14
**repeating** 33:20
**Reporter** 39:5
**requested** 12:13
  28:19
**research** 36:4
**responsibilities**
  21:22
**rest** 25:22
**restaurants** 24:8
**returns** 10:4
**revenue** 10:8
**rid** 20:7,8
**right** 5:14,22
  11:19 17:20,23
  18:8 23:23 32:1
  33:19 34:15
  38:1
**roads** 21:13
**Robert** 2:3 4:6
**roles** 7:6
**Roth** 2:15 5:12
  5:12 12:15
  14:12,14 26:14
  26:19 28:1,5,7
  28:13 29:1,6,10
  30:12,23 31:2
  31:14,24,24
  32:6,8,12,12,25
  33:9,13,24 35:6
  35:10,23 36:6,8
  36:18 37:23
**running** 25:10

**S**

**salary** 10:23
**sale** 16:8
**sales** 14:2
**Sarah** 2:9 5:1
**saw** 22:25
**saying** 10:18
**says** 13:14 33:16
**schedule** 16:4

**scheduled** 4:8
**schedules** 10:7
**see** 16:3
**seek** 32:7
**seen** 17:11,17
  19:24,25 25:23
**send** 11:17 13:25
**sending** 34:3
**sent** 12:15 13:10
  13:11 24:17
  25:1,17
**September** 4:6
**services** 30:21
**set** 22:1
**Shanni** 2:5 4:18
  4:23 14:17
  15:17 31:13,16
  31:17 32:3 33:5
**share** 18:17
**shareholder** 7:23
  17:18 18:9 26:4
**shareholders**
  7:15,20 10:22
  18:20 25:14,17
  25:24 26:3
  32:23 33:2
**shares** 18:1,13,16
  18:18,25 19:9
  19:13
**shed** 28:6 30:10
  30:12
**show** 11:24 13:7
  13:20
**shows** 12:8
**sign** 19:25 26:10
**signed** 7:14 13:15
  19:20 30:24
**simple** 8:21
**sir** 8:10 27:12
  37:2
**situation** 14:25
**skill** 22:1
**Slaby** 2:13 4:22
  4:22 31:21
**Slone** 2:3 3:4 4:1

CONT 341 MEETING OF CREDITORS  -  1/17/2023

4:6,12,20,24 5:3
5:7,10,13,19,24
6:3 16:23 17:4
26:13 27:7,9,12
29:16,18 34:24
38:2,3,7,10,12
38:18
**Slone's** 35:1
**Snyder** 2:5,6,7
3:4,5,6,7 4:9,9
4:11,19,23 5:7,9
5:14,14,18,19
5:22 6:1,2,4
11:21 12:15
13:15 14:17
17:7,9 23:14,16
27:6,13,15
28:12 29:15,19
29:19,22,24
30:1,4 31:11,13
31:18 32:3 33:5
38:5,16
**Snyder's** 31:22
**sold** 12:18,19
14:6
**sorry** 11:15 21:3
21:6 23:18 24:4
37:18
**sort** 7:1 9:23
19:19 20:5,23
22:6 24:22 25:4
25:8,10 34:25
**speak** 4:13 5:20
**specifically** 4:8
**specifics** 13:2
**speculating** 18:7
**split** 7:5,5
**spoke** 33:8,8
**start** 6:9 12:16
**started** 6:19
36:12
**starting** 4:16
**States** 1:1 2:3
**stay** 23:16
**steps** 31:12

**strong** 5:25
**structure** 6:25
**stuck** 29:8,10
31:6
**stuff** 12:10 13:11
20:22 21:11
**sure** 25:7 29:23
30:11 33:1
34:19 35:9,13
35:15
**swear** 5:15 29:18
**sworn** 29:20

_____
**T**

**T** 39:3,3
**take** 31:14 35:2
**taken** 16:9 31:12
**talk** 19:11 36:8
**talked** 9:6 17:25
23:6 35:7 36:6
**tangible** 16:8
**tax** 10:4 13:16,17
**taxes** 13:7,8,21
**tell** 35:6,16
**tenants** 20:13
**testified** 18:8,12
19:15
**testimony** 4:9
5:15 11:19
19:19 31:11
**Thank** 17:6 27:6
38:3,16,18
**Thanks** 38:14
**they'd** 23:1
**thing** 6:21 23:2
**things** 6:18 7:14
8:21 9:11 11:16
15:8,8 18:1
19:21 20:8,10
20:24 24:8,9,13
25:8 26:9
**think** 6:20 7:4
8:22 9:7,8
10:12,24 11:16
14:8,9,9 15:18

18:15 19:1,5
20:18,18,22
23:12 25:6
26:22 28:18
30:24,25 33:10
33:15 35:20,22
37:7,9,11,20
**thought** 7:11
9:18 15:22 18:2
26:21 34:22
35:4
**thousand** 10:14
**three** 19:3
**till** 9:21 36:18
**time** 4:4 7:12 9:7
9:7,12 11:1,1
21:1 22:24
23:10 27:8
33:10 38:14
**times** 24:5
**to-** 24:23
**today** 17:10
**told** 9:12,16
34:24 35:23
**tractor** 14:7
**TRANSCRIPT**
1:12
**transcription**
39:8
**treading** 7:1
**trigger** 9:21
**true** 39:7,10
**Trustee** 2:3,4 4:7
4:18 35:19
**truth** 5:17 6:21
**Turtle** 23:5
**two** 11:15 23:9
**typical** 24:7
**typically** 23:1

_____
**U**

**U** 1:7 4:3,5 5:11
6:5 9:9 11:4,4
11:12 12:24
13:1 14:11,22

16:7 17:12,18
18:9 19:13 22:8
22:23 23:6
24:13 26:19
27:1,19,24
28:16 31:12,25
32:12,21,23
34:5 35:2,12,18
36:11
**unclear** 7:13
**understand** 24:21
**understanding**
26:18,24 27:2
30:15,19 34:1,9
34:13,20,21
**understood** 15:23
**unfortunately**
13:1
**United** 1:1 2:3

_____
**V**

**variation** 27:17
**vice** 7:9,12 19:17
**volunteering**
15:21

_____
**W**

**W-2's** 9:1
**wage** 16:1
**wages** 14:18
**wait** 9:21,23
**waiting** 25:11
**want** 11:24 27:15
33:11 35:14
**wanted** 33:13
**wants** 16:25
**wasn't** 14:6 15:20
24:6,6 28:25
35:9 37:7
**water** 7:1
**way** 19:25 22:18
24:22 25:15
30:20
**we'll** 11:22 13:25
29:18

**we're** 11:19 30:16
38:10
**we've** 35:7
**Wednesday**
22:24 23:8
**Wednesdays**
22:21
**weekly** 21:2 23:4
24:9
**Wenrich** 2:9 5:1
**went** 12:25 13:1
22:18
**weren't** 8:12
**WESTERN** 1:1
**William** 2:10 5:1
**willing** 31:5
**wish** 27:8 38:8
**wishes** 38:4
**work** 14:14 15:4
20:6 21:16,19
36:24 37:5,24
**worked** 6:6 20:4
**workers** 8:6
20:11,12
**working** 20:23
36:19
**wouldn't** 35:5,5
**writing** 6:15,22
32:10 37:22
**written** 17:12
25:3
**wrong** 6:14 18:1
**wrote** 6:18,20

_____
**X**

_____
**Y**

**yeah** 8:14 12:4
22:21 23:18,21
29:18 31:21
32:17 34:17
35:7 37:3,14
**year** 8:24 10:8
11:14
**years** 7:2 11:9,15

BIROS_APPENDIX_0180
EXHIBIT A

CONT 341 MEETING OF CREDITORS  -  1/17/2023

Page 45

| | | | | | |
|---|---|---|---|---|---|
| 11:24 15:15<br>21:18 23:9 | **4** 18:15<br>**45,000** 12:19 | | | | |
| **Z** | **5** | | | | |
| **Zebley** 2:4 3:6,7<br>4:16,16,17,18<br>27:9,10,14 28:5<br>28:11 29:16,25<br>30:2 38:1<br>**zero** 9:18,19 | **5** 3:4<br>**5,000** 37:20 | | | | |
| | **6** | | | | |
| | **6** 1:14 39:9<br>**600** 8:16,24 | | | | |
| **0** | **7** | | | | |
| **1** | **7** 1:3 4:18 35:19 | | | | |
| **10,000** 33:10,13<br>33:17<br>**100** 18:15,24 19:9<br>21:1<br>**1099** 8:6,7<br>**1099's** 9:2<br>**12,000** 10:10<br>**12/20/22** 16:7<br>**13,000** 10:9,9<br>**16** 3:5<br>**17th** 39:12 | **8** | | | | |
| | **9** | | | | |
| | **9** 4:6<br>**9/19** 12:13<br>**9/9/22** 29:20<br>**90** 20:25<br>**99,000** 16:1 | | | | |
| **2** | | | | | |
| **2000** 37:11,16<br>**2015** 6:10<br>**2017** 37:10,11,17<br>37:19<br>**2020** 10:7,9<br>**2021** 10:7 12:18<br>12:19<br>**2022** 4:6<br>**2023** 1:14 39:9,12<br>**22-20823-GLT**<br>1:2 4:3<br>**25** 3:6<br>**27** 3:7 | | | | | |
| **3** | | | | | |
| **341** 1:13 29:20<br>38:18 39:9 | | | | | |
| **4** | | | | | |

AKF Technologies
412-261-2323

BIROS_APPENDIX_0181
EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re:  U LOCK INC. a/k/a | ) | |
| U-LOCK INC. | ) | Bankruptcy 22-20823-GLT |
| | ) | |
| Debtor. | ) | Chapter 7 |
| | ) | |
| —------------------------------------------------- | ) | |

## DECLARATION OF GEORGE SNYDER

I, George Snyder, declare and state under the penalty for perjury that the

following is true and correct (28 USC 1746):

1. My name is George Snyder.  I am an officer of U Lock Inc.
2. I am making this declaration in response to Trustee Robert Slone's request for 1099 or W-2 records of employees and independent contractors.
3. U Lock had persons that did do work for the Company since 2015 through 2022.
4. No 1099s were filed because they did not receive cash compensation in excess of $550.  John Biros told us the way he handled pay for people who helped with his machines was to keep cash payments under the reporting requirements and that he'd like to keep it similar to that.  Christine Biros stated the same thing similar, but it was primarily John insisting to be careful about having to file things.  The cash payments under $550 per year were people who helped with the landscape, construction, maintenance, painting, electrical, errands.  I do not know if, whether it was formally calculated, what they actually received from U Lock amounts to minimum wage.  Hopefully it was near minimum wage, but I cannot be certain.  I had some notes and books, flashdrives, in the trailer at U Lock in file box, but I could not access due to the lockout by Christine Biros. When I finally obtained access to that trailer in January 2023, before it was demolished, the file box was not there.  Therefore, I can only go by memory.  I recall some of the workers from 2015 to 2022 were Nicole Delancey, Ray Weishorn, Amber Leddon, Ray Weishorn, Angelica Weishorn, Tristan Weishorn, Kyle Wishorn, Kathy Gribshaw, Karley Gribshaw, Gina Gribshaw, none earning more than $550 per year but the exact amounts are in the records which disappeared from the trailer.  There may be some other people whose names I cannot present recall.
5. At first we would provide workers with food, often from the pizza shop in White Oak controlled by the Biros family.  Sometimes food would be given from Sheetz or McDonalds, etc.  We did not consider the food compensation where we issued a 1099 for giving them that.  Sometimes John Biros paid, sometimes we used U Lock rent money, or I loaned money for the food.
6. To the extent these workers did not receive minimum wage, I am unclear on what is required, but they never stated they were owed more so I did not list them as creditors. I still do not fully understand what is required under the

BIROS_APPENDIX_0182
EXHIBIT A

Labor Laws, who is an employee, and how to determine that since they were paid so little.

7. Our executive employees such as John Biros, Kash Snyder, and myself, we did not take money for salary, all hoping to advance the company until Robert Biros interfered and made Christine Biros file suit. I understand we were due minimum wage for our work because even executives are entitled to that, but we did not pay it because the company had very little revenue. I would not consider Christine Biros an employee since she just participated in Board meetings at her bar on a weekly basis. She was more like a Director or officer, but not actually working on site. Per the instruction of Christine Biros and John Biros, at the weekly meetings from 2015 through 2018, salary to cover the work would come once we rented to tenants. John Biros had almost daily meetings from 2015 to 2018, he worked on site sometimes, he brought some of his personal effects and stored them there, and he was an executive, and Kash Snyder worked for the company, along with me. Kash worked on site and offsite, but he did not receive income for the same reasons.

8. John Biros provided the Company pickup truck until 2020 when he said he needed it. John and I would obtain supplies, shelving, and things in the truck. I did not list the truck on the schedules because I think he might have kept the title in his name.

9. People who helped out, and whatnot, and people like Shanni Snyder who helped with security and cameras, were not salaried employees receiving cash. Because they received no cash or compensation, we did not issue a W-2. If we eventually have to pay them, or if we can pay them, we would issue a 1099 at that time. But we cannot issue a 1099 because we can't pay.

10. For these reasons, I cannot provide 1099s or W-2s.
   Dated this 12th day of February 2023.

/s/ *George Snyder*

BIROS_APPENDIX_0183
EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: | Bankruptcy No. 22-20823 |
| U LOCK INC, | Chapter 7 |
| Debtor. | |
| CHRISTINE BIROS, | Related Doc. No.: |
| Movant, | |
| v. | |
| GEORGE SNYDER, | |
| Respondent. | |

## <u>ORDER OF COURT</u>

AND NOW, this _____ day of _____, 2023, upon consideration

of the foregoing *OBJECTION TO CLAIM NUMBER 5 FILED BY GEORGE SNYDER* (the

"Objection"), it is hereby ORDERED that the Claim is DISALLOWED and EXPUNGED.

_____
Hon. Gregory L. Taddonio
United States Chief Bankruptcy Judge

**BIROS_APPENDIX_0184
EXHIBIT A**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:<br><br>U LOCK INC,<br><br>     Debtor. | Bankruptcy No. 22-20823<br><br>Chapter 7 |
| CHRISTINE BIROS,<br><br>     Movant,<br><br>     v.<br><br>GEORGE SNYDER,<br><br>     Respondent. | Related Doc. No.: |

## NOTICE OF HEARING AND RESPONSE DEADLINE REGARDING OBJECTION TO CLAIM NUMBER 5 FILED BY GEORGE SNYDER

TO THE RESPONDENT(S):

You are hereby notified that the Movant seeks an order affecting your rights or property.

You are further instructed to file with the Clerk and serve upon the undersigned attorney for Movant a response to the Motion by no later than March 27, 2023 (*i.e.*, thirty (30) days after the date of service below), in accordance with the Federal Rules of Bankruptcy Procedure, the Local Rules of this Court, and the general procedures of the presiding judge as found on the Court's webpage at www.pawb.uscourts.gov. If you fail to timely file and serve a written response, an order granting the relief requested in the Motion may be entered and the hearing may not be held. Please refer to the calendar posted on the Court's webpage to verify if a default order was signed or if the hearing will go forward as scheduled.

You should take this Notice and the Motion to a lawyer at once.

An in-person hearing will be held on April 13, 2023,, at 10:30 a.m. before Judge Gregory L. Taddonio in Courtroom A, 54th Floor U.S. Steel Tower, 600 Grant Street, Pittsburgh, PA, 15219. In accordance with Judge Taddonio's procedures, parties may appear for non-evidentiary matters remotely by utilizing the Zoom video conference platform. Parties seeking to appear remotely must register for the hearing by submitting a registration form

**BIROS_APPENDIX_0185**
**EXHIBIT A**

via the link published on Judge Taddonio's website (which can be found at http://www.pawb.uscourts.gov/judge-taddonios-video-conference-hearing-information) by no later than **4 p.m. on the business day** prior to the scheduled hearing. All parties participating remotely shall comply with Judge Taddonio's *General Procedures*, (which can be found at http://www.pawb.uscourts.gov/sites/default/files/pdfs/glt-proc.pdf).

**Parties who fail to timely register for remote participation will be expected to attend the hearing in person.**

Only a limited time of ten (10) minutes is being provided on the calendar. No witnesses will be heard. If there is an issue of fact, an evidentiary hearing will be scheduled by the Court for a later date.

Date of Service: February 24, 2023

BERNSTEIN-BURKLEY, P.C.

By: */s/ Robert S. Bernstein*
Robert S. Bernstein (PA ID No. 34308)
Lara S. Martin (PA ID No. 307272)
601 Grant Street, Floor 9
Pittsburgh, PA 15219
Telephone: (412) 456-8100
Facsimile: (412) 456-8135
rbernstein@bernsteinlaw.com
lmartin@bernsteinlaw.com

*Counsel for Christine Biros*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE:<br><br>U LOCK INC,<br><br>        Debtor. | Bankruptcy No. 22-20823<br><br>Chapter 7 |
| CHRISTINE BIROS,<br><br>        Movant,<br><br>        v.<br><br>GEORGE SNYDER,<br><br>        Respondent. | Related Doc. No.: |

**CERTIFICATE OF SERVICE OF THE OBJECTION TO CLAIM NUMBER 5 FILED
BY GEORGE SNYDER AND THE NOTICE OF HEARING AND RESPONSE
DEADLINE REGARDING OBJECTION TO CLAIM NUMBER 5 FILED BY GEORGE
SNYDER**

I certify under penalty of perjury that I served the above captioned pleading on the parties at the addresses specified below or on the attached list on February 24, 2023.

The type(s) of service made on the parties (first-class mail, electronic notification, hand delivery, or another type of service) was:  first-class mail, electronic notification.

If more than one method of service was employed, this certificate of service groups the parties by the type of service. For example, the names and addresses of parties served by electronic notice will be listed under the heading "Service by Electronic Notification," and those served by mail will be listed under the heading "Service by First-Class Mail."

SERVICE BY FIRST CLASS MAIL

| U LOCK INC<br>14140 U.S. Route 30<br>N. Huntingdon, PA 15642 | J. Allen Roth<br>805 S Alexandria Street<br>Latrobe, PA 15650 |
|---|---|

**BIROS_APPENDIX_0187
EXHIBIT A**

| Shanni Snyder | David L. Fuchs |
|---|---|
| 14390 Route 30 | Fuchs Law Office, LLC |
| Unit H | 554 Washington Ave., First Floor |
| North Huntingdon, PA 15642 | Carnegie, PA 15106 |

| Robert H. Slone, Trustee | Office of the United States Trustee |
|---|---|
| 223 South Maple Avenue | Liberty Center. |
| Greensburg, PA 15601 | 1001 Liberty Avenue, Suite 970 |
| | Pittsburgh, PA 15222 |

Dated: February 24, 2023          BERNSTEIN-BURKLEY, P.C.

By: */s/ Robert S. Bernstein*
    Robert S. Bernstein (PA ID No. 34308)
    Lara S. Martin (PA ID No. 307272)
    601 Grant Street, Floor 9
    Pittsburgh, PA 15219
    Telephone: (412) 456-8100
    Facsimile: (412) 456-8135
    rbernstein@bernsteinlaw.com
    lmartin@bernsteinlaw.com

    *Counsel for Christine Biros*

**BIROS_APPENDIX_0188**
**EXHIBIT A**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re:  U LOCK INC. a/k/a | ) | |
| U-LOCK INC. | ) | Case. 22-20823-GLT |
| | ) | |
| Debtor. | ) | |
| | ) | RE Motion at 337 |

### GEORGE SNYDER'S RESPONSE OPPOSING THE OBJECTION TO MY CLAIM

I am an officer of the debtor U Lock.  I file this response to the objection in my

personal capacity as a creditor who filed the proof of claim.

Biros attaches one declaration I provided, but forgot to attach the Declaration I gave

to the Trustee on or around September 7 2022.  I have attached it hereto.  The trustee emailed

asking for more information about my claim so I provided the Declaration.  The Trustee gives

Ms. Biros everything I give him, so I am not sure why they forgot it. The Trustee didn't ask

for more.  The Declaration about the employees was about the request for W2s and 1099s

that don't exist, explaining why, which I gave to the Trustee at his request and he gave it to

Biros.

Anyway as this Court knows, I worked for U Lock, or I guess Christine Biros if she is

right that she owned the business at all times, since 2015 and received nothing to compensate

myself.  It is true I didn't list myself as an employee when I did the schedules for U Lock.

From the company's perspective, I was an officer. But I also performed actual labor there,

maintenance, cleanup, supervising contractors, administering, customer service, everything,

meeting with John Biros practically every day from 2015 to 2018, meeting with Christine

Biros weekly to give status updates, all of that is work.

From my personal perspective, I filed a proof of claim by the claim's deadline giving

everyone notice of my claim.  I thought that was the procedure.  I didn't know I had to amend

and amend every time a claim was filed.  I can file amended schedules for U Lock and list all

**BIROS_APPENDIX_0189
EXHIBIT B**

these claims that were lodged including the Biros claims of the specious environmental damage, the shanni claim, and my claim.  Certainly the IRS I think I listed them on the original schedules.

I filed this claim for wage after researching this Shanni Snyder claims and how vast and broad the FLSA was, I believe it covers me even though I was an officer and owner. There were over 1000 shareholders I didn't list them all on the schedules because this court didn't convert the case to Chapter 11.  I understand I don't have to give a shareholder list in a Chapter 7.  I can upload one.  Also John Biros was partner, he had daily meetings with me form 2015 to 2018, then even after that meetings up until 2019.  Christine Biros had weekly meetings with me, even after she filed her lawsuit, still had meetings about the plan moving forward.  So it's just not the shareholders here that were on paper, this was supposed to be a partnership.

Regardless I think my claim should be sustained, I think I am entitled to at least minimum wage or the minimum executive compensation. I did a lot of work.  I incorporate my declaration attached and the declaration that Biros did file.

I declare under penalty for perjury that the above is true and correct.

This March 26, 2023.

George Snyder
PO Box 15
Irwin PA  15642
412-979-9999

BIROS_APPENDIX_0190
EXHIBIT B

DECLARATION OF GEORGE SNYDER

FILED
3/28/2023 12:03 PM
CLERK
U.S. BANKRUPTCY
COURT - WDPA

I, George Snyder, declare and state under the penalty of perjury that the following is true and correct:

1.  My name is George Snyder.

2.  From July 2015 to the present, I acted as executive of U Lock Inc. and/or, pursuant to Christine Biros' theory, her constructive trust.  I believe that U Lock Inc. owes the minimum wage and, if Christine Biros is correct in her legal theories that U Lock is a constructive trust for her, then she jointly owes the wage.

3.  I did not perform only executive duties at U Lock, I also performed labor. Specifically, my duties entailed:  Management of the enterprise, weekly meetings with the Biros family (John and Christine) through June 2018, renting units, collection of rents, check mail daily, cut grass and whack weeds weekly, spray round up monthly, remove trees and overgrowth, remove snow, plow snow, salt roads, graded parking area, put down millings, graded access road in back to upper level, cleaned up tires and scrap that had been dumped, met routinely with customers, cleaned out units when a person left, fixed and secured electrical service (guide wire for mast), fixed leaks in roof, lubricated and adjusted doors, met with and administered highways projects, moved around heavy machinery, cleanup, replaced rotting wood framing, put gravel down in both aisles, general management, monitor trespass incidents, deal with lawsuit issues, prepare documents, and many other tasks.

4.  I filed a proof of claim alleging that U Lock owed me $99,999 for wage.  This is because I did not receive compensation from U Lock or Christine Biros in any way.

5.  The Fair Labor Standards Act requires that most employees in the United States be paid at least the federal minimum wage for all hours worked and overtime wage at not less than time and one-half the regular rate of pay for all hours worked over 40 hours in a workweek.

6.  However, Section 13(a)(1) of the FLSA provides an exemption from both minimum wage and overtime pay for employees employed as bona fide executive, administrative, professional and outside sales employees. Section 13(a)(1) and Section 13(a)(17) also exempt certain computer employees. These exemptions are often called the "white-collar" or "EAP" exemptions.

BIROS_APPENDIX_0191
EXHIBIT C

7. To qualify for exemption, employees generally must meet certain tests regarding their job duties and be paid on a salary basis at not less than $684 per week. Job titles do not determine exempt status. In order for an exemption to apply, an employee's specific job duties and salary must meet all the requirements of the Department's regulations.

8. I did not receive a salary of at least $684 per week.  In fact, due to U Lock's insolvency since its inception, I received no salary whatsoever.

9. I worked approximately 5 days per week.  From July 10, 2015, until April 26, 2022, when the bankruptcy was filed, there were 2,481 days.  I worked approximately 5 days per week.  Excluding weekends, there were 1,771 days, totalling approximated 7,084 hours of unpaid work.

10. The calculations I used are as follows;

**July 2015**

16 days included

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
|     |     |     | 1   | 2   | 3   | 4   |
| 5   | 6   | 7   | 8   | 9   | 10  | 11  |
| 12  | 13  | 14  | 15  | 16  | 17  | 18  |
| 19  | 20  | 21  | 22  | 23  | 24  | 25  |
| 26  | 27  | 28  | 29  | 30  | 31  |     |

11.

**August 2015**

21 days included

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|

BIROS_APPENDIX_0192
EXHIBIT C

**September 2015–March 2022**

September 2015–December 2015: 88 days included

Year 2016: 261 days included

Year 2017: 260 days included

Year 2018: 261 days included

Year 2019: 261 days included

Year 2020: 262 days included

Year 2021: 261 days included

January 2022–March 2022: 64 days included

**April 2022**

BIROS_APPENDIX_0193
EXHIBIT C

16 days included

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | | | | | | |

12. While I did not *per se* "take off" weekends, I used this calendar for calculation purposes because there were some days I did not work.

13. I worked approximately 4 to 5 hours average per day or more dealing with U Lock Inc. or under Christine Biros' theory, her trust including monitoring and maintaining the property, cutting the grass, providing customer service, dealing with the legal proceedings, paying its bills, collecting from tenants, etc.Excluding weekends, there were 1,771 days, totalling approximately 7,084 hours of unpaid work. At minimum wage, that would entitle me to $51,359.compensation from U Lock (or Christine Biros under her theory).

14. Moreover, under the FLSA, apparently I would be owed liquidated damages of the same amount because U Lock and, under Christine Biros' theory, the her trust, so I doubled the amount in my proof of claim.

15. These are extremely low estimates of the time and hours I put in.

16. Alternatively, if it is found that I am a salaried executive, I would be entitled to $684 per week, which well exceeds the $99,999 claim I submitted.

George Snyder

BIROS_APPENDIX_0194
EXHIBIT C

RESOLUTION OF U LOCK INC.

At a meeting of the shareholders on June 30, 2022, in Westmoreland County, Pennsylvania:

WHEREAS, Shanni Snyder commenced an involuntary bankruptcy under Chapter 7 of the Bankruptcy Court which, because of a lack of defense to the allegation of insolvency, it did not answer, and as the Corporation is insolvent and unable to pay its debts when due,

and WHEREAS, the Corporation and its creditors would best be served by reorganization of the Corporation under Chapter 11 of the Bankruptcy Code, Subchapter V, Small Business Recorganization, considering that benefit to the creditors and the Company would be best had by invoking the Pennsylvania Uniform Voidable Transactions Act or similar avoidance and preferential transfer laws available under the bankruptcy code and federal law to void the purported involuntary transfer of U Lock's property, obtain available financing, and pay the creditors in full, it is hereby:

RESOLVED, that the Corporation authorizes as soon as practicable counsel J Allen Roth to convert the case to reorganization pursuant to Chapter 11 of the Bankruptcy Code, Subchapter V, Small Business Reorganization.  The Corporation consents to reorganization.

Present:     George Snyder     345,000,000 outstanding shares
             Kash Snyder       75,000,000 outstanding shares (telephonically)

Quorum:  98.82% of shareholders voting for resolution.  1.18% not present.

The undersigned hereby certifies that he is  the custodian of the books and records of U Lock Inc., a corporation duly formed pursuant to the laws of the Commonwealth of Pennsylvania, and that the foregoing is a true record of a resolution duly adopted at a meeting of the shareholders with a quorum present exceeding 98.82% of the outstanding share of U Lock's stock and that said resolution is now in full force and effect without modification or rescission.

_____
George Snyder
Majority shareholder

BIROS_APPENDIX_0195
EXHIBIT D

# IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA
## CIVIL ACTION LAW

| | |
|---|---|
| **CHRISTINE BIROS**<br>    Plaintiff | )<br>)<br>) |
| **vs** | )<br>)<br>)     **No. 4886 of 2017** |
| **DENISE SCHUR, Executrix of the ESTATE**<br>**OF ALEX SCHUR, HENRY L. MOORE**<br>**and SUSAN STANO, Co-Executors of the**<br>**ESTATE OF NICHOLAS SCHUR,**<br>**KATHLEEN S. WALTER, Executor of the**<br>**ESTATE OF MICHAEL SCHUR,**<br>**CYNTHIA SARRIS, Administrator of the**<br>**ESTATE OF ANN SARRIS and U LOCK INC.,**<br>**a Pennsylvania corporation,**<br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**TYPE OF PLEADING:**

        Defendant U Lock Inc.'S Amended Objections
        And Responses To The Interrogatories, Requests
        For Admissions, And Request For Production Of Documents

**FILED ON BEHALF OF:**

        J. Allen Roth, Esquire

**COUNSEL OF RECORD:**

        J. Allen Roth, Esquire
        PA I.D.# 30347
        757 Lloyd Avenue
        Suite B
        Latrobe, PA 15650
        724-537-0939



BIROS_APPENDIX_0196
EXHIBIT E

**IN THE COURT OF COMMON PLEAS**
**OF WESTMORELAND COUNTY, PENNSYLVANIA**

CHRISTINE BIROS,                          CIVIL DIVISION

        Plaintiff,                          No. 17 CI 04886

    vs.

DENISE SCHUR, et al,

        Defendants.

**DEFENDANT U LOCK INC.'S AMENDED OBJECTIONS AND RESPONSES TO THE**
**INTERROGATORIES, REQUESTS FOR ADMISSIONS, AND REQUEST FOR**
**PRODUCTION OF DOCUMENTS**

        Defendant U Lock Inc., by and through its undersigned counsel, submits the following objections and responses to the discovery requests propounded by Plaintiff:

**INITIAL OBJECTIONS:**

U Lock incorporates by reference all of its objections contained in the original discovery responses and provides these amended responses in accordance with the directive of the Court.

INTERROGATORIES

1. **Identify all current and former officers and directors of U Lock. Provide the dates during which each held office and the address of the current residence of such:**

        Kash Snyder -- mid 2014 to present,
        670 Lime Street, North Huntingdon, PA  15642

        George Snyder, 14140 Route 30, North Huntingdon, PA  15642
        -- mid 2014 to present

        Erik Martin
        Mid 2014 to present

**BIROS_APPENDIX_0197**
**EXHIBIT E**

218 Maryland Avenue, North Versailles, PA  15137

Chelsea Hauser acted as special Vice President with respect to the buy and sell of a dump trailer.

*EXHIBIT "A&O"*

2. **Identify all current and former shareholders of U Lock.  Provide the dates during which each held shares, the number of shares and the consideration paid for such shares.  Provide the address of the current residence of each.**

See the attached list of shareholders and transactions.

3. **Identify all current and former employees of U Lock.  Provide the dates during which each was employed, their job title, responsibility and the total compensation paid to each during his or her employment.  Provide the address of the current residence of each.**

U Lock states that it does not maintain "employees" and did not maintain "employees" in the past.  U Lock operates through officers, volunteers, and contractors.

4. **Identify all customers, tenants and licensees of U Lock.   Provide the dates of for which each was a customer, tenant or licensee, and the amount of consideration paid by each to U Lock.**

This request was withdrawn by the Plaintiff pursuant to the Court Order.

5. **Identify all real estate owned or leased by U Lock.**

U Lock states the property that is the subject this action is the only real estate owned by U Lock.

*EXHIBIT "X"*

6. **Identify each individual and entity to whom or which U Lock has made any payment, the aggregate amount and the reason for which such sum was paid.**

U Lock produces records of the transactions herewith.

*EXHIBITS "E,F,G,H,I, W"*

7. **Provide a description of any and all improvements made by or for U Lock to the Property.  Identify each person or entity which performed the improvements. Provide copies of each written contract and evidence of payment to such person or entity.**

U Lock refers to the receipts and documents attached by reference, many of which are expenses incurred improvement or repairing the property.

9/3/15 repaired roof on big buildings.  Estimated costs $1800.

9/23/15 graded and graveled big garage floor left side.  Emptied and cleaned garage to prepare the ground for gravel.  Estimated costs $2500.

12/12/16 $2,400 garage door opener.

11/18/15 tree removal between hotel and u lock   Clean up and then to burn brush

11/15/15 graded area by hotel, install 10 triaxels of clean fill.

12/12/15 renovated big garage right side same as other side

12/15/15 graded and graveled floor garage right side.

8/15/17 excavated road rear of property, 2 machines , excavator and trackloader used.

9/3/15 repaired roof on big buildings

*EXHIBIT "J"*

8. **Identify all financial institutions which currently hold or formerly held accounts of U Lock, account numbers, and copies of each bank statement prepared by such financial institution since such account was opened.**

U Lock maintains an account with Citizens Bank.  U Lock agrees to make copies of the bank statements available for inspection and copying.

*EXHIBIT "K"*

9. **Identify the individual named Erik Martin who is listed as a "debtor" on that certain UCC-1 filed in the Office of the Secretary of State of Pennsylvania and identified as UCC Filing No. 2016081700035.  Describe the legal and financial relationship between U Lock and Erik Martin, and any payments made to Erik Martin by or on behalf of U Lock concerning this transaction.**

**BIROS_APPENDIX_0199**
**EXHIBIT E**

Defendant does not have a copy of the UCC form to positively identify the transaction. However, it is believed that Erik Martin would be the same Erik Martin discussed in paragraph 1, above. Furthermore, it is believed, without seeing the form, that it relates to an excavator. U Lock pays the amount for the machine each month, which is used for work on the property that the subject of this litigation.

   **EXHIBIT "A,B,C&O"**

10. **Describe in detail the terms of any alleged loan or agreement to repay Plaintiff, including the amount borrowed, the interest rate, the term of the loan, the periodic payment amounts and any security for the loan or agreement. Provide a copy of any written documentation of such loan or agreement.**

Subject to this answer being supplemented upon Plaintiff providing the agreement that she created and demanded be signed, along with further investigation and discovery, U Lock provides this answer to the interrogatory based on available information, recollection, and memory. This response is meant to provide the best information available.

After locating a property to purchase, a confederation of individuals primarily including George and Kash Snyder negotiated with John Biros, not Plaintiff. George and Kash Snyder advised Biros that they were in the process of forming an entity to purchase the property, continuing the U Lock storage business, and ultimately developing the property into something more lucrative. In discussions with John Biros, Mr. Biros agreed to provide U Lock with the funds to purchase the property. It was understood and verbally agreed between John Biros and George and Kash Snyder that Mr. Biros would receive a share of the equity, approximately 35-40%, and that George and Kash would be tasked with maintaining operations, development, etc. As the closing date approached, Mr. Biros continued to represent that the funds would be available and that an agreement could be worked out. Subsequently, John Biros advised the Snyders that, for "family" reasons and to maintain the appearance that Christine Biros was the source of family income, the money must come from Plaintiff, not him, and that subsequent to the transaction the equity of the company in the form of the issuance of shares could be issued to him or that an agreement could be made to pay the money back at current interest rates. The time period for repayment was discussed but not specifically agreed upon. In some conversations, a 5 year balloon payment with monthly interest payments was mentioned, a 10 year balloon payment with monthly interest payments was mentioned, and a conventional 20 or 30 year mortgage was mentioned.

On the date of the closing, specifically while driving to the closing event for the property with Kash Snyder in the vehicle, Plaintiff expressed that she had a concern that nothing was in writing. Plaintiff demanded that a document be signed by Kash Snyder. Plaintiff provided a document she created and handwrote and insisted Kash Snyder signed it. Kash Snyder, faced

with the prospect of the funds not being provided, signed the paper.  It is unknown if Kash Snyder signed the document in his personal capacity, as incorporator for U Lock Inc., or as an officer of U Lock Inc.  The terms are unknown to U Lock.

Over the past couple years, Plaintiff and her brother John Biros repeatedly saw the officers of U Lock, Kash and George Snyder.  At no time did either of the Biros' demand the money back, interest payments, or the equitable interest that was discussed or planned.

In mid-2017, Plaintiff propounded a demand letter acknowledging that the payment made in 2015 was a loan.  The letter referenced the agreement signed in 2015.  The letter demanded that officers of U Lock personally guarantee the 2015 loan, be paid in full no later than 2022, and that interest be at 9%.  Subsequent to service the demand, Plaintiff and John Biros advised George Snyder that the terms were negotiable.  Several discussions took place in the second and third quarter of 2017 where Plaintiff and John Biros verbally stated to disregard the letter, that no repayment needed to occur, and that instead they wanted to become equity owners (shareholders) in U Lock as originally agreed because they believed the property was undervalued and they wanted to be part of the development.

In late 2017 or early 2018, Plaintiff and John Biros advised that their father wanted to take the property and that they were being forced by him to sue.  Plaintiff and John Biros repeatedly advised that because "dad" decided they wanted to develop the property, they had to try to take it.  Plaintiff and John Biros stated that they would try to discuss the matter with "their dad" or that they would attempt to ignore their father.

At no time prior to filing the lawsuit did Robert Biros, John Biros, or Plaintiff claim they owned the property, ask U Lock, George Snyder, or Kash Snyder for an accounting, or claim any wrongdoing or dispute about the issue.  Rather, the only communication was the 2017 letter admitting that the transaction constituted a loan.

As to any "security" for the loan, U Lock has no information to believe that there was any security provided for the loan.  Even the letter demand did not mention any pre-existing security interest in the property in exchange for the loan, but demanded that a mortgage be issued to Plaintiff along with personal guarantees.  However, without seeing the original letter, U Lock cannot positively state what the document states.

Of course, even if the document pledged the property, U Lock does not believe that the paper Plaintiff demanded Kash Snyder sign constitutes a security interest in the property that is valid under the statute of frauds, or codes and statutes of the Commonwealth of Pennsylvania. Therefore, the Plaintiff does not maintain a security interest in U Lock's property.

   *EXHIBIT "A&O"*

11. **Describe any consideration or investment, including money, property or services, paid or provided to or for U Lock by any of the current or former executors or administrators of the Defendant Estates.**

Aside from the sale of the property to U Lock Inc. pursuant to the terms and conditions in the purchase agreement and the deeds, the non-U Lock defendants provided an assignment of leases was provided to U Lock Inc. and transfer of title in certain storage containers. Upon the execution of a protective Order, non-disclosure agreement, and limited use agreement, U Lock agrees to provide said documents to Plaintiff. Additionally, a short term loan was provided with U Lock pledging the property. U Lock agrees to provide copies of the loan documents.

## REQUEST FOR ADMISSIONS

1. **U Lock has not submitted any written applications for borrowing funds from financial institution which would be secured by a mortgage on the Property.**

As of the date of this response, admit.

2. **U Lock has not submitted any written applications for borrowing funds from any lender which would be secured by a mortgage on the Property.**

As of the date of this response, admit as qualified: Because Plaintiff has not disclosed the documents signed by Kash Snyder, it is unclear if the document signed by Kash Snyder constituted a mortgage or is secured by the property. Defendant reserves the right to supplement this response as soon as Plaintiff discloses a copy of the document.
*EXHIBITS "B &C"*

3. **U Lock has not filed any federal, state, or local tax returns.**
Denied as stated. Pursuant to multiple verbal requests of John Biros and Plaintiff, U Lock delayed filing the IRS 1120 form and state returns because Mr. Biros persuaded George Snyder, controlling shareholder of U Lock that: (1) It would not owe taxes and operated at a loss during 2015, 2016, and 2017, so a late filing would not result in penalties; (2) Accurate information needed to be compiled with respect to whether Biros would be listed as a partner or a lender; and (3) John Biros and Plaintiff asked George Snyder, majority shareholder in U Lock, to delay filing said returns because it was important that no filing occur until the Attorney General of Pennsylvania completed its investigation of the family's gambling business. U Lock will be submitting returns to the IRS and the Commonwealth of Pennsylvania Department of Revenue by the end of 2018. Those returns will be provided to counsel for U Lock in accordance with the Court's directive.
*EXHIBIT "E"*

4. **U Lock does not have a Federal Employee Identification Number.**

Denied.  U Lock attaches its FEIN.
   ***EXHIBIT "D"***

5. **U Lock has made no payments of tax to any income taxing authority.**

Denied as stated.  U Lock has not made a profit that would warrant payment of "income tax." U Lock has made payments to the Township of North Huntingdon.
   ***EXHIBIT "Q"***

6. **U Lock has no intention of repaying Plaintiff for the funds she paid for the Property.**

Denied.  Plaintiff refused to provide a copy of the contract signed on July 15, 2015, for determination as to whether the corporation is liable pursuant to said agreement or if only Kash Snyder is liable.  Plaintiff sent the demand letter, which U Lock has filed with the Court.  This demand letter, however, does not provide a copy of the original agreement.  U Lock cannot determine if it is legally obligated to pay the loan made by plaintiff to Kash Snyder, what the terms of the loan are, and whether said loan is secured, unsecured, or owed by U Lock or just Kash Snyder.  In the event that it is determined that U Lock must pay the loan, and not only Kash Snyder, U Lock will comply with said obligation pursuant to the terms of that written instrument.

7. **U Lock has neither applied for nor received any permits to store motorized equipment on the Property.**

Based on information, property owners maintain the ability to store their equipment in spaces on property that they own or lease without the need for a permit.  U Lock possesses a North Huntingdon general business license and has disclosed a copy.  U Lock is not operating as a salvage yard and is not engaged in the business of salvaging vehicles.  If Plaintiff is aware of a necessary permit, she should advise U Lock so it may take corrective action.

## REQUEST FOR PRODUCTION OF DOCUMENTS

1.  **Provide copies of all U Lock's federal, state, and local tax returns for tax years 2015, 2016, 2017 and 2018.**

As stated above, U Lock is preparing to file the returns by the end of the 2018.  At this

time, it could not locate any responsive records. U Lock incorporates its response to the request for admissions by reference as if fully set forth again.

*EXHIBIT "D &E"*

2. **Provide a copy of U Lock's Bylaws and any amendments to such Bylaws.**

U Lock agrees to provide any copies of Bylaws or Amendments to Bylaws that it locates.
*EXHIBIT "Y"*

3. **Provide copies of all corporate minutes for U Lock.**

U Lock agrees to provide any corporate minutes that it locates after a diligent search.

4. **Provide copies of all issued share certificates for U Lock.**

U Lock would not possess share certificates. The shareholders would. Rather, U Lock maintains a share ledger that it has provided in connection with this discovery request. U Lock will update the ledger throughout this litigation.
*EXHIBIT "R"*

5. **Provide a copy of the stock ledger for U Lock.**

See response to document request 4, above.
*EXHIBIT "R"*

6. **Provide copies of any and all lease(s) to which U Lock is or was a party.**

Leases for customers has been withdrawn. U Lock agrees to disclose any leases that it locates after a diligent search.

7. **Provide copies of any and all stock purchase agreement(s) to which U Lock is or was a party.**

U Lock agrees to disclose any share purchase agreements in its possession after a diligent search.
*EXHIBIT "R"*

8. **Provide copies of any and all agreement(s) to purchase and/or sell assets to which U Lock is or was a party.**

    *EXHIBIT "S,T,U,V"*

9. **Provide copies of all financial statements prepared for U Lock.**

U Lock did not prepare financial statements as of this time.

10. **Provide copies of each and every application for financing applied for by U Lock.**

Financing applications are maintained by lenders, not by U Lock.  U Lock ordinarily would not receive the application copy.  However, U Lock agrees to conduct a diligent search and disclose and provide any application for financing.
    *EXHIBIT "I"*

11. **Provide copies of U Lock's subchapter S election, if such election was made.**

U Lock did not elect to be a subchapter S corporation.

12. **Provide copies of U Lock's Federal EIN application.**

U Lock did not retain its EIN application because it is a digital online form.  U Lock did not submit a paper form.  U Lock agrees to provide the EIN number and related documents.
    *EXHIBIT "D"*

13. **Provide copies of all written documentation evidencing a loan from Plaintiff to U Lock.**

Defendant does not maintain evidence of the 2015 document created by Plaintiff. Interrogatory #10's answer and objection is incorporated by reference.  The only copy of the document, which Plaintiff propounded immediately prior to the close and insisted Kash Snyder sign, was retained by the Plaintiff.  In mid-2017, Plaintiff propounded a letter asking U Lock to sign an agreement stating that the loan was for 10 years at 9% interest.  The letter admits the existence of the 2015 document, but does not attach it.  The demand letter provided to U Lock Inc. has been previously produced and served on Plaintiff's counsel.  U Lock agrees to provide

the 2017 letter again if needed by Plaintiff. The letter makes it clear that the money was not paid for the property, but was a loan.

*EXHIBIT "A&O"*

14. **Provide a copy of any advertisements which were placed to comply with Section 1307 of the Pennsylvania Associations Code, 15 Pa.C.S. 1307.**

Defendant agrees to produce all advertisements located after a diligent search.

*EXHIBIT "L"*

15. **Provide copies of each contract to which U Lock is or was a party for which U Lock provided services in excess of $500.00 over the term of the contract.**

Plaintiff withdrew the request for customer information.

16. **Provide copies of each contract to which U Lock is or was a party for which U Lock received services in excess of $500.00 over the term of the contract.**

Defendant agrees to produce all relevant documents located after a diligent search.

17. **Provide copies of all documents concerning the lease or purchase by U Lock of equipment from Kubota.**

U Lock agrees to produce the documents in its possession and located after a reasonable search. U Lock notes that the majority of the documents would be maintained and constitute business records of Kubota, not U Lock.

*EXHIBIT "I &G"*

18. **Provide copies of each and every policy of insurance on U Lock, the Property and U Lock's employees.**

Defendant agrees to produce all documents relevant to this request located after a diligent search.

*EXHIBIT "F"*

19. **Provide copies of each and every document necessary to provide a full and complete response to the matters set forth above in [the] Interrogatories and [the[ Request for Admissions.**

Defendant agrees to produce all documents relevant to this request located after a diligent search.

20. **Provide copies of each and every document or exhibit U Lock intends to present at trial.**

Defendant agrees to produce all documents relevant to this request located after a diligent search. Defendant notes discovery is continuing and additional documents will be disclosed as they are located or received.

*EXHIBITS "A,M,N,O,P"*

Respectfully submitted,

J. Allen Roth, Esquire
Counsel for Defendant, U Lock, Inc.

## **VERIFICATION**

**AND NOW,** comes, **GEORGE SNYDER on behalf of U LOCK INC.**, who verifies that

the facts contained in the foregoing **Defendant U Lock Inc.'s Amended Objections And**

**Responses To The Interrogatories, Requests For Admissions, And Request For Production**

**Of Documents** are true and correct upon her own knowledge, information and belief.   This

Verification is made subject to the penalties of 18 PA. C.S. Section 4904 relating to unsworn

falsification to authorities.

9/28/18
**DATE**

**GEORGE SNYDER on behalf of U LOCK INC.**

**BIROS_APPENDIX_0208**
**EXHIBIT E**

**IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY,**
**PENNSYLVANIA**
**CIVIL ACTION LAW**

| | | |
|---|---|---|
| **CHRISTINE BIROS** | ) | |
| Plaintiff | ) | |
| | ) | |
| **vs** | ) | **No. 4886 of 2017** |
| | ) | |
| **DENISE SCHUR, Executrix of the ESTATE** | ) | |
| **OF ALEX SCHUR, HENRY L. MOORE** | ) | |
| **and SUSAN STANO, Co-Executors of the** | ) | |
| **ESTATE OF NICHOLAS SCHUR,** | ) | |
| **KATHLEEN S. WALTER, Executor of the** | ) | |
| **ESTATE OF MICHAEL SCHUR,** | ) | |
| **CYNTHIA SARRIS, Administrator of the** | ) | |
| **ESTATE OF ANN SARRIS and U LOCK INC.,** | ) | |
| **a Pennsylvania corporation,** | ) | |
| Defendants | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that I will forward a copy of the Defendant, U LOCK INC.'S Response to

Production Of Documents and Interrogatories by U.S. first class mail prepaid and hand delivery

to the following:

William E. Otto, Esquire
P.O. Box 701
Murrysville, Pa 15668
(Counsel for Plaintiff, Christine Biros)

William F. Ross, Esquire
Ross & Storck, Ltd.
406 N. Market Street
Wooster, OH 44691
(Counsel for Defendant, Denise Schur)

John Tumolo, Esquire
Suite 1500 Frick Building
Pittsburgh, Pa 15219
(Counsel for Defendant, Kathleen S. Walter)

Dennis Del Cotto, Esquire
4345 Old William Penn Highway
Murrysville, Pa 15668
(Counsel for Defendants, Henry L. Moore, Susan Stano and Cynthia Sarris)

10-1-18
Date

J. Allen Roth, Esquire
Attorney for Defendant U Lock, Inc.

BIROS_APPENDIX_0210
EXHIBIT E

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA

IN RE:                          .    Case No. 22-20823-GLT
                                .
                                .
U LOCK INC,                     .    5414 U.S. Steel Tower
                                .    600 Grant Street
                                .    Pittsburgh, PA 15219
          Debtor.               .
                                .    April 13, 2023
. . . . . . . . . . . ..             1:30 p.m.

     TRANSCRIPT OF #294 CONTINUED ORDER TO SHOW CAUSE SIGNED
  ON 1/17/2023. (RE: RELATED DOCUMENT(S): 258 APPLICATION
  FOR ADMINISTRATIVE EXPENSES; #278 CONTINUED AMENDED ORDER
 TO SHOW CAUSE SIGNED ON 1/6/2023. (RE: RELATED DOCUMENTS(S):
  249 ORDER SCHEDULING HEARING); #345 CONSENT MOTION TO
 APPROVE COMPROMISE UNDER RULE 9019; #340 OBJECTION TO CLAIM
 OF SHANNI SNYDER; AT CLAIM NUMBER 1; #337 OBJECTION TO CLAIM
   OF GEORGE SNYDER; AT CLAIM NUMBER 5; #344 AMENDED
     APPLICATION FOR ADMINISTRATIVE EXPENSES PURSUANT TO
 11 U.S.C. 503(b)(1) AND/OR FOR PAYMENT OF ADEQUATE PROTECTION

           BEFORE HONORABLE GREGORY L. TADDONIO
           UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:          Law Office of J. Allen Roth
                         By:  J. ALLEN ROTH, ESQ.
                         805 S. Alexandria Street
                         Latrobe, PA 15650

For George Snyder:       By: GEORGE SNYDER, PRO SE
                         Box 15
                         Irwin, PA 15642

ECRO:                    Hayley Smith

 Proceedings recorded by electronic sound recording, transcript
             produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

**BIROS_APPENDIX_0211**
**EXHIBIT F**

2

APPEARANCES (Cont'd):

For Christine Biros:          Bernstein-Burkley, P.C.
                              By:  ROBERT S. BERNSTEIN, ESQ.
                                   MARK LINDSAY, ESQ.
                              601 Grant Street, 9th Floor
                              Pittsburgh, PA 15219

For Christine Biros,          The Law Firm of William E. Otto
Lead Counsel in the           By:  WILLIAM E. OTTO, ESQ.
State Court Action:           4027 Old William Penn Highway
                              P.O. Box 701
                              Murrysville, PA 15668

TELEPHONIC APPEARANCES:

Chapter 7 Trustee:            Mahady & Mahady
                              By:  ROBERT H. SLONE, ESQ.
                              223 South Maple Avenue
                              Greensburg, PA 15601

For Shanni Snyder:            The Lynch Law Group LLC
                              By:  JOHN PATRICK LACHER, ESQ.
                              501 Smith Drive, Suite 3
                              Cranberry Twp, PA 16066


                         -  -  -

BIROS_APPENDIX_0212
EXHIBIT F

3

1          ECRO:  Court may now come to order.  The Honorable
2   Gregory L. Taddonio presiding.

3          THE COURT:  All right.  Good afternoon, everyone.
4   This is the United States Bankruptcy Court for the Western
5   District of Pennsylvania and this is the Court's docket of
6   Chapter 7 and Chapter 11 matters on this Thursday, April 13,
7   2023.  The matter under consideration at this time is Case
8   Number 22-20823, U LOCK INC.  I'll begin by taking appearances
9   first here in the courtroom and I'll start over here.  Mr.
10  Roth?

11         MR. ROTH:  Alan Roth on behalf of U LOCK.

12         THE COURT:  All right, good afternoon.

13         MR. SNYDER:  George Snyder.

14         THE COURT:  All right, good afternoon.  Want to come
15  over here?

16         MR. BERNSTEIN:  Your Honor, on behalf of Christine
17  Biros, Robert Bernstein, Bernstein-Burkley.

18         THE COURT:  Okay.

19         MR. BERNSTEIN:  William Otto sitting next to me.

20         THE COURT:  All right, good afternoon.

21         MR. BERNSTEIN:  Ms. Biros is in the courtroom next to
22  him and my colleague Mark Lindsay.

23         MR. LINDSAY:  Good afternoon.

24         THE COURT:  All right, good afternoon, everyone.  All

BIROS_APPENDIX_0213
EXHIBIT F

4

1  right, that satisfies the appearances here in the courtroom and

2  then I'll take appearances on the Zoom call.  I'll start first

3  with the Chapter 7 Trustee.

4          MR. SLONE:  Yes.  Robert Slone, Chapter 7 Trustee,

5  Your Honor.

6          THE COURT:  All right, good afternoon.  And, I'll

7  take an appearance for Shanni Snyder?

8          MR. LACHER:  Good afternoon, Your Honor.  John Lacher

9  on behalf of Shanni Snyder, and Shanni Snyder is in the room

10  with me, Your Honor.

11          THE COURT:  Okay, good afternoon.  All right, and is

12  there anyone else who wishes to enter an appearance in this

13  case?

14                  (No audible response)

15          THE COURT:  All right.  This is a hearing set on

16  several pending matters and I have -- the Claims Objections

17  filed by Christine Biros to the claims of George Snyder and

18  Shanni Snyder.  I have an Amended Application for Payment of

19  Administrative Expenses, including Post-Petition Rent,

20  relatedly a Consent Motion to Approve Compromise under Rule

21  9019, and then two continuations of hearings related to Orders

22  to Show Cause that were issued by the Court at Docket Numbers

23  278 and 294.  Unless there's any housekeeping matters that I

24  need to be aware of, I am just going forward in starting with

25  the claims objections, so any preliminary comments from the

BIROS_APPENDIX_0214
EXHIBIT F

1 parties that we need to address?

2                    (No audible response)

3          THE COURT:  All right, hearing none.  I'd like to

4 begin with the Christine Biros' objection to the claim of

5 George Snyder, which is Claim Number 5, and since this seemed

6 to help us with some efficiencies in the hearing, I'm going to

7 just go through some of my observations of what the parties

8 have argued at this point and just ask if there's additional

9 clarification or other remarks that anyone wants to add?

10          So, I have Claim Number 5-1 that was filed by George

11 Snyder in the amount of $99,000 as an unsecured claim or,

12 quote, wage, Fair Labor Standards, end quote.  There was no

13 supporting documentation attached to the claim, but it was

14 timely filed.  Ms. Biros has filed an objection indicating that

15 Mr. Snyder signed the schedules without listing a wage claim

16 and should be judicially estopped from doing so now, and at the

17 341 meeting, Mr. Snyder allegedly testified that, quote, the

18 $99,000 is what Biros would owe me, end quote, because he never

19 received officer compensation for the last seven years.

20          Ms. Biros asserts that the Fair Labor Standards Act

21 does not apply to these claims because, one, Snyder is not an

22 employee of the Debtor and testified the Debtor has no

23 employees.  The FLSA carves out establishments whose only

24 regular employees are the owner and immediate family members,

25 so Snyder is not entitled to a minimum wage.

BIROS_APPENDIX_0215
EXHIBIT F

6

1                In addition there is no evidence that Snyder was a

2     contractor for U LOCK, and even if he could assert a claim, the

3     statute of limitations is two years, not seven.  Mr. Snyder has

4     filed a response, indicating that he worked for Biros, and if

5     she is correct and owned the business at all times since 2015,

6     he filed the claim after researching Shanni's FLSA claim.  He

7     also cites to Section 13(a)(1) and 13(a)(17) of the FLSA, which

8     provides exemptions from Section 206 regarding minimum wage

9     requirements for employees in a bona fide executive,

10    administrative, or professional capacity, and certain skilled

11    computer workers, and the declaration provides as calculation,

12    assuming he worked four to five hours a day five days a week.

13    Mr. Snyder also asserts he doubled the amount of his actual

14    claim as liquidated damages.

15              So, that's the context of how I understand the claim

16    objection and I'll ask the parties if there's anything in

17    addition that they wish to add separate and apart from what's

18    already in the papers.  Mr. Bernstein?

19              MR. BERNSTEIN:  Assuming that Your Honor was

20    highlighting what was in the papers and not making an

21    exhaustive recitation, we have nothing else to add to what was

22    in our objection.

23              THE COURT:  All right.  Thank you.  Mr. Snyder,

24    anything else you want to add?

25              MR. SNYDER:  Not much.  You covered mostly

BIROS_APPENDIX_0216
EXHIBIT F

7

1  everything.  I just wanted to add the one thing that Mr. Slone

2  --

3        MR. BERNSTEIN:  Your Honor, I'm sorry.  Could we --

4  because Mr. Snyder is representing himself, is it possible that

5  he be sworn for these assertions so that we have a clear

6  record?

7        THE COURT:  I don't have any issue with that.  Mr.

8  Snyder, you understand what we're going to do is we're going to

9  put you under oath and so any statements that you give are

10 going to be your sworn testimony in this matter?

11       MR. SNYDER:  Yes, I do.

12       THE COURT:  Okay.  If you can please rise and raise

13 your right hand and I'll ask the court reporter to please swear

14 you in.

15               GEORGE SNYDER, WITNESS, SWORN

16       ECRO:  Thank you, and if you can please speak clearly

17 into the microphone.  Thank you.

18       MR. SNYDER:  Okay, yeah.  I noticed I did that.  Kay.

19       The only other thing I wanted to add throughout this

20 whole process, right after we handed in the schedules, I was

21 also going to -- Mr. Slone and I were talking about amending

22 the schedules, so I could have amended that part as well.  I

23 just thought I'd mention that.

24       THE COURT:  Okay.  But, nothing further at this

25 point?

BIROS_APPENDIX_0217
EXHIBIT F

8

1        MR. SNYDER:  No.

2        THE COURT:  All right.  Well, upon review of the

3 papers and review of the claim, I'm going to make the following

4 findings.  Number one, as noted before, the claim is just a

5 bare bones claim.  It does not have any supporting

6 documentation substantiating the amounts claimed, or breakdown

7 of the time periods, or the time frames by which the wages were

8 accrued, and so under the <u>Allegheny International</u> line of cases

9 that followed from the Third Circuit decision there, I find

10 that it's not entitled to prima facie validity.  And in

11 addition to that, I do think that there are valid points that

12 have been raised by Christine Biros with respect to

13 deficiencies in the claim.

14        First off, under applicable law, 29 U.S.C.A. Section

15 203(s)(2), provides, quote, any establishment that has as its

16 only regular employees, the owner thereof, or the parent,

17 spouse, child, or other member of the immediate family of such

18 owner, shall not be considered to be an enterprise engaged in

19 commerce, or in the production of goods for commerce, or a part

20 of such an enterprise, end quote.

21        Relatedly, Section 29 U.S.C.A., Section 206 provides,

22 quote, every employer shall pay to each of his employees, who

23 in any work week is engaged in commerce, or in the production

24 of goods for commerce, or is employed in an enterprise engaged

25 in commerce, or in the production of goods for commerce, wages,

BIROS_APPENDIX_0218
EXHIBIT F

9

1  at the following rates, end quote.

2          Here, the Court is finding that this did not

3  constitute -- U LOCK did not constitute an entity or an

4  enterprise engaged in commerce, since he was -- George Snyder

5  was the owner, U LOCK had no other employees, and consequently

6  George does not appear to be an employee as qualified under the

7  FLSA.

8          I also note that the statute does provide under 29

9  U.S.C., Section 255(a), that there is a two year statute of

10  limitations except that an action arising from a willful

11  violation may be commenced within three years.  Here, the

12  allegation is that some of these claims may reach as far back

13  from 2015 to at least 2019 and, therefore, would seemingly be

14  time barred.

15          I also note that the response that was given does

16  seem to have some inconsistencies.  I'm not sure exactly why

17  Mr. Snyder is claiming exemptions under the FLSA, because the

18  exemptions would not be helpful to him and, in fact, would

19  exclude U LOCK or his status from coverage for wages.

20          It also appears to me that Claim 5-1 appears to be an

21  attempt to recoup lost sweat equity or capital contributions

22  that were provided through his labor and efforts, rather than a

23  wage.

24          And, finally, and also compelling, is that the claim

25  does conflict with sworn statements that were given elsewhere

BIROS_APPENDIX_0219
EXHIBIT F

10

in this case, particularly with respect to the schedules and
testimony at the 341 meeting and in other sworn declarations.
So, for all those reasons, I find that the objection is well-
founded and I will sustain the objection and deny Mr. Snyder's
claim.

So, that brings us forward to the next claim
objection which is the objection to Claim Number 1 filed by
Shanni Snyder.  This was a claim filed in the amount of
$263,100, originally as a secured judgment.  Ms. Biros has
filed an objection, asserting that Shanni was not an employee
of U LOCK, and as is supported by Shanni's schedules, and given
her failure to properly schedule a wage claim, Shanni should be
judicially estopped from asserting one now.

Both George and Kash Snyder have testified
extensively that U LOCK had no employees and did not consider
Shanni Snyder to be an employee.  She also notes that there is
no evidence that Shanni was a contractor of U LOCK and further
observes that Shanni does not qualify as an employee under the
FLSA because U LOCK was an immediately -- or an immediate
family-owned business.  And, even if she had such a claim under
the FLSA, the statute of limitations is two years.

Biros' also asserts that the claimant Shanni worked
for ten hours a night, every night, for four years, is on its
face incredible, and given that the security setup at the site
did not have wifi or other connectivity, it is unclear how

BIROS_APPENDIX_0220
EXHIBIT F

1  Shanni could have monitored the cameras as alleged in her

2  claim.

3          Ms. Snyder filed a response arguing that Biros is

4  seeking to collaterally attack her judgment and she asserts

5  that judicial estoppel cannot apply because she later amended

6  her schedules and only part of the claim belonged to her

7  estate, and finally suggests that if an evidentiary hearing is

8  necessary to address the validity of the judgment, the

9  reference should be withdrawn to permit the District Court to

10  do so.

11          So, again, those are my initial observations of what

12  had been contended by each of the parties with respect to that

13  pending claim objection.  Is there anything further that Ms.

14  Biros wishes to raise with respect to that claim objection?

15          MR. BERNSTEIN:  Nothing further at this point, Your

16  Honor.  Thank you.

17          THE COURT:  All right, thank you.  All right, Mr.

18  Lacher, how about on your behalf for Ms. Snyder?

19          MR. LACHER:  Yes, thank you, Your Honor.  Again, as

20  noted, we're dealing here with a final judgment and I would

21  also point out that Ms. Biros has commenced a RICO action in

22  the District Court, which includes the same attacks on the

23  judgment that they raise here before Your Honor.  So, you have

24  them asking the District Court to pass on the facts and they

25  have Your Honor asking to pass on the facts, and based on Your

BIROS_APPENDIX_0221
EXHIBIT F

12

1  Honor's findings in regard to the last objection, I'd also

2  point out, they rely largely on a case issued by Judge Deller,

3  kind of stating that this Court can always get behind a

4  judgment in a claims objection situation.  I don't think that

5  case says that at all.  That was a case that dealt with

6  confessed judgments that, on the face of the record, were not

7  lawful, the process was not followed.  In this instance, Ms.

8  Snyder filed her complaint.  Went to court.  Attended a hearing

9  in front of Judge Colville.  Judge Colville took evidence.

10 Judge -- including testimony from Ms. Snyder.  He rendered a

11 final judgment.  That judgment is a year and a half old.

12 Nobody has attacked it, and I do believe this Court can't get

13 behind it, and I also believe that if it is going to be

14 challenged, it should go back to the District Court, as Your

15 Honor mentioned.

16       THE COURT:  Okay.  Anything in response, Mr.

17 Bernstein?

18       MR. BERNSTEIN:  Nothing that we haven't already set

19 forth, Your Honor.  Thank you.

20       THE COURT:  All right, thank you.  All right.  I'll

21 address the points as follows.  I do think that Shanni's

22 judgment was entered by default.  It's clearly indicated as

23 such and, therefore, I reach the finding that it is not

24 entitled to preclusive effect, and in support of that, I do

25 rely on the In re Chatkin case, 465 B.R. 54, at Page 65, which

BIROS_APPENDIX_0222
EXHIBIT F

13

1   is a decision of the Bankruptcy Court of the Western District

2   of Pennsylvania from 2012, which provided, quote, as a general

3   rule under federal law, any issue raised in a case where a

4   default judgment was entered is not actually litigated for

5   purposes of collateral estoppel, and therefore does not bar

6   litigation of the issue in the Second Federal Court, end quote.

7           There is no exception where the defendant never

8   appeared and participated.  I think Biros is correct that the

9   statute of limitations for the FLSA claim is two years, with

10  the possibility of three years for a wilful violation.  It's

11  under 29 U.S.C., Section 255(a), and to the extent that Shanni

12  reopened her bankruptcy case and amended her schedules and

13  entered into a settlement with the Trustee, I do find that

14  judicial estoppel would appear to be moot and is no longer at

15  play here.

16          But, even though Shanni is the sister of Kash and

17  George, it is unclear whether adult siblings under the

18  circumstances would be considered, quote, immediate family

19  under the FLSA, and I think there are some factual issues that

20  are raised here, but nevertheless, the fact that there is a

21  judgment, does require at this point for the Court to schedule

22  an evidentiary hearing on the merits of the claim itself.  And,

23  so I am prepared to do that and we'll issue a suitable pretrial

24  order.  My expectation though is that this should not be a long

25  or involved process.  I am contemplating an evidentiary hearing

BIROS_APPENDIX_0223
EXHIBIT F

14

1  of no more than two hours and I think the primary witness would

2  be Ms. Snyder herself.  If there is cause to be shown that

3  there are needs for other witnesses, we can address that, but

4  I'm not envisioning that as we sit here today.

5         To the extent the parties need a discovery period,

6  I'm prepared to provide a brief 60-day discovery period for

7  that.  But, in short, I'm moving forward with quantifying the

8  claims of this estate, and the only way to do so is to have an

9  evidentiary hearing on the merits of that claim objection.  To

10  the extent that Ms. Snyder wants to seek a withdraw of the

11  reference, that's her prerogative.  She can file an appropriate

12  motion with the District Court.  The District Court can act

13  with it as it deems necessary, but my expectation would be that

14  liquidating and determining the allowance of claims is

15  something that is normally done within the Bankruptcy Court and

16  unless there's some other basis to seek a withdraw of the

17  reference, I would not be betting money that the District Court

18  would grant that.

19         But, nevertheless, I'm prepared to be surprised on

20  that, but in the meantime, I'm not going to wait for the

21  District Court to rule on that.  This is an estate that needs

22  to be properly addressed, and so I will move forward with the

23  evidentiary hearing under the schedule that I've just outlined.

24         I would also note though that, and this is for Mr.

25  Lacher's benefit because he is new to the party, so to speak,

BIROS_APPENDIX_0224
EXHIBIT F

15

1  is that, on its face and given the circumstances of which

2  unfolded, and again mind you, I'm not making any final

3  determinations, but the veracity and validity of the Shanni

4  Snyder claim is certainly somewhat dubious.  I made no mistake

5  about that and some of the things I've written in my orders

6  before, and so I want to make sure that we're all clear on what

7  the expectations are going forward, and that is the Court has

8  already put all of the parties in this room and on the Zoom

9  call on notice that I'm not tolerating any more games or

10 crossing any lines.  Rule 11 is in play and, to the extent that

11 there were sworn statements given in this proceeding, penalty

12 of perjury also applies here.

13        So, as we move forward with an evidentiary hearing, I

14 want folks to be mindful of that so that we can be all clear on

15 what the expectation is and that there is no funny business or

16 games that are being played as we move forward with the goal of

17 including the administration of this estate and determining

18 what the claims are and allowing the Trustee to take what

19 limited resources he has and make distributions to creditors.

20 So with that, any questions or further clarifications that the

21 parties need at this stage?

22        MR. BERNSTEIN:  No, Your Honor.

23        MR. LACHER:  No, Your Honor.

24        THE COURT:  So, while we're at it, I'm going to just

25 set a date.  If I use 60 days from today for discovery, I have

BIROS_APPENDIX_0225
EXHIBIT F

1 the window of July 14th in the afternoon, which is a Friday,

2 for an evidentiary hearing.  How does that work for the

3 parties?

4 　　　　　MR. BERNSTEIN:  Fine with us, Your Honor.

5 　　　　　MR. LACHER:  Fine with me, Your Honor.

6 　　　　　THE COURT:  All right.  Then, I'll set that for July

7 14th at 1:30 p.m.

8 　　　　　MR. OTTO:  Unless you're home for Bastille Day.

9 　　　　　THE COURT:  All right.  That brings us forward to the

10 next pending item, which I will take as the consent motion to

11 approve the compromise under Rule 9019 and this is somewhat

12 related to the amended application for administrative expenses

13 that was filed by Christine Biros, which has drawn an objection

14 from George Snyder.  The motion to compromise has drawn

15 objections from both George Snyder and Shanni Snyder and a

16 consent response from the Chapter 7 Trustee.

17 　　　　　Okay.  So, again, where I view the papers at this

18 stage is as follows.  Christine Biros and the Trustee have

19 entered into a settlement of her claims.  The settlement would

20 provide for an allowance of an administrative expense claim of

21 $18,000 for use and occupancy of the subject property during

22 the pendency of the bankruptcy.  That equates to $2,000 a month

23 for a period of nine months.  It would also allow amended Claim

24 Number 2 in the amount of $27,701.59 as a priority claim under

25 Section 507(a)(8) for pre and post-petition real estate taxes

BIROS_APPENDIX_0226
EXHIBIT F

17

1  incurred on the real property.  Biros will reduce this claim to

2  the extent the taxes are paid by the estate.  It will also

3  allow Claim Number 3 in the amount of $162,000 as a general

4  unsecured claim for the pre-petition use and occupancy of the

5  property.  That is based on a rental figure of $7,000 a month

6  for 81 months, dating back to approximately July of 2015.

7            And, Claim Number 4, which is $200,000 as an allowed

8  general unsecured claim for environmental remediation costs.

9  And, Ms. Biros asserts that this is the middle range of the

10 remediation estimates she received.  I have objections from

11 Shanni Snyder indicating that Biros' claims are premature,

12 because they are based on Biros' alleged ownership, which

13 Shanni has challenged in an avoidance action that is pending

14 before this Court, and even if Shanni is not successful, she

15 alleges that the rent claims are excessive in relation to the

16 fair market value.  She also contends that rent would

17 constitute unjust enrichment, because after obtaining title to

18 the property, she would effectively be recovering a second time

19 for the same pre-petition period.  And, Shanni also contends

20 the environmental claim is unilateral estimate of damages and

21 does not address the availability of insurance coverage for the

22 garbage truck fire.

23            George has filed an objection indicating that he

24 thinks that $1500 a month for administrative expense rent is

25 the more appropriate number.  He objects to Biros seeking rent

BIROS_APPENDIX_0227
EXHIBIT F

18

1 and real estate taxes and objects to the real estate taxes

2 being paid to her, as they are owed to the taxing authorities,

3 and objects to the pre-petition rent on the basis that the

4 State Court did not grant retroactive relief.

5          I will hear from the parties in just a minute, but I

6 do have some additional questions for the Trustee with respect

7 to this, and so -- well, let me go around the room first.

8 Anything further from Ms. Biros' team with respect to this

9 motion?

10          MR. BERNSTEIN:  The only thing I'd point out and I

11 don't know where the Court is inclined to go, at this point,

12 Mr. Snyder is not a creditor and on his own I don't think would

13 have standing to object or --

14          THE COURT:  I think that's correct, but that's just

15 an order I issued today, so I think for the purposes of today,

16 I'll still allow him to be heard with the expectation of I've

17 ruled that he is not a creditor any further at this point.

18          MR. BERNSTEIN:  Thank you.  That's all, Your Honor.

19          THE COURT:  All right.  So, anything further, Mr.

20 Snyder?  I'm going to come back after I hear from the Trustee,

21 but any preliminary comments?

22          MR. SNYDER:  Just preliminarily, the State Court, you

23 know, kind of looked at it as if we owed this -- the State

24 Court looked at is as, you know, part of the basis of their

25 judgment, was to say that we owed the taxes, so in lieu of

BIROS_APPENDIX_0228
EXHIBIT F

19

1 taxes, they gave them the property, so they get the property,

2 and now they're going to come back and try to get the money for

3 the taxes.  So, that was one of my -- I just don't think the --

4 the settlement, I think it lacks good faith and it's not a good

5 business decision for that reason and several others --

6                THE COURT:  Okay.  And --

7                MR. SNYDER:  -- others.

8                THE COURT:  -- Mr. Lacher, anything else from you

9 preliminarily?

10               MR. LACHER:  Yes, Your Honor.  I would just say that

11 there is a claims process under the bankruptcy code.  Parties

12 in interest have an opportunity to object.  There's no real

13 deadline on that in the Chapter 7 case.  Obviously, if Your

14 Honor wants these objections filed, you can order it and we

15 would most certainly obey, but to be bound to have our right to

16 object taken away because the Trustee and Ms. Biros agree to

17 the treatment of the claims vis-a-vis the Trustee, I think,

18 would be improper.

19               So, I would say at the very least we should be given

20 an opportunity to object.  But, again, as set forth in my

21 response, I think that's pretty wasteful and maybe needlessly

22 costly and time consuming if the avoidance action is going to

23 make all these claims subject to change, so I would just put

24 that --

25               THE COURT:  Okay, but why wasn't there an objection

BIROS_APPENDIX_0229
EXHIBIT F

1 raised prior to this?  I mean, these claims have been out there

2 for a while.  It looks like Ms. Biros filed her claims back in

3 August and, you know, I've now looking to conclude the estate.

4 I've had the Trustee liquidate some of the proceeds or some of

5 the assets into proceeds.  You've got your adversary claim.  I

6 mean, this is the time to quantify claims, so I don't know why

7 it's incumbent upon the Court to actually set a deadline for

8 claims objections at this point.  The creditors were free to

9 file objections at any point.

10        MR. LACHER:  Well, I agree, Your Honor, but -- and I

11 do agree.  But, I would also say that we're not passed a

12 deadline to file objections.  You know, and again, Ms. Biros

13 just filed her claim to Ms. Snyder's and Mr. Snyder's

14 objection.  Those claims sat there for a long time, as well.

15 In this case, you have an avoidance action intervening.  It can

16 really change the validity or mootness of those claims.  That

17 said, if Your Honor wants objections, we'll absolutely file

18 them right away.

19        THE COURT:  Well, I'm just saying.  I mean, the

20 motion to compromise was filed -- when was this filed?

21        MR. BERNSTEIN:  March 1st, Your Honor.

22        THE COURT:  March 1st.  So, we're a month in.

23 There's been no claim objection.  This was an effort to

24 compromise the claim.  I'm thinking if there was a time to

25 object to the claim, it's now or never, and so I'm not too

BIROS_APPENDIX_0230
EXHIBIT F

21

1  receptive to parties that want to sit on their rights and then

2  claim somehow that there's a need for a further delay when the

3  issue has been teed up.  The Trustee has had a discussion with

4  Biros about compromising the claims.  The Trustee obviously

5  must have had some reason to object in his own right to some of

6  the claims and that's why the parties have come forward with a

7  compromise to resolve their dispute.  So, this is the time to

8  do it.  All right, well, let me turn to the Trustee.

9  Relatedly, Mr. Slone, is it correct for me to understand that

10  you've investigated these claims and you've looked into them?

11          MR. SLONE:  I have, Your Honor.  Before we get too

12  far, the claim for the real estate taxes had to be paid

13  directly to the Tax Claim Bureau of Westmoreland County.  I

14  think that was part of the agreement.  It doesn't have to go to

15  Mrs. Biros.  It can be paid there.  So, I'm holding a little

16  over $70,000 in my account.  If the administrative claim is

17  between 15 and $18,000 and the tax claim is $27,000, that's

18  over $40,000 right there.  I have a lot of time in this case.

19  My bookkeeper pointed out I have 155 hours already in the case.

20  Even if half of that is legal time we're eating up most of the

21  $70,000 with administrative costs in the tax claims, Your

22  Honor.  We're fighting over -- we'd be fighting over just a

23  little bit of money on unsecureds at this point.  I don't think

24  we're going to get too many -- too much money left for the

25  unsecured creditors, Your Honor.

BIROS_APPENDIX_0231
EXHIBIT F

22

1          THE COURT:  Well, that's kind of my thought, as well,

2    but you've investigated the claims, you've looked at the

3    assertions that Ms. Biros has made in terms of what she's

4    alleging in each one of these components that you're seeking to

5    compromise?

6          MR. SLONE:  I am, Your Honor.  Rather than me file

7    objections in all four claims, I thought this was the best way

8    to handle this.

9          THE COURT:  All right, and there's a reference to

10   this appraisal report or the estimate of the fair rental value

11   and the valuation of the property.  Have you seen those

12   reports?

13         MR. SLONE:  I got the -- not the entire reports.  I

14   got the summary from Mr. Lindsay and Mr. Bernstein when we were

15   trying to put this thing together, Your Honor.  I disregarded

16   most of it.  I didn't feel that it was worth anywhere near

17   $7,000 a month for rent.  I thought 2,000 was more of a figure

18   that I would be more comfortable with, Your Honor.

19         THE COURT:  All right.  And, what -- have you run

20   down the issue on the garbage fire insurance?

21         MR. SLONE:  I have not, Your Honor.  Although, the U

22   LOCK would be, under the law, would be responsible even if it

23   wasn't there -- or could be responsible.  And, again, it would

24   only be if an unsecured creditor for the amount of money we are

25   dealing with would be de minimis.

BIROS_APPENDIX_0232
EXHIBIT F

1          THE COURT:  All right.  All right, let me go around

2     the room one more time.  Then, based on where we are at this

3     point, anything further from Christine Biros?

4          MR. BERNSTEIN:  I'm just going to point out with

5     respect to what the Trustee said, there were more than one

6     environmental problem on the property.  The truck fire was only

7     the most recent one.  And, the compromise amount obviously is

8     significantly less than the fair rental value under this

9     broker's report, this real estate appraisal report that we

10    received.  We'd certainly make that available if necessary.

11    There's no attempt to hide it.  There was no --

12          MR. SLONE:  Your Honor, may I ask Mr. Bernstein to

13    speak into the microphone?

14          THE COURT:  Okay.

15          MR. BERNSTEIN:  I'm sorry.

16          THE COURT:  Is --

17          MR. BERNSTEIN:  I was just saying that there was more

18    than one environmental problem.  It wasn't just the truck.

19    And, with respect to the $7,000 opinion by the appraiser, the

20    comprise is -- the compromise agreement with the Trustee is for

21    significantly less than that.  And, I believe we may have

22    provided the summary pages to Mr. Slone.  It is a bonafide

23    report.  There is no attempt to hide it and we'll produce it as

24    requested.

25          THE COURT:  Okay, and you will produce that?  All

BIROS_APPENDIX_0233
EXHIBIT F

24

1  right.  All right, anything further, Mr. Snyder?

2        MR. SNYDER:  Yeah.  In response to that, they said

3  there was no attempt to hide it.  In fact, the person who did

4  the environmental report did in fact hide.  He parked his car

5  down the street, walked over, and did what he did.  There were

6  no other environmental issues.  The DEP had came out several

7  times from Harrisburg and said there was no issue and nothing

8  the buyers were required to remediate, so that's a fabricated

9  number, in my opinion.

10       Also, there weren't other environmental issues that

11 were new to the property.  When the property was acquired,

12 there were some tires there.  Some junk vehicles and things

13 like that.  In January, myself and a couple people cleaned up

14 everything that really wasn't our responsibility to clean up,

15 and I believe the purchaser, or my sister purchasing the

16 assets, cleaned the property even further, so everything was

17 cleaned up, which really they weren't entitled to that cleanup.

18 So, I don't see where there would be one dollar required to

19 clean up anything let alone a couple hundred thousand, so I

20 don't think that's a good compromise.

21       THE COURT:  Well, I mean, do you have anything to

22 back that up in terms of additional evidence or an

23 environmental expert that would counter the American

24 Geosciences report?

25       MR. SNYDER:  As far as the garbage truck fire?

BIROS_APPENDIX_0234
EXHIBIT F

25

1          THE COURT:  Well, just the environmental claim

2    generally?

3          MR. SNYDER:  Well, I don't have -- I don't have

4    anything to refute that, other than the fact that they don't

5    have a report from the DEP saying it's required to clean up,

6    because they did investigate it and came from Harrisburg

7    several times and I haven't seen anything in any of the filings

8    that said there was environmental damage because of this truck

9    and anything had to be cleaned up.  In fact, she told me in

10   person that nothing needed to be cleaned up.

11         THE COURT:  Well, is there a reason that the DEP has

12   to be a prerequisite to having an allowed environmental claim?

13         MR. SNYDER:  Pardon me?

14         THE COURT:  Is there somewhere that you can point to

15   that a determination of the DEP is a prerequisite to having an

16   environmental claim?

17         MR. SNYDER:  Well, just that they are saying there's

18   multiple environmental issues, and I'm just saying that it's

19   not really substantiated.  And, then in the report, I don't

20   know if it was -- I can't remember when this was done.  This

21   was -- they had a report from an environmental company that

22   said cars need to be removed, tires need to be removed.  There

23   was a lot of issues and they've all been addressed and resolved

24   that I'm aware of.

25         THE COURT:  Okay.  Thank you.  Mr. Lacher, anything

BIROS_APPENDIX_0235
EXHIBIT F

26

1  further from you?

2         MR. LACHER:  Yes, thank you, Your Honor.  Again, I

3  would point out, there was not an attempt to sit on our rights

4  here.  I did raise some substantive objections in my response,

5  I pointed out to the Court but I thought it might be wasteful

6  in light of the avoidance action to do these things now.  I

7  will point out that neither U LOCK, nor Biros, nor anyone else,

8  has gone after the garbage truck owner that caused the problem,

9  and I think there's grounds to object if the Court thinks it's

10 necessary to object at this point, and I would ask that they be

11 allowed to do so.

12        THE COURT:  All right.  Thank you.  So, I do have one

13 additional question for Ms. Biros and that is, so the

14 contention is that the pre-petition rent is a double recovery.

15 Why is that not accurate, because I mean it's unclear to me

16 that the State Court order was meant to be entirely retroactive

17 and it would seem to me that if the State Court was issuing an

18 order saying, "well, because you lent the money, it would be

19 unjust enrichment for U LOCK to have title with no ability to

20 pay back that money, a constructive trust was imposed."  But,

21 why does that entitle Ms. Biros to pre-petition rent on top of

22 that?

23        MR. BERNSTEIN:  So, obviously, Your Honor, the

24 initial position is that the purpose of this compromise is to

25 avoid litigating these issues which may be in dispute.  If Ms.

BIROS_APPENDIX_0236
EXHIBIT F

1  Biros was the beneficial owner of this property since 2015 and

2  did not have the use of the property, we believe that she has a

3  claim against the party who held the property for the fair

4  rental value of that property.  The so-called unjust

5  enrichment, and I know we're using unjust enrichment twice in

6  this situation, but that's advisedly.

7       So, her property, she had a right to this property.

8  She had the equity interest in this property that was worth

9  something, and it was kept from her.  She couldn't use it.

10  She's entitled to some -- compensation for that.  And, even

11  though she has the property today, or as of the end of January,

12  she had that whole pre-petition period where she did not have

13  the property.

14       THE COURT:  Okay.  So, let me stop you there.  Where

15  in the State Court order, either Trial Court or Superior Court

16  does it reach back to 2015 or does it give her title

17  retroactively?  I mean, it just seemed that it imposed a

18  constructive trust, declared the 2015 deeds void ab initio, but

19  that doesn't necessarily equate to giving title to Ms. Biros as

20  of 2015.  At least that's my initial review.  So, if you want

21  to direct me somewhere else, I'm happy to do that, because,

22  again, she was deemed by the State Court to be a lender here

23  and the constructive trust was imposed as an equitable remedy,

24  so she normally would not be the titleholder, and so this was

25  extraordinary relief that was given, and so, as such, I need to

BIROS_APPENDIX_0237
EXHIBIT F

28

1 have an understanding of how she can reach back to 2015 for

2 that rent.

3         MR. BERNSTEIN:  I don't know that we have all of

4 those documents here, Your Honor.  And, Mr. Otto, who is more

5 conversant with this, is going to see if he can point to that.

6         THE COURT:  Okay.  Well, I know Mr. Snyder included

7 the copies of the State Court and Superior Court orders to his

8 responses, so that's one area where the copy is.

9         MR. BERNSTEIN:  Here -- look through there.  While

10 Mr. Otto is looking, Your Honor, just briefly in response to

11 what Mr. Lacher said.  Purpose of the compromise is to avoid

12 the fight.  The Court certainly has the power to allow the

13 claims, and allowing the claims ends the ability of other

14 parties to object.  Ms. Snyder, as the Court said, has been

15 here since the beginning.  Has -- these claims have been here

16 since almost the beginning of this case.  We were here three or

17 four months ago when the Court admonished both Ms. Snyder and

18 Ms. Biros to bring their actions and let's get this going.  If

19 you wanted us to bring the objections to the claims, to their

20 claims.  You wanted her to bring the avoidance action.  All of

21 that is now in play.  It simply doesn't make sense to us to

22 allow some further period for them to object, to have us

23 litigate these claims that we're trying to compromise.  Now,

24 that will change the whole deal with the Trustee.

25         THE COURT:  All right.  Well, let me tell you where

BIROS_APPENDIX_0238
EXHIBIT F

29

1  I'm at, at this point, while you search for that.  This is a

2  settlement and compromise, so I'm not looking for perfection

3  and I'm not looking for, you know, crossing every T and dotting

4  every I.  I do find that what's been proposed is the allowed

5  administrative expense for use and occupancy post petition wise

6  at $18,000, is reasonable under the circumstances.  It's not

7  far off from what the Court had originally estimated during the

8  sale process, and I acknowledged that that's a significant

9  change from the position that Ms. Biros was at several months

10  earlier.

11          As to the taxes, I don't know that there's

12  necessarily a dispute as to that from what I heard from Mr.

13  Snyder.  I mean, there's an acknowledgment that real estate

14  taxes are due and owing.  If it's due and owing from U LOCK,

15  and I don't think particularly that there's an issue with that,

16  then that would be paid from the U LOCK estate.  If it's not

17  paid from the U LOCK estate, Ms. Biros, as the current title

18  holder, is alleging that she's entitled to reimbursement from

19  the estate for that.  So, I do find that that aspect of the

20  compromise is not a really compromise.  It's just commonsense

21  at this point.

22          As to Claim Number 4 and the environmental claim.

23  It's $200,000.  I acknowledged that I have a report from

24  American Geosciences in 2020 that was attached suggesting that

25  the remediation was about $414,000.  Ms. Biros has also alleged

BIROS_APPENDIX_0239
EXHIBIT F

30

1 that there's estimates between 125 to $314,000 for the cleanup

2 work.  And, this is a significant compromise down to $200,000,

3 so Biros asserts that that's the middle range of the

4 remediation estimates.

5          As I noted during the exchange with the parties, I

6 don't have anything from anybody else challenging those numbers

7 from any degree of certainty or expertise.  It's just

8 conjecture.  And, at this point, I just need more than just

9 bare lay opinion.  I need some sort of data points to look at

10 and I've got the Trustee relaying to me that he has

11 investigated these things.  He has taken the time to drill down

12 and represents the $200,000 allowance for that claim is

13 reasonable.

14          Where I do have the problem and where I think the

15 Snyders have made a compelling argument to me, is with respect

16 to this general unsecured claim for their pre-petition use and

17 occupancy of the premises.  $7,000 a month for 81 months.  In

18 my review, I'm not convinced that the State Court has

19 retroactively granted her relief for that period and it would

20 seem to be a double recovery, and so I'm not inclined to allow

21 or accept that portion of the settlement.  If that blows things

22 up, then be that as it may, but I'm inclined to otherwise rule

23 in that direction.  I do find that the Martin factors otherwise

24 are satisfied.  I think there's a probability of success on the

25 merits, weighs to the fact that there is a likelihood that Ms.

BIROS_APPENDIX_0240
EXHIBIT F

1  Biros can prevail on her claims as showing entitlement to
2  post-petition rent and reimbursement of taxes for the reasons
3  I've stated, as well as proof that environmental remediation
4  cost exist, and those costs existed before the garbage truck
5  fire and are separate and distinct from that whole fiasco.

6          The difficulty of collection, you know, is one of the
7  estate having limited assets and, furthermore, there is a
8  complexity of the matter that would require unnecessary time
9  and expense and delay to go through and litigate these matters.
10 One thing that's been apparent to me throughout this case and
11 I've remarked on it on several occasions, is the parties have
12 no problems litigating minute or small dollar amount issues to
13 the hilt in a way that is totally out of proportion of what the
14 value of the claim is, so that's to me probably the most
15 compelling thing here is that this would preserve what little
16 is left in the estate for the distribution of creditors.  And,
17 so from that standpoint, it's in the paramount interest of
18 creditors to allow the estate to proceed to quantify these
19 claims and get closer to a distribution that the Chapter 7
20 Trustee can make to creditors.

21         Having said all that, I am mindful of one thing that
22 Mr. Lacher has said, which is he's got his pending avoidance
23 action out there and I think that could change the perspective
24 here.  So, as a result, I'm prepared, based on what I've said
25 on the record, I'll give Ms. Biros' team one last chance to

BIROS_APPENDIX_0241
EXHIBIT F

1 respond on this pre-petition rent thing, but that the allowance
2 is on an interim basis, but the payment of any claim would be
3 held in abeyance pending the conclusion of the avoidance
4 action.  And, from that standpoint, that would allow me to
5 ensure that there is no money going out the door prematurely
6 until we have a full handle on the what the estate is and what
7 the respective rights of the parties are.

8            Having said that, and I understand that this is not
9 teed up for today, but if nothing, I always try to be candid
10 with you all so you know exactly where I sit on these things.
11 I've had a chance to look at the avoidance action and, right
12 now, I have to tell you, I'm not real impressed with it.  You
13 know, I question whether it could be dismissed as implausible
14 under Twombly and, specifically, the complaint seems to be more
15 mechanical and simply assumes that the constructive trust is an
16 avoidable transfer without giving any more depth or background
17 to that.  So, again, that's not a final determination.  That's
18 just an initial off-the-cuff reaction of what I've seen on the
19 pleadings, but it does color, in an extent, to me, the
20 scheduling of where we are and the need to move forward and
21 what the expectations are for what I think the time frames need
22 to be to bring this matter to a close.  If I thought there was
23 more there, then I think we would be inclined to have a more
24 robust time frame for this to occur.  It's not to say we're not
25 going to do that here.  It's just that I'm starting to question

BIROS_APPENDIX_0242
EXHIBIT F

33

1   whether or not this is something that can be resolved on a Rule

2   12 stage at this point, but we'll see what the coming weeks are

3   at this point.

4          Again, just food for thought for the parties so that

5   there are no surprises, and the parties can come into the

6   courtroom on the appropriate date adequately prepared to

7   address what I see as some concerns at this stage.  So with

8   that, let me come back, anything further on the pre-petition

9   rent?

10          MR. BERNSTEIN:  Yes, Your Honor, just a couple of

11  things addressing, maybe in reverse order, what the Court said.

12  If the Court -- we understand the concern about the avoidance

13  action might have some affect on payment of these claims and we

14  don't expect -- we don't expect payment now other than perhaps

15  the tax claim should be paid and we would be happy to work with

16  the Trustee.  The Trustee may want to file a claim on behalf of

17  the Tax Claim Bureau.  I believe the Trustee is entitled to do

18  that.  And, if that's allowed, because Ms. Biros isn't looking

19  for a duplicate claim, so we can -- we'd like to put that one

20  to bed.  We'd like to put the fight over Ms. Biros' claims to

21  bed now, even if payment is not made until ultimately later in

22  the case or at the end of the case.

23          With respect to the 2015 issue, I think the -- Mr.

24  Otto, who litigated that, can speak more to it, but in looking

25  at the August 2019 order, perhaps the particular section, I'm

BIROS_APPENDIX_0243
EXHIBIT F

34

1  sorry paragraph, is that, one, it says "plaintiff, Christine

2  Biros, is the equitable owner of the subject property."  It

3  does not indicate in that paragraph, that 2015, that it's

4  retroactive to them.  Even -- and I think Mr. Otto can explain

5  why that is and perhaps satisfy the Court that it is

6  retroactive.  Even if it isn't, it would be effective as of

7  that date, which is August of 2019, and if we count August of

8  2019 to the petition date, I think I count 45 months.  45

9  months at our asserted fair rental value of $7,000 a month is

10 more than the 162,000 that we've compromised.  45 months, even

11 at the $2,000 that we've been using in the admin claim is

12 $90,000, and I would need a few seconds to speak with Ms. Biros

13 about whether that would be a number that would satisfy her if

14 that would eliminate that retroactivity issue from the Court's

15 concerns.  If I may have just a --

16          THE COURT:  Well, yes, I mean, my initial reaction to

17 that though is that even though that was the decision in 2019,

18 that the deeds were still not delivered until later and, you

19 know, it's -- I don't want to get back into asking the State

20 Court to have to clarify that order because it's just not time

21 intensive.  And the other aspect of this, which I think is

22 another point that's been raised by several parties is, at the

23 end of the day, is this going to really matter when the Trustee

24 is holding no more than $70,000 plus whatever could be salvaged

25 from the avoidance claim?  I've already told you that I've got

BIROS_APPENDIX_0244
EXHIBIT F

1  some concerns about the avoidance claims, so if I go with the

2  supposition that there's only $70,000, arguing over an

3  additional hundred and --

4        MR. BERNSTEIN:  Sixty-two.

5        THE COURT:  -- sixty-two thousand when I've already

6  said I'm going to allow the 200,000 plus the 27,000 for taxes

7  and the 18,000 for the administrative claim, I just think it's

8  a fool's errand.

9        MR. BERNSTEIN:  Your Honor, you're right, and if the

10 Shanni Snyder claim was disallowed also and Ms. Biros knew that

11 her $200,000 general unsecured claim was the only one, then it

12 would be -- that would be an easy resolution.  We're still in a

13 little bit of shifting sands, but we know there's very little,

14 and I'd love to figure out a way so that this compromise could

15 resolve all of those things.  That's what we were trying to do

16 with the Trustee.  Perhaps Mr. Otto can just give you a couple

17 of minutes on the State Court, that background to see if --

18       THE COURT:  All right.  I'll allow it very briefly.

19       MR. BERNSTEIN:  Thank you.

20       MR. OTTO:  Your Honor, the Trial Court actually

21 issued three post-trial orders.  The first was the judgment and

22 that was on the August 2019 date.  The second was an order in

23 response to post-trial motions.  The third order was issued in

24 mid-2022 in response to appeals by U LOCK, Shanni Snyder, and

25 Mark Mycka, when he issued a 1925 order.  The appeals from U

1  LOCK, Mark Mycka, and Shanni Snyder, were all filed post
2  petition, and he was -- the judge was required by Superior
3  Court to issue a 1925 opinion, which he did.  And, in the
4  course of those three orders -- and I apologize, we don't have
5  those three orders in front of us, we only have the Trial Court
6  or the trial decision.  In at least one of those, the judge
7  specifically states that she had equitable title dating back to
8  2015.

9        I would also point out something that Mr. Bernstein
10 probably wasn't thinking about.  The way this trial went, there
11 were deeds that were issued by the estates in May of 2019.
12 After the final decision by the Pennsylvania Supreme Court,
13 then we recorded the deeds that we received from the Trial
14 Court.  Those deeds were dated in May of 2019, which in essence
15 predate the Trial Court's trial judgment.  So, if the question
16 is how far back do we go, theoretically, we could go back to
17 legal title in May of 2019.

18              THE COURT:  Okay.

19              MR. OTTO:  But, I -- if Your Honor wants or asks for,
20 I would be happy to provide the portions of the Trial Court's
21 orders that state that she had equitable title dating back to
22 2015.  I do agree with Mr. Bernstein that you get to the point
23 where it doesn't make a big difference because there's not
24 enough money to cover everything anyway.

25              THE COURT:  Yes.

BIROS_APPENDIX_0246
EXHIBIT F

1        MR. BERNSTEIN:  Let me see if I can help here, Judge.

2        THE COURT:  Well, I mean, yes, all right, if you have

3  a suggestion.

4        MR. BERNSTEIN:  I do have a suggestion.  Using August

5  of 2019 when the order occurred, or using -- when was the deed

6  dated."

7        MR. OTTO:  May.

8        MR. BERNSTEIN:  -- May when the deeds were dated, we

9  would offer the Trustee a unilateral amendment to our

10 settlement to reduce Claim 3 to $90,000.  We think that's fair.

11 The cost of litigating this, it's not worth it to anybody.  We

12 really, in this settlement, tried to protect the Trustee so

13 that at this point the reasonable expectation is the Trustee is

14 going to get paid for what he did and what his counsel did and

15 we're not in his pocket.  The more we litigate this, the more

16 that is not clear.  You know, so I'll bid against myself twice.

17 If the Court were to allow the administrative claim, allow the

18 tax payment either to us or to the Tax Claim Bureau, allow

19 Claim 4 of the general unsecured claim, and allow the Claim 3

20 in any amount from 0 to $162,000, we would be satisfied.

21        THE COURT:  I'm sorry.  Say that last part again?

22        MR. BERNSTEIN:  The last part is, we'll give up on

23 Claim 3 --

24        THE COURT:  Okay.

25        MR. BERNSTEIN:  -- if we can't convince the Court

BIROS_APPENDIX_0247
EXHIBIT F

38

1  that there is some value to that.  It's just not worth it to

2  stand here and argue over it.

3       THE COURT:  All right.  Thank you.  Well, that's

4  where I was ending up on this, is that I am prepared to enter

5  an interim order approving the settlement on the grounds that I

6  said, which is to allow the administrative expense, the tax

7  claim, and the environmental claim, to preclude the

8  pre-petition rent claim on the basis that I've said, and

9  payment would be deferred pending the resolution of the

10  avoidance action and we'll take it back up again when that's

11  concluded, at which time I would enter a final order

12  authorizing the settlement at that point, because I just don't

13  see a utility in having a full blown evidentiary hearing on

14  this.  That's the whole point of a settlement is to avoid

15  unnecessary litigation when the costs exceed the benefits.

16       So having said all of that, I'm going to issue an

17  order to that effect and then we'll take up the rest of it once

18  the --

19       MR. BERNSTEIN:  Your Honor, if I may just ask for

20  clarification to --

21       THE COURT:  -- avoidance action is resolved, with the

22  exception of the tax claim though.  I mean, if the Trustee --

23       MR. BERNSTEIN:  If I heard correctly, the allowance

24  will not be final until the avoidance action is resolved?

25       THE COURT:  What I will do is, I will withhold the

BIROS_APPENDIX_0248
EXHIBIT F

39

1  payments and the distributions until the avoidance action is

2  resolved.

3          MR. BERNSTEIN:  That's fine.  I just don't want to

4  have to come back and fight over the claims again.  Thank you.

5          THE COURT:  But --

6          MR. LACHER:  Well, Your Honor -- I'm sorry.

7          THE COURT:  Well, let me make this clear though.  I'm

8  saying the distributions would be withheld, with the exception

9  that if the Trustee wishes to proceed with paying the tax claim

10 to the Tax Claim Bureau he is free to do that because that's

11 something that would be independent of the settlement here.

12 Mr. Lacher?

13         MR. LACHER:  Yes, Your Honor.  The one I'm focused on

14 is the environmental claim and this kind of mirrors Mr.

15 Bernstein's question for clarification.  If we were successful

16 in the avoidance action, am I to understand Ms. Biros would

17 have an allowed claim from the environmental clean up even

18 though she's not the owner of the property?

19         THE COURT:  Well, she would not receive a

20 distribution on that claim if she is not the owner of that

21 property.  That's how I would rectify that.

22         MR. LACHER:  I appreciate that, Your Honor, and

23 that's why, again, I wanted to know the effect of the

24 allowance, let's say.

25         THE COURT:  Yes.

BIROS_APPENDIX_0249
EXHIBIT F

40

1          MR. LACHER:  Thank you, Your Honor.

2          THE COURT:  Okay.  All right, any other

3  clarifications or questions that we have with respect to that?

4          MR. BERNSTEIN:  I'm sorry, Your Honor, I have to do

5  this, because the landscape just changed again.  If the

6  avoidance action is successful, that will put more money in the

7  estate.  If the unsecured claim of Ms. Biros is disallowed

8  because the avoidance action is successful, then she will have

9  given up her claim to the pre-petition rent argument as part of

10  the settlement and be left with nothing out of the unsecured

11  portion.  We're just trying to fix the rights now and if the

12  avoidance action is successful, she's likely -- she will have

13  lost a significant value.

14          THE COURT:  Well, no, I don't know.  I mean, if she

15  loses the avoidance action, that would deem that she is not the

16  owner of the property.  She would not be subject to the

17  environmental obligations at that point because she has no duty

18  to do that as not being the owner, so --

19          MR. BERNSTEIN:  We can't say that for sure.  She's a

20  -- if she's a potentially responsible person, party, now, we

21  don't know whether the environmental claim will follow her

22  because she was the owner of that property during the time that

23  it occurred.  She may have some liability and there's no --

24  there's nobody indemnifying her.  I know it creates a

25  complication, but that's part of why we did this, this way,

BIROS_APPENDIX_0250
EXHIBIT F

41

1  with the Trustee, because otherwise she can come out -- I know

2  that we don't expect her to lose the avoidance action, but

3  lightening strikes.  If she lost the avoidance action,

4  therefore, loses her environmental claim, doesn't get any

5  distribution as an unsecured creditor, but is a target of

6  somebody, perhaps the new owner of the property, Ms. Snyder,

7  who decides to go after people who were in control of the

8  property when the environmental situation happened.  It just

9  opens up a whole can of worms.

10        THE COURT:  All right.  Well, if that's the case,

11  then what I'm doing is, I'm just deferring any determination on

12  the settlement motion until after the avoidance action is

13  concluded because --

14        MR. BERNSTEIN:  I guess you have to do that, Judge.

15  I can't -- we're -- I'm sorry -- yeah, other than perhaps the

16  taxes, but the rest of it --

17        THE COURT:  Well, the taxes, but I mean, again, you

18  raise a point about her being in a chain of title as being a

19  responsible party for the environmental, but I'm still not

20  hearing how she would have any claim to pre-petition rent if

21  she was not the owner having lost the avoidance action.  But,

22  be that as it may, you know, this is starting to dilute the

23  efficacy of having a compromise, so --

24        MR. BERNSTEIN:  Yeah.

25        THE COURT:  -- at this stage, I'm inclined to just

BIROS_APPENDIX_0251
EXHIBIT F

42

1  defer it until after the avoidance action and then I'll take it

2  up at that point and see what the landscape is at that stage.

3  But I think that, as I indicated, my views on the

4  administrative expense claim are such that I think that would

5  be a satisfactory resolution of the administrative expense

6  motion, but if we're not going to approve that today then I'm

7  going to just --

8       MR. BERNSTEIN:  Your Honor, one moment please.

9  Sorry.

10                      (Pause)

11      MR. BERNSTEIN:  What we're discussing, Your Honor, is

12  whether it's worth upsetting this settlement and then allowing

13  the other parties to file objections to the claims or taking

14  the beating that we're taking today and having you allow the

15  claims, which will prevent another set of objections to the

16  claims in the litigation that would follow there.  I think

17  we'll take what the Court offered before I raised the

18  environmental responsibility issue.  I just think that that is

19  -- that we're better off taking that and eliminating the

20  ongoing fight objection from the Snyders as to these claims and

21  beating them to death.

22      THE COURT:  Well, again, I think if the avoidance

23  action is successful, it changes the landscape of rights.  It

24  changes Ms. Biros from being an owner, back to being a lender,

25  and what that entails.  You know, you've got potentially

BIROS_APPENDIX_0252
EXHIBIT F

43

1 another $300,000 worth of claims that she would have at that

2 point so, but, again, I had viewed this as a way of trying to

3 narrow the issues, but if it's going to create more, then I'm

4 just going to defer it and then we'll see what happens with the

5 avoidance action and make that determination at that time.

6       MR. BERNSTEIN:  Is the Court willing to determine

7 that the process to date and the opportunity to object to this

8 settlement was a sufficient time for the other parties in the

9 case to --

10       THE COURT:  I definitely think that the settlement

11 was appropriately noticed and there was adequate time to be

12 heard with respect to the merits of the settlement.

13       MR. BERNSTEIN:  However Your Honor wants to handle it

14 at this point.  I will just add that the avoidance action being

15 successful does not automatically undo Ms. Biros' rights that

16 occurred during the time that she was an owner or a

17 constructive owner, just as if Ms. Biros had received a

18 monetary transfer, if it -- if that monetary transfer or that

19 preference were avoided, but she had used that money to create

20 some investment that she made a million dollars on, the

21 estate's claim for the avoidance would not be the profits on

22 the avoidance, it would just be the value at the time that it

23 was transferred.  So, she's still going to have her claims as a

24 constructive owner and as a real owner, regardless of whether

25 the transfer was avoided.  She was an owner during the time she

BIROS_APPENDIX_0253
EXHIBIT F

44

1  was an owner.  So, I just don't think it's automatic that if

2  they win the avoidance action that her claims disappear.  With

3  that, I'll sit down and Your Honor decide --

4          THE COURT:  Well, I didn't say they'd disappear.  I

5  just -- I think they get recharacterized into different types

6  of claims, but --

7          MR. BERNSTEIN:  Perhaps.

8          THE COURT:  You know, all right.  And, since we've

9  had a long exchange there, anything further, Mr. Lacher, that

10  you wanted to add at this point?

11          MR. LACHER:  No thank you, Your Honor.

12          THE COURT:  George?

13          MR. SNYDER:  Yes.  If I can clarify two things.  On

14  the environmental claim, they had mentioned something about the

15  things that had happened while Christine was the owner.  For

16  clarification, the only thing environmental would have been

17  that fire truck -- or garbage truck that caught on fire.  All

18  the other stuff, the property was purchased in a condition with

19  the tires, and cars, and different things.  None of that was U

20  LOCK bringing any environmental issues to the table.  So, I

21  wanted to clarify that.

22          THE COURT:  Okay.

23          MR. SNYDER:  And, the thing with the rent, I had just

24  wanted to mention.  I spoke with Mr. Slone and officially they

25  were given -- the Biros were given sole control, possession of

BIROS_APPENDIX_0254
EXHIBIT F

45

1 the property in October, because I was -- because they put a

2 cable up. Locked me out, the tenants out.  In fact, there were

3 tenants that they knew.  They met them before, exchanged

4 numbers and information and called the police on them, and I

5 think Mr. Otto actually went to the police station the next day

6 to try to get them arrested.  So, but prior to that, and I

7 believe early on, you know, it was like the Biros took over

8 full trustee powers from Mr. Slone and he appeared to be in the

9 backseat.  And, when I spoke to Mr. Slone about it, he had said

10 that he was threatened by them, so I'm not sure --

11         MR. BERNSTEIN:  Your Honor, I'll object to that,

12 hearsay.

13         MR. SNYDER:  Here, he could maybe speak to that.

14         THE COURT:  All right.  Well, it's not relevant to

15 the issue that I'm hearing, other then that you're contending

16 that Ms. Biros had full control of the property, which I

17 understand you've made before, and I have discussed that in my

18 opinion before that it's not as if she was deprived of all

19 access to the property during the time period.  But, what this

20 comes down to is, what is a reasonable value of what the

21 estate's interest was for having possession of the property,

22 and bottom line is, irrespective of whether Ms. Biros had

23 control of 80 percent of the property or none of the property,

24 the fact of the matter is, the estate had assets on the

25 property at that time.  The use of the property was beneficial

BIROS_APPENDIX_0255
EXHIBIT F

46

1 to the estate and, as such, Ms. Biros, as the title holder, is

2 entitled to some sort of compensation for the reasonable value,

3 and you know we've discussed that ad nauseam at the prior

4 hearings.  But, you know, again, I come back to where we are

5 now, $2,000 a month.  You, yourself, said 1500 was reasonable.

6 This is just slightly above that, so I'm not really quibbling

7 with that amount at this stage.

8          MR. SNYDER:  Okay, and that -- that's the part I was

9 getting at.  That's what I was discussing with Mr. Slone,

10 because I said about the 1500, which could have been a

11 reasonable amount, but I was telling him, that wasn't even

12 necessarily fair because I didn't have access to doing

13 anything.  You couldn't do anything.  And, Mr. Slone seemed to,

14 you know, he said I had a good point.  But, yeah, I'm not

15 arguing about --

16          THE COURT:  Okay.

17          MR. SNYDER:  -- you know, the particulars there,

18 other than they weren't really entitled to anywhere near this.

19          THE COURT:  Okay.  Thank you.

20          MR. SNYDER:  Thank you.

21          THE COURT:  All right.  Well, I'm going to take this

22 under advisement and consider whether what kind of order I do,

23 if I do an order with respect to the settlement motion, but

24 we've had an extensive discussion on this so you know where the

25 Court has preliminary comments has been and what my inclination

BIROS_APPENDIX_0256
EXHIBIT F

47

1  was initially.  I'll ponder some more what was discussed and

2  see if that changes my thought process at all.

3         Relatedly, is the Christine Biros' amended motion for

4  allowance of payment of the administrative expense.  I did have

5  the objections from George Snyder and I think we've covered

6  that, so to the extent that I approve the settlement, that will

7  render the administrative claim motion moot.  To the extent

8  that I deny or defer approval of the settlement, that will keep

9  that objection live and I'll issue a scheduling order on that

10 further, to the extent that that remains an active issue.

11         MR. BERNSTEIN:  On that scheduling, Your Honor, we're

12 happy to have it ride along if the Court decides to defer the

13 settlement.  We're happy to have that admin motion ride along

14 without it.

15         THE COURT:  That's what I would intend to do, so

16 thank you.

17         MR. BERNSTEIN:  Thank you.

18         THE COURT:  Okay.  So, then the next item is the

19 order to show cause that was issued on January 17, 2023.  This

20 relates to the administrative expenses.  At the last hearing, I

21 explained in detail why I found the filing of Christine Biros'

22 motion for allowance of the administrative expense claim,

23 pursuant to 11 U.S.C., Section 503(b)(1), was in violation of

24 Rule 9011(b)(1) through (3) and why I found the response to be

25 unpersuasive.

**BIROS_APPENDIX_0257**
**EXHIBIT F**

1          Most notably, the response offered no defense to the

2  assertion of the $144,000 administrative expense, other than

3  suggesting that Ms. Biros could have proven its reasonableness

4  had she been afforded an opportunity to submit a detailed

5  record.  The Court continued the order to show cause to allow

6  Ms. Biros and Attorney Bernstein to -- time to consider the

7  Court's comments and potentially seek reconsideration of the

8  Court's memorandum.  I note that no motion for reconsideration

9  was filed, nor was there any further response.  And, as noted,

10 Ms. Biros did file her amended motion for administrative

11 expense seeking $63,000, which was less than half of the

12 original request, and then she then proposed to settle the

13 claim for $18,000, which is roughly 12.5 percent of the

14 original request.  So, as indicated in the Court's order dated

15 January 30, 2023, at Docket Number 314, this was their last

16 change to appear in opposition to the order to show case.  So,

17 anything further that the parties wish to raise or address at

18 this point on that account?

19          MR. BERNSTEIN:  The Court can resolve this obviously

20 however it wants to.

21          THE COURT:  Okay.

22          MR. BERNSTEIN:  I think we've shown why what was

23 requested in the original admin motion was not completely

24 unreasonable, or impossible, or so out of line.  We've

25 attempted to provide the estate with a way to resolve the admin

BIROS_APPENDIX_0258
EXHIBIT F

49

1  claim at a reasonable number.  We have heard and taken to heart

2  the Court's comments about the way it proceeded.  Although, and

3  the fact that we did not file a motion for reconsideration or a

4  further response, frankly, we thought the filing -- we thought

5  our choices included filing an amended motion and that it

6  wasn't necessary to file a new response or a motion for

7  reconsideration and that it was open.  And, we have -- we've

8  previously apologized to the Court for taking an approach which

9  the Court found unreasonable, and we did what we thought was an

10 appropriate thing to do for our client under the circumstances.

11         As I said at the last hearing on this, Ms. Biros, on

12 this matter, followed our recommendations and did not have an

13 independent decision to file the motion the way it was filed.

14 We told her what we thought the appropriate thing to do is.

15 So, to the extent there is a sanction to be applied, it should

16 be us and not her.  And, frankly, we think that we've suffered

17 as a result of being in a position to receive that kind of

18 order from the Court and I think that's all I have to say, Your

19 Honor.

20         THE COURT:  Okay.

21         MR. BERNSTEIN:  Thank you.

22         THE COURT:  So, I mean, what I want to address though

23 is there's no effort at this point to establish any further

24 record, or offer anything else to suggest the reasonableness of

25 the $144,000?

BIROS_APPENDIX_0259
EXHIBIT F

50

1          MR. BERNSTEIN:  Other than the assertions in our

2    amended motion that explain the various values and methods of

3    computation, I have nothing -- nothing further to add today.

4          THE COURT:  Okay.  Thank you.  All right, well, I'm

5    not finding anything that dissuades me from the original

6    finding that there was a Rule 9011 issue with respect to the

7    original motion and that the $144,000 was unreasonable.

8    Certainly, appreciate the efforts to try to resolve this

9    through the amended motion.  I thought that was certainly well

10   crafted and well thought out and it doesn't go unnoticed from

11   the Court, the time and effort that went into that.  But, it

12   still leaves me with the factor that the original claim of

13   $144,000 was settled for 12.5 percent of that, which seems to

14   indicate again to me that the original amount was patently

15   unreasonably.

16          In terms of where we go from here, I am considerate

17   of the fact that Mr. Bernstein has indicated that Ms. Biros

18   followed the advice of counsel and, as a result, with taking

19   that advice, she is not blame worthy at this point with respect

20   to sanctions.  And, with respect to counsel, I do find that

21   this is a first offense and that the prior memorandum opinion

22   is a sufficient admonishment with respect to where we are with

23   respect to this matter, so I will conclude it there with that.

24          MR. BERNSTEIN:  Thank you, Your Honor.

25          THE COURT:  Going forward, we have the order to show

BIROS_APPENDIX_0260
EXHIBIT F

51

1  cause that was issued with respect to the stay violations.  I

2  had just continued this as a placeholder in the event that

3  there was anything else that had any bearing on those motions.

4  They were submitted, but to the extent that there was

5  additional discussion that had an impact on the Court's

6  findings or conclusions, I wanted to have the option open.

7       I'm not hearing anything today that would suggest

8  that I need to add new considerations to the mix, but before I

9  do close the door on that, I open it up one last time to the

10 parties if there's anything else they wish to address on any

11 other matters here?

12      MR. BERNSTEIN:  Nothing further from Ms. Biros, Your

13 Honor.

14      THE COURT:  All right, thank you.  Mr. Snyder?

15      MR. SNYDER:  Nothing further, Your Honor.

16      THE COURT:  All right.  Mr. Lacher?

17      MR. LACHER:  Nothing further, Your Honor.  Thank you.

18      THE COURT:  All right, thank you.  All right.  Well,

19 then that concludes the matters that are presently set before

20 the Court at this time.  I will enter an order just to recap

21 sustaining the objection to the claim of George Snyder.  I will

22 issue a scheduling order on the claim of Shanni Snyder.  I will

23 consider what I do with respect to the 9019 motion, and if it's

24 granted, the application for administrative expenses at 344

25 will be denied as moot.  If it's continued, then that motion at

**BIROS_APPENDIX_0261**
**EXHIBIT F**

52

1 344 will be continued and heard at the same time, and I have
2 addressed the show cause orders in the latter two with respect
3 to the stay motions are under advisement with the other show
4 cause having been resolved on the record for the reasons stated
5 here today.  And, with that, we will call it a day.

6          MR. BERNSTEIN:  Thank you, Your --

7          THE COURT:  The Court will now stand adjourned and we
8 will close the record.  Thank you, everyone.

9          MR. BERNSTEIN:  Thank you, Your Honor.

10         UNIDENTIFIED ATTORNEY:  Thank you.

11         UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

12         UNIDENTIFIED ATTORNEY:  Thanks, Your Honor.

13                        * * * * *

14                  **C E R T I F I C A T I O N**

15         I, WENDY ANTOSIEWICZ, court approved transcriber,
16 certify that the foregoing is a correct transcript from the
17 official electronic sound recording of the proceedings in the
18 above-entitled matter and to the best of my ability.

19

20 _/s/ Wendy Antosiewicz_
21 WENDY ANTOSIEIWICZ
22 J&J COURT TRANSCRIBERS, INC.   DATE:  April 24, 2023
23
24
25

**BIROS_APPENDIX_0262**
**EXHIBIT F**